IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ROBERT GENE REGA,               )
                Petitioner,      )          No. 2:13-cv-1781
                                 )
        v.                       )
                                 )
JOHN E. WETZEL, et al.,          )
                Respondents.     )

## OPINION

Joy Flowers Conti, Chief United States District Judge.

In June 2002, a jury convicted the petitioner, Robert Gene Rega ("Rega"), of first-degree murder, second-degree murder, robbery, burglary and related crimes in a criminal case in the Court of Common Pleas of Jefferson County, Pennsylvania. At the conclusion of the penalty phase of the trial, the jury determined that Rega should be sentenced to death on the first-degree murder conviction. He is serving an aggregate term of 39 ½ to 79 years on his other convictions in this case.[1]

Before this court is Rega's petition for a writ of habeas corpus (ECF No. 6), which he filed pursuant to 28 U.S.C. § 2254. He contends that he is entitled to a new trial or, at a minimum, a new sentencing hearing. For the reasons set forth below, the court grants his petition to the extent that Rega seeks a new sentencing hearing and denies it in all other respects. If the Commonwealth still seeks the death penalty for Rega, it must conduct a new capital sentencing hearing.

---

[1] The trial court originally imposed a term of life imprisonment on Rega's second-degree murder conviction. It subsequently granted a post-sentence motion filed by Rega to merge that life sentence with his sentence for first-degree murder. (ECF No. 48, Hr'g Tr., 4/5/05, at 93-94.)

# I.  Relevant Background[2]

On December 21, 2000, Christopher Lauth ("Lauth") was working at the Gateway Lodge as its night watchman. Commonwealth v. Rega, 933 A.2d 997, 1003 (Pa. 2007) ("Rega I"). Around 6:30 a.m. the following morning, another employee discovered his body in a hallway leading to the kitchen area. Id. at 1005. Lauth had been shot three times in the head and back. Id. at 1009. The Gateway Lodge's "office and kitchen were in total disarray, with papers everywhere and tables overturned. The ATM had bullet holes in it." Id. at 1005. Its safe, which had been located in an office near the kitchen and contained approximately $18,000, was missing. Id. Lauth's murder and the other crimes that occurred at the Gateway Lodge that evening are referred to collectively as the "Gateway Lodge crimes."

Because the safe was too heavy for a single person to have moved it, the police suspected that there was more than one individual involved in the Gateway Lodge crimes. Id. The circumstances also indicated that at least one of the perpetrators knew the layout of the premises, and based upon those circumstances, the police obtained the Gateway Lodge employment records in order to interview its current and former employees. Id. (See also ECF No. 30, Trial Tr., 6/14/02, at 173.) Rega and his friend, Shawn Bair ("Bair"), used to work at the Gateway Lodge, and a police investigator first spoke with them on December 22, 2000. Id. at 1016-17. They denied any involvement in, or knowledge of, the Gateway Lodge crimes. Id. (See also ECF No. 30, Trial Tr., 6/14/02, at 174-75.)

In Rega's subsequent interviews with the police in early January 2001, he continued to maintain that he was not involved in the Gateway Lodge crimes. Id. at 1006. Bair's adherence to his initial statement quickly faltered and he soon gave statements to the police in which he

---

[2] The Commonwealth submitted the original state court record. Following the issuance of this opinion and the final order, the court will enter onto the ECF docket those documents cited herein that the parties did not file electronically.

admitted that he, Rega, and Stanford Jones ("Stan") robbed the Gateway Lodge. Id. Stan admitted his involvement, and implicated Raymond Fishel ("Fishel"), who confessed too. Id. Eventually, Bair, Stan, and Fishel all told the police that Rega was the shooter. Id.

The police arrested Rega, Bair, Stan, and Fishel and charged each of them with criminal homicide, robbery, burglary, criminal conspiracy, and related crimes. Rega, unlike his co-defendants, continued to maintain his innocence. On January 10, 2001, he gave the lead investigator, Trooper Louis Davis ("Trooper Davis"), a statement in which he revealed a "tremendous amount of detail about the homicide and the events surrounding it, but asserted that his role was limited to assisting Bair and Stan after the fact." Id. at 1006-07. Rega said that he knew what happened because Bair, Stan, and Stan's wife, Susan Jones ("Susan"), planned the robbery when they were at Rega's mobile home. Id. He told Trooper Davis that he refused to join them and that they retrieved Fishel from a nearby bar and Fishel agreed to go with them. Rega said that the group came back to his mobile home after they had committed the Gateway Lodge crimes. They shared with him the money from the safe, he said, because he let them use his grinder to open it. Id. He also "described where the gun could be found, which he described in detail, and where the two-way radios were." Id. at 1007.

Rega's six-day jury trial for the Gateway Lodge crimes commenced on Friday, June 14, 2002.[3] Michael K. English, Esq. ("English") and Ronald T. Elliott, Esq. ("Elliott") (collectively, "trial counsel," or "defense counsel"), represented him.

Bair, Fishel, and Susan were key witnesses for the Commonwealth. It did not call Stan to testify for reasons discussed below. English gave the defense's opening statement and he argued

---

[3] "On December 20, 2000, the day before the Lauth murder, [Rega], Bair, Stan and Susan went to Morgan Jones's residence to steal a gun with which to commit robberies." Rega I, 933 A.2d at 1019. Rega distracted Morgan Jones "while Bair stole the gun[.]" Id. Rega was charged with theft of that handgun, and the criminal case for that theft was consolidated with Rega's June 2002 trial for the Gateway Lodge crimes. Id. The jury convicted him of theft by receiving stolen property for his role in stealing Morgan Jones's gun. (ECF No. 35, Trial Tr., 6/20/02, at 300-01.)

to the jury that Bair's, Fishel's, and Susan's testimony should not be credited because "they're liars…. I'm not asking you to take my word for it. Take their word for it. They're up here…trying to save their own skins. They're up here because they know they're in trouble too." (ECF No. 30, Trial Tr., 6/14/02, at 56-57.) They lied about "big stuff," English said, and "even lied about the little things." (<u>Id.</u> at 58.) English explained that "they've admitted their involvement" and he asserted that they are "looking for consideration" in exchange for their testimony. (<u>Id.</u> at 60.)

The prosecution's theory was that Rega was the leader of the group that committed the Gateway Lodge crimes. <u>Rega I</u>, 933 A.2d at 1003-07. It introduced evidence to establish that Bair, Fishel, Stan and Rega drove to the lodge together in Stan's car, which was easily identifiable because it was in a dilapidated condition.[4] They "intended that during the robbery, nobody would get hurt." <u>Id.</u> at 1003. They assumed that Lauth would be inside the lodge when they arrived and that he would not be able to recognize them because their faces would be masked. Their plan was to enter the lodge, overtake Lauth, and force him to call the assistant innkeeper who resided on the premises, Ann Lipford ("Lipford"). They intended to steal the lodge's safe and the money in the ATM machine and "place Lipford and Lauth inside the kitchen's walk-in freezer with a sign indicating they were in there." <u>Id.</u>

The Pennsylvania Supreme Court explained in <u>Rega I</u> that "from the moment they arrived at the Gateway Lodge the plan went awry." <u>Id.</u> at 1004.[5] The prosecution introduced evidence at the trial to establish:

> [u]pon driving to the parking area, the group noticed that Lauth was not inside as expected, but outside, and, in fact, had watched them drive up, park, and turn off the lights. Because Stan's car was so distinctive and Lauth had watched them pull into the parking lot, the group immediately began to panic. [Rega] decided that

---

[4] Susan did not go with them. She stayed at Rega's mobile home with his young daughters. <u>Rega I</u>, 933 A.2d at 1004.

[5] In <u>Rega I</u>, the Pennsylvania Supreme Court spelled Fishel's name as "Fishell." The misspelling is corrected in the quotation so that the spelling of his name is consistent throughout this opinion.

everyone should jump out of the car at the same time, because Lauth was approaching the car. All four doors opened at once, and everyone jumped out. Bair walked around the car and got into the driver's seat. [Rega], with his gun drawn, Stan and Fishel approached Lauth and took him into the kitchen of the Gateway Lodge. Bair stayed behind in the car, with a two-way radio to keep in contact with [Rega].

Once they had Lauth in the building, Fishel held Lauth at knifepoint while they directed him to call Ann Lipford…as planned…. Lipford did not answer. Instead, Lauth reached her answering machine, and his voice was captured on her answering machine at 1:48 a.m. [Rega] then used the two-way radio to ask Bair whether he saw Lipford's car in the parking lot. Bair looked around, and informed [Rega] that he did not see her car. Realizing that she was not home, the group gained entry to her apartment and ransacked it, apparently looking for the key to the ATM.

The group proceeded to the room where the safe was kept. After locating it under a desk, Stan and Fishel began to move it while [Rega] held Lauth at gunpoint. [Rega] radioed Bair to tell him to pull Stan's Buick up so they could load the safe into it. As Fishel and Stan carried the safe to the car, [Rega] fired several shots at the ATM in an unsuccessful attempt to break into it. The group also cut various wires in the office because they were concerned about police being notified somehow.

After failing to gain entry to the ATM and then cutting the wires in the office, [Rega] moved Lauth into the kitchen at gunpoint. Fishel and Stan joined [Rega] and Lauth. Upon Fishel and Stan's appearance in the kitchen, [Rega] hit Lauth with his flashlight and then handed it to Fishel, instructing him to hit the victim. Fishel hit Lauth one time. [Rega] then fired the gun at the freezer door in an attempt to open it. To escape any potential ricochet, Fishel returned to the car. At the same time, Stan found Lauth's vehicle in the parking lot and drove it over the hillside down an embankment, and then he returned to the car. Bair was still in the car, acting as a lookout. While Stan, Fishel, and Bair waited in the car, they heard a gunshot, a scream, a gurgling sound, and then another couple of gun shots. [Rega] ran out of the building, got into the car, and directed Bair to drive.

While in the car, [Rega] asked Stan whether he thought [Rega] did the right thing. Stan indicated that he did. On the way back to [Rega's] trailer, [Rega] stated "I think I killed him." After arriving at [Rega's] trailer, they used a grinder to open the safe. The group, along with Susan, separated the items from the safe and split the money four ways, about $ 5000 each. [Rega] then instructed the group to put all credit cards and papers they found in the safe back into it, and took it to the car. They stuffed a kerosene soaked blanket into the safe, lit it on fire, and dumped it down an embankment. They then drove Fishel to his house. The group, minus Fishel, returned to Rega's trailer, where Bair stayed for the night. Stan and his wife returned to their own home. Before Stan and Susan left, [Rega] handed them a bullet and told them it would be for them if they opened their mouths. Later in the day on December 22, 2000, [Rega] gave his gun, wrapped inside a bag, to Stan. Stan put the wrapped gun in his car, drove away with his wife Susan, and threw the gun into a creek.

Id. at 1004-05 (footnotes omitted).

Bair and Fishel both testified that Rega was the one that shot and killed Lauth. (ECF No. 33 at 135-36, Trial Tr., 6/18/02, at 136-37; ECF No. 34, Trial Tr., 6/19/02, at 5.) Each acknowledged that he faced very serious charges because of his involvement in the Gateway Lodge crimes. (Id. at 135, 217, Trial Tr., 6/18/02 at 136, 218; ECF No. 34, Trial Tr., 6/19/02, at 5.) Each admitted that he lied to the police about various matters during the course of the investigation because he was scared or trying to protect themselves or others. (Id. at 169-74, Trial Tr., 6/18/02, at 170-75, 193-218; ECF No. 34, Trial Tr., 6/19/02, at 25.) Each testified that the Commonwealth did not make any promise to him in exchange for his testimony. (Id. at 135, 172, Trial Tr., 6/18/02, at 136, 173; ECF No. 34, Trial Tr., 6/19/02, at 5.)

Susan testified that a few days after Lauth's murder, she had a conversation with Rega about what happened at the Gateway Lodge. (ECF No. 31, Trial Tr., 6/15/02, at 192-93.) During that conversation, she asked Rega why he killed Lauth and "[h]e said he had to do what he had to do" because Lauth might have recognized one or more of them. (Id. at 193.) Like Bair and Fishel, Susan stated that district attorney did not make any promises to her in exchange for her testimony. (Id. at 209, 249.) She admitted she had charges pending against her on the Jefferson County trial list. (Id. at 155.) She also testified that she had not yet been charged with any crime for her involvement in the Gateway Lodge crimes, but that Trooper Davis told her that she probably would be because she had admitted that she handled the money stolen from the lodge. (Id. at 209, 249-50; see id. at 239-40 (Susan admits on cross-examination that she received stolen property.)). She said that she was worried that charges would be filed against her for that conduct. (Id. at 249.) Susan admitted that she lied when the police first interviewed her. (Id. at 192, 214-17.) She said she did so because she "was scared of going to jail and losing my children[,]" and was trying to protect her husband, Stan, at that time. (Id. at 192.)

In addition to the testimony provided by Bair, Fishel, and Susan, the prosecution introduced evidence to establish that Rega, who was lacking cash before the Gateway Lodge crimes, spent a considerable amount of money right after the crimes were committed. Rega I, 933 A.2d at 1006-08. "His purchases after the robbery included $540 towards a bill at a music store, $540 for a car stereo, $162 for car tires, $258 for a ring for his wife, $400 for toys for his children[,]" id, at 1007-08, a car for $1,750, and a new paint job for it that cost $650. Id. at 1006. The Commonwealth also produced evidence that Rega and Bair stole the weapon that Rega later used to kill Lauth from a gun dealer, Morgan Jones, and that Rega bought bullets for that gun at a local Walmart. Id. at 1004 n.2, 1019.

The Commonwealth introduced evidence of Rega's consciousness of guilt; specifically, that Rega attempted to tamper with his jury by planting someone on it favorable to him, and that he also persuaded his friend, Michael Sharp ("Sharp"), to lie to the police and provide him with a false alibi. Id. at 1006-07. Sharp testified that he initially told the police that he was with Rega at his mobile home the night of the Gateway Lodge crimes. Id. "[H]owever, Sharp was unable to keep his story straight, and eventually confessed that [Rega] had asked him to provide an alibi and that he had not, in fact, been with Rega on December 21, 2000." Id. at 1006. Sharp admitted that he faced charges because he lied to the police and that those charges were pending against him. (ECF No. 31, Trial Tr., 6/15/02, at 261.)

After the Commonwealth rested its case-in-chief, the defense called Stan to testify. Stan admitted that he wrote a letter, which the district attorney received on June 26, 2001, in which he confessed to shooting Lauth. (ECF No. 35, Trial Tr., 6/20/02, at 7-9.)[6] In his letter, Stan wrote that Rega, Bair, and Fishel "were all innocent[,]" and that his wife, Susan, "knew everything that

_____

[6] The district attorney provided English with a copy of Stan's letter on June 28, 2001. (6/28/01 letter, ECF No. 10-2 at 1.)

happened" and that is was she who disposed of the murder weapon. (6/26/01 letter, ECF No. 10-2 at 2.) Stan wrote another letter to the district attorney a little less than one month later, on July 19, 2001, in which he retracted his confession and identified Rega as the shooter. (7/19/01 letter, ECF No. 10-1 at 4-5.)

During his examination by the district attorney, Stan testified that he wrote the first letter because he and Susan hated each other by that point in time and he wanted to implicate her in the Gateway Lodge crimes so that she would go to prison too and his mother would have custody of their children.[7] (ECF No. 35, Trial Tr., 6/20/02, at 14-15, 20.) Like Bair and Fishel, Stan testified that Rega was the one that shot Lauth. (Id. at 19-20.)

In order to rebut the prosecution's suggestion that Rega needed money in December 2000 because he wanted to buy Christmas presents for his daughters, the defense called Rega's estranged wife, Renee Rega ("Renee"). She testified that she was paying Rega child support in December 2000 and that it was she, and not Rega, who purchased all the Christmas presents for their daughters that year. (Id. at 67-70.) Renee denied that Rega bought her a ring at the beginning of 2001. (Id. at 70.) Another witness, Ronald Wilson, testified that he purchased a trailer from Rega and that he paid Rega $150.00 per month. (Id. at 78-81.) Rega's sister, Janet Rega ("Janet"), testified that in August and September 2000, she loaned Rega $6,500.00 in cash. (Id. at 116-17.) She testified that in January 2001, she was at Rega's home when Stan and Susan were present. (Id. at 117.) Janet said that Stan told her that Fishel, not Rega, shot Lauth. (Id. at 118-19.)

Elliot, who gave the defense's summation, argued that the Commonwealth did not meet its burden of showing that Rega was guilty of the crimes charged beyond a reasonable doubt.

---

[7] The district attorney asked Stan: "isn't it true that I told you when you pull shenanigans like that I can't put you on as a witness?" (ECF No. 35, Trial Tr., 6/20/02, at 40.) Stan replied: "Yes." (Id.)

"There are at least four reasonable doubts in this case[,]" Elliott stated, they are "Susan Jones, Stan Jones, Shawn Bair and Raymond Fishel." (<u>Id.</u> at 145.) He pointed out that Stan and Susan, who were married to each other at the time the Gateway Lodge crimes were committed, had a motive to lie to protect each other, as did Bair and Fishel, who were best friends. (<u>Id.</u> at 171.) Rega was "the odd man out," Elliott argued, and that is why his accomplices all turned on him. (<u>Id.</u>) Elliot discussed the special rules that the jury must apply when evaluating an accomplice's testimony,[8] (<u>id.</u> at 150-55), and he explained that the trial court would instruct it that an accomplice "may testify falsely in the hope of obtaining favorable treatment or for some corrupt or wicked motive." (<u>Id.</u> at 152-53.)

Elliot focused the jury on admissions of each of Rega's co-defendants that they were involved in the Gateway Lodge crimes and that they repeatedly lied to the police during the investigation. He utilized poster boards displayed on an easel to highlight the inconsistent statements that Bair, Fishel, Susan, and Stan gave to the police and he argued to the jury that it should not credit any of the testimony they gave. (<u>Id.</u> at 155-71.) Rega, Elliott reminded the jury, was the only one who consistently maintained his innocence. (<u>Id.</u> at 147-48.) Elliot urged the jury not to convict Rega "for the actions of Stan Jones, Shawn Bair and Ray Fishel[,]" (<u>id.</u> at 146), and pointed out that each of them, and Susan, had motive to curry favor with the Commonwealth:

> [E]ach one wants to please the Commonwealth with the testimony that they have offered today. When the time comes these defendants are obviously thinking I want the Commonwealth to give me a favorable plea agreement or treat me in an otherwise favorable way. The witnesses were obviously thinking two things; I can please the Commonwealth by offering this testimony, but I can also implicate and

---

[8] Susan was considered, along with Bair, Fishel, and Stan, to be an accomplice. <u>Rega I</u>, 933 A.2d at 1014. "The trial court did not consider Sharp to be an accomplice, and therefore did not instruct the jury that Sharp was a corrupt and polluted source whose testimony should be viewed with caution." <u>Id.</u> at 1008. In his direct appeal, Rega argued that that was an error. The Pennsylvania Supreme Court disagreed and denied that claim. <u>Id.</u> at 1014-16.

put the blame for these events on Robert Rega. They have an obvious interest in this case, and to suggest otherwise I suggest to you is absurd.

(Id. at 151; see id. at 157 (regarding Susan, "[w]hile it may be true that she wanted to protect her husband in this case, I also suggest to you that she wanted to curry favor with the Commonwealth.")). Elliott concluded by asking the jury not to convict Rega "on the word of people who only know how to lie, who sometimes do not know why they lie and who cannot be believed to any degree whatsoever." (Id. at 174.)

In his closing argument, the district attorney conceded that Bair, Fishel, and Stan had all lied to the police during the course of the investigation and were unsavory individuals (id. at 180), but emphasized to the jury that:

> [t]hey were there. They were in. They saw this. And you know what? They have admitted things that would forever alter their lives. Forever. Forever. You heard me ask them, each and every one of you have admitted serious, serious crimes, haven't you? And they all knew they have. They all knew they have. And not a single one of them took the stand up here with a promise from the Commonwealth. They admitted serious crimes in front of you. Serious crimes. That cannot be discounted…. [Rega] picked his accomplices, not us. We are just asking you, ladies and gentlemen, to take the evidence where it leads you…. Can there be any doubt in your minds whatsoever after having seen those three take the stand that the intellectual superiority [sic] of that group was Mr. Rega[?] Ladies and gentlemen, Shawn Bair was not capable of forming this plan. Ray Fishel was not capable of forming a plan. Stanford Jones, you saw what he tried to do. Good grief, he tried to convince me by sending me a letter that he committed the whole robbery all by himself. He tried to tell me that. Ladies and gentlemen, this was a group that could easily be controlled by Robert Rega.

(Id. at 181-82.) The district attorney acknowledged that Susan had lied to the police too, and he argued:

> Susan Jones points the finger at Robert Rega, too…. Susan Jones wasn't even at the Gateway Lodge that night. Susan Jones is not guilty of second degree murder. She's not even close to being guilty of second degree murder. Her involvement in the Gateway Lodge homicide was simply that she was at home babysitting Robert Rega's kids. She can't stand her husband [Stan], so why would she protect him? You have heard that from her and you have heard that from him. They don't like each other. That is abundantly clear. So why did she point the finger at Robert Rega?

(<u>Id.</u> at 184.)

In its final jury charge, the trial court instructed on the special rules that apply to evaluating accomplice testimony. (<u>Id.</u> at 232-34.) Before setting forth those special rules, it stated:

> When a Commonwealth witness was so involved in the crime charged that he was an accomplice his testimony has to be judged by special precautionary rules. Experience shows that an accomplice when caught will often try to place blame falsely on someone else. He or she may testify falsely in hope of obtaining favorable treatment or for some corrupt or wicked motive. On the other hand, an accomplice may be a perfectly truthful witness. The special rules I shall give you are meant to help you distinguish between truthful or false accomplice testimony. In view of the evidence of Bair's, Fishel's, Stanford Jones's, Susan Jones's criminal involvement you must regard them as accomplices in the crimes charged and apply special rules to all of their testimony.

(<u>Id.</u> at 232-33.)

On June 20, 2002, the jury convicted Rega of criminal conspiracy to commit robbery, burglary, unlawful restraint, and theft, first-degree murder, second-degree murder, robbery, burglary, theft by unlawful taking or disposition, aggravated assault, criminal mischief, and unlawful restraint. (<u>Id.</u> at 300-01.) Rega's one-day penalty hearing was held the next day. (ECF No. 36, Sent. Hr'g Tr., 6/21/02.) At the conclusion of it, the jury fixed the punishment at death for the first-degree murder conviction.

In May 2003, Rega was tried on unrelated rape and sexual assault charges. The jury in that case convicted Rega of fifty-one counts, including rape, statutory sexual assault, indecent sexual assault, involuntary deviate sexual intercourse, indecent assault, and selling or furnishing liquor to minors. Susan testified as a prosecution witness in that case too.

In post-sentence proceedings and on direct appeal, Rega was represented by Clifford Schenkemeyer, Jr., Esq. ("Shenkemeyer") and Robbie Taylor, Esq. ("Taylor") (collectively, "appellate counsel"). In his post-sentence motion, Rega raised numerous claims that his trial

attorneys provided him with ineffective assistance in violation of his rights under the Sixth Amendment. In relevant part, Rega claimed that they were ineffective for failing to investigate and present available mitigating evidence at his sentencing hearing. The trial court presided over evidentiary hearings on April 4, 2005 (ECF No. 47) and April 5, 2005 (ECF No. 48.)

On January 13, 2006, the trial court denied Rega's post-sentence motions. (ECF No. 10 at 1-66, Commonwealth v. Rega, CP-33-CR-26 & 524-2001, slip op. (C.P. Jefferson Jan. 13, 2006) ("Post-Sent. Op.")). Appellate counsel filed an appeal with the Pennsylvania Supreme Court. On October 17, 2007, the supreme court issued its decision (Rega I) in which it affirmed Rega's convictions and his sentence of death. The United States Supreme Court denied Rega's writ of certiorari on April 14, 2008. Rega v. Pennsylvania, 552 U.S. 1316 (2008).

Later that same year, Rega filed a *pro se* petition for collateral relief (ECF No. 51) pursuant to Pennsylvania's Post-Conviction Relief Act ("PCRA"). On January 26, 2009, new counsel filed an amended PCRA petition (ECF No. 10-27), which was later amended and supplemented. (ECF No. 10-28 at 1-37, 73-96, 100-32).

In his PCRA proceeding, Rega raised the same claims that are now before this court in his federal habeas petition. The PCRA court conducted evidentiary hearings on December 14, 2009 (ECF No. 54), December 15, 2009 (ECF No. 55), December 17, 2009 (ECF No. 56), December 18, 2009 (ECF No. 57), January 18, 2010 (ECF No. 58), January 19, 2010 (ECF No. 59), January 21, 2009 (ECF No. 60), January 22, 2010 (ECF No. 61), May 21, 2010 (ECF Nos. 62, 71, 72), and October 20, 2011 (ECF No. 63). On October 27, 2011, it issued a decision and order in which it denied all of Rega's claims for relief. (ECF No. 10-1, Commonwealth v. Rega, CP-33-CR-26 & 524-2001, slip op. (CP Jefferson Co. Oct. 27, 2011) ("PCRA Ct. Op.")). Rega filed an appeal with the Pennsylvania Supreme Court, which affirmed the PCRA court's decision. Commonwealth v. Rega, 70 A.3d 777 (Pa. 2013) ("Rega II").

After the Pennsylvania Supreme Court denied his PCRA claims, Rega filed his federal habeas petition. (ECF No. 6). Thereafter, he filed his brief in support (ECF No. 22), the Commonwealth[9] filed its answer (ECF No. 29), Rega filed a reply (ECF No. 75), and the Commonwealth filed a sur-reply (ECF No. 77).

## II. Jurisdiction and Standards of Review

This court has jurisdiction under 28 U.S.C. §§ 2241 and 2254. Section 2254 is the federal habeas statute applicable to state prisoners and it permits a federal court to entertain an application for habeas corpus relief from a state prisoner, in relevant part, "only on the ground that he or she is in custody in violation of the Constitution…of the United States." 28 U.S.C. § 2254(a). It is Rega's burden to prove that he is entitled to the writ. Id.; see, e.g., Vickers v. Superintendent Graterford SCI, 858 F.3d 841, 848-49 (3d Cir. 2017), petition for cert. denied, — S.Ct. — , 2018 WL 311655 (Jan. 8, 2018). There are other prerequisites that he must satisfy before he can receive habeas relief (most relevant here is the burden imposed upon him by the standard of review set forth at 28 U.S.C. § 2254(d) (discussed below)), but ultimately Rega cannot receive federal habeas relief unless he demonstrated that he is in custody in violation of the federal constitution.

In 1996, Congress made significant amendments to § 2254 with the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214. AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002) (citing Williams v. Taylor, 529 U.S. 362, 403-04 (2000)). It reflects the view that habeas corpus is a

---

[9] Going forward, the court also refers to the respondents, who are Rega's custodians, as the "Commonwealth."

"'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." <u>Harrington v. Richter</u>, 562 U.S. 86, 102-03 (2011) (quoting <u>Jackson v. Virginia</u>, 443 U.S. 307, 332, n.5 (1979) (Stevens, J., concurring in judgment)).

## A. Deference To the State Court's Findings Of Facts Under 28 U.S.C. § 2254(e)(1)

A finding of fact made by a state court has always been afforded considerable deference in a federal habeas proceeding. AEDPA continued that deference and mandates that "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). Rega has the "burden of rebutting the presumption of correctness by clear and convincing evidence." <u>Id.</u>

## B. Standard of Review When the State Court Adjudicated a Claim On the Merits

AEDPA also put into place a new standard of review, which is codified at 28 U.S.C. § 2254(d). It applies "to any claim that was adjudicated on the merits" by the state court, § 2254(d), and it prohibits a federal habeas court from granting relief unless the petitioner established that the state court's "adjudication of the claim":

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

### 1. Application of 2254(d)(1)

#### a) "Clearly established Federal law"

The standard of review set forth at § 2254(d)(1) applies to questions of law and mixed questions of law and fact. In applying it, this court's first task is to ascertain what law falls within

the scope of the "clearly established Federal law, as determined by the Supreme Court of the United States[,]" 28 U.S.C. § 2254(d)(1). Importantly, "'clearly established federal law' means 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'" Dennis v. Sec'y, Pennsylvania Dep't of Corr., 834 F.3d 263, 280 (2016) (en banc) (quoting Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003)). It "includes only 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions.'" White v. Woodall, 134 S.Ct. 1697, 1702 (2014) (quoting Howes v. Fields, 565 U.S. 499, 505 (2012), which quoted Williams, 529 U.S. at 412). The Supreme Court "has repeatedly emphasized" that "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court'" under § 2254(d)(1). Glebe v. Frost, 135 S.Ct. 429, 431 (2014) (per curiam) (citing Lopez v. Smith, 135 S.Ct. 1, 4-5 (2014) (per curiam)). See, e.g. Renico v. Lett, 559 U.S. 766, 779 (2010) (state court's failure to apply decision by federal circuit court "cannot independently authorize habeas relief under AEDPA.") Thus, this court is restricted under § 2254(d)(1) to evaluate the state court's decision in light of United States Supreme Court precedent. Additionally, "[c]ircuit precedent cannot 'refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme] Court has not announced.'" Lopez, 135 S.Ct. at 4 (quoting Marshall v. Rodgers, 133 S.Ct. 1446, 1451 (2013) (per curiam)).

**b) The "contrary to" clause**

Once the "clearly established Federal law" is ascertained, this court must determine, if Rega makes this argument, whether the Pennsylvania Supreme Court's adjudication of the claim at issue was "contrary to" that law. Williams, 529 U.S. at 404-05 (§ 2254(d)(1)'s "contrary to" and "unreasonable application of" clauses have independent meaning). A state-court adjudication is "contrary to…clearly established Federal law[,]" § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," Williams, 529 U.S. at

405, or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent," id. at 406.[10] A "run-of-the-mill" state-court decision applying the correct legal rule from Supreme Court decisions to the facts of a particular case does not fit within § 2254(d)(1)'s "contrary to" clause and will be reviewed under the "unreasonable application" clause. Id.

### c) The "unreasonable application of" clause

If the Pennsylvania Supreme Court's decision was not "contrary to…clearly established Federal law," then the court next considers whether Rega demonstrated that the state court's decision to deny his claim was an "unreasonable application of[,]" 28 U.S.C. § 2254(d)(1), that law. "A state court decision is an 'unreasonable application of federal law' if the state court 'identifies the correct governing legal principle,' but 'unreasonably applies that principle to the facts of the prisoner's case.'" Dennis, 834 F.3d at 281 (quoting Williams, 529 U.S. at 413). To satisfy his burden here, Rega must do more than convince this court that the state court's decision was incorrect. Id. He must show that it "'was *objectively* unreasonable.'" Id. (quoting Williams, 529 U.S. at 509 (emphasis added by court of appeals). Importantly, this means that Rega must demonstrate that the Pennsylvania Supreme Court's decision "*was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement*." Richter, 562 U.S. at 103 (emphasis added).

It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. See Lockyer, supra, at 75, 123 S.Ct. 1166.

---

[10] A state court adjudication is not "contrary to…clearly established Federal law[,]" 28 U.S.C. § 2254(d)(1), merely because it does not cite Supreme Court authority. In fact, the state court "does not even require awareness of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam); see Bell v. Cone, 543 U.S. 447, 455 (2005) (per curiam) ("Federal courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation.").

If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings. Cf. Felker v. Turpin, 518 U.S. 651, 664, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no further.

Id. at 102.

Finally, the court is mindful that:

[w]hile a determination that a state court's analysis is contrary to or an unreasonable application of clearly established federal law is necessary to grant habeas relief, it is not alone sufficient. That is because, despite applying an improper analysis, the state court still may have reached the correct result, and a federal court can only grant the Great Writ if it is "firmly convinced that a federal constitutional right has been violated," Williams, 529 U.S. at 389, 120 S.Ct. 1495. See also Horn v. Banks, 536 U.S. 266, 272, 122 S.Ct. 2147, 153 L.Ed.2d 301 (2002) ("[w]hile it is of course a necessary prerequisite to federal habeas relief that a prisoner satisfy the AEDPA standard of review...none of our post-AEDPA cases have suggested that a writ of habeas corpus should automatically issue if a prisoner satisfies the AEDPA standard"). Thus, when a federal court reviewing a habeas petition concludes that the state court analyzed the petitioner's claim in a manner that contravenes clearly established federal law, it then must proceed to review the merits of the claim de novo to evaluate if a constitutional violation occurred. See Lafler v. Cooper, 566 U.S. 156, 174, 132 S.Ct. 1376, 182 L.Ed.2d 398 (2012).

Vickers, 858 F.3d at 848-49 (footnote omitted); see Dennis, 834 F.3d at 283-84.

## 2. Application of § 2254(d)(2)

The standard of review set forth at § 2254(d)(2) applies when Rega "challenges the factual basis for" the Pennsylvania Supreme Court's "decision rejecting a claim," Burt v. Titlow, 134 S.Ct. 10, 15 (2013), and, as set forth above, it requires that he prove that its adjudication was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). "[A] state court decision is based on an 'unreasonable determination of the facts' if the state court's factual findings are 'objectively unreasonable in light of the evidence presented in the state-court proceeding,' which requires

review of whether there was sufficient evidence to support the state court's factual findings." Dennis, 834 F.3d at 281 (quoting § 2254(d)(2) and citing Miller-El v. Cockrell, 537 U.S. 322, 340 (2003)). "'[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" Titlow, 134 S.Ct. at 15 (quoting Wood v. Allen, 558 U.S. 290, 301 (2010)); see Rice v. Collins, 546 U.S. 333, 342 (2006) (reversing court of appeals's decision because "[t]he panel majority's attempt to use a set of debatable inferences to set aside the conclusion reached by the state court does not satisfy AEDPA's requirements for granting a writ of habeas corpus."). Thus, "if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede'" the state court's adjudication. Wood, 558 U.S at 301 (quoting Collins, 546 U.S. at 341-42). "[H]owever, '[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review,' and 'does not by definition preclude relief.'" Brumfield v. Cain, 135 S.Ct. 2269, 2277 (2015) (quoting Miller-El, 537 U.S. at 340); see Dennis, 834 F.3d at 281.

Since AEDPA's enactment, federal courts have debated how to harmonize §§ 2254(d)(2) and (e)(1). They "express the same fundamental principle of deference to state court findings[,]" and federal habeas courts "have tended to lump the two provisions together as generally indicative of the deference AEDPA requires of state court factual determinations." Lambert v. Blackwell, 387 F.3d 210, 235 (3d Cir. 2004). The Supreme Court has not yet "defined the precise relationship between" these two provisions of the federal habeas statute. Titlow, 134 S.Ct. at 15. In Lambert, the Court of Appeals for the Third Circuit instructed that § 2254(d)(2), when it applies, provides the "overarching standard" that a petitioner must overcome to receive habeas relief. 387 F.3d at 235. Section 2254(e)(1) applies to "specific factual determinations that were made by the state court, and that are subsidiary to the ultimate decision." Id. The court of appeals

declined to adopt a "rigid approach to habeas review of state fact-finding" id. at 236 n.19, and instead provided the following guidance:

> In some circumstances, a federal court may wish to consider subsidiary challenges to individual fact-finding in the first instance applying the presumption of correctness as instructed by (e)(1). Then, after deciding these challenges, the court will view the record under (d)(2) in light of its subsidiary decisions on the individual challenges. In other instances, a federal court could conclude that even if petitioner prevailed on all of his individual factual challenges notwithstanding the (e)(1) presumption of their correctness, the remaining record might still uphold the state court's decision under the overarching standard of (d)(2). In that event, presumably the (d)(2) inquiry would come first.

Id.

### III. Guilt-Phase Claims

#### A. **Brady** Claims

In Claims 1, 2, and 3, Rega contends that his convictions were obtained in contravention of his constitutional rights because the Commonwealth violated the rule of Brady v. Maryland, 373 U.S. 83 (1963). A Brady violation occurs when the government: (1) knowingly presents or fails to correct false testimony; (2) fails to provide requested exculpatory evidence; or, (3) fails to volunteer exculpatory evidence never requested. Haskell v. Superintendent Greene SCI, 866 F.3d 139, 149 (3d Cir. 2017) (citing United States v. Agurs, 427 U.S. 97 (1976), holding modified by Unites States v. Bagley, 473 U.S. 667 (1985)).

In what the court will refer to as Claim 1(a), Rega asserts that the Commonwealth withheld evidence that it had reached agreements with, or had made promises to, Bair, Fishel, Susan, and Sharp that the Brady rule requires be disclosed. In what the court will refer to as Claim 1(b), Rega contends that the Commonwealth withheld information about Susan's memory impairment. In Claim 2, Rega contends that the prosecution committed additional Brady violations because Bair, Fishel, and Susan testified falsely at trial that no promises had been made to them. In Claim 3, Rega contends that if he is not entitled to habeas relief on any

individual <u>Brady</u> claim, he is entitled to it because of the "cumulative prejudice" he incurred as a result of the suppress-evidence and false-testimony violations.

Rega raised his <u>Brady</u> claims in his PCRA proceeding and a substantial portion of the evidentiary hearings held before the PCRA court dealt with the allegations he made in them.[11] Susan and Fishel testified at the PCRA hearings. So did the following attorneys, who represented the witness named in the parentheses following his name: (1) Timothy Morris, Esq. ("Morris") (Susan); (2) Mark Wheeler, Esq. ("Wheeler") (Fishel); (5) John Ingros, Esq. ("Ingros") (Bair); (3) Fred Hummel, Esq. ("Hummel") (Bair); (4) David Inzana, Esq. ("Inzana") (Sharp); and (5) Matthew Taladay, Esq. ("Taladay") (Stan). Trooper Davis also gave relevant testimony, as did Rega's trial attorneys, English and Elliott.

To prove his suppressed-evidence <u>Brady</u> claims (Claims 1(a) and 1(b)), Rega had to demonstrate to the state court that: (1) the evidence at issue was favorable to the defense, either because it was exculpatory or because it was impeaching; (2) the Commonwealth suppressed the evidence; and (3) the evidence was material. <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999). To prevail on his false-testimony claim (Claim 2), Rega had to demonstrate to the state court that: (1) the witness at issue committed perjury; (2) the Commonwealth knew or should have known that the witness's testimony was false and did not correct it; and (3) "'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" <u>Haskell</u>, 866 F.3d at 146 (quoting <u>Agurs</u>, 427 U.S. at 103); <u>see</u> <u>id.</u> at 146; <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972); <u>Napue v. Illinois</u>, 360 U.S. 264, 271 (1959).

---

[11] Rega sought discovery on his <u>Brady</u> claims in this federal habeas proceeding. He did not demonstrate that he was entitled to the requested discovery and the court denied his motion. (ECF Nos. 20 and 21.)

# Claim 1(a) and Claim 2

## Background

Because the allegations that Rega makes in Claim 1(a) and Claim 2 are related, the court addresses them together, as did the state courts. The PCRA court made numerous findings of fact when it evaluated and rejected these claims. It determined that, prior to Rega's trial, there were no agreements, express or tacit, between the Commonwealth and any of the witnesses at issue. (PCRA Ct. Op., ECF 10-1 at 19-25.) The PCRA court rejected Rega's contention that the district attorney was negotiating plea deals with any of the witnesses prior to his trial. (Id.) "The clear picture that emerged from the testimony" of Hummel, Ingros, Taladay, Morris, and Inzana, the PCRA court determined, was that the district attorney "did not deviate in this case from his established policy that plea deals would be neither offered nor negotiated for co-defendants wishing to cooperate in a fellow co-defendant's prosecution until after the latter's charges had been resolved." (Id. at 20.)

The PCRA court found as fact that "the Commonwealth neither promised nor fostered the expectation of leniency" with any of the witnesses. (Id.) "That is not to say," the PCRA court explained, "that [Susan], Bair, Fishel, and Sharp were not hoping for leniency, perhaps even expecting it in some cases. It means, though, that the Commonwealth had no Brady obligation pertinent to those hopes and expectations." (Id.) "In none of the cases," the PCRA court determined, "did the Commonwealth foster the notion that any of them would receive any level of leniency, let alone a specific deal, in exchange for their cooperation. Rather, [the district attorney] conveyed nothing more than that he would 'probably' take any cooperation into account when later considering plea deals." (Id. at 24 (footnote omitted).) "To the extent that" Bair, Fishel, or Susan "believed they would receive leniency in exchange for their cooperation, then, that expectation stemmed from their attorneys' ill-advised statements or their own subjective

ideas of what their cooperation would get them." (Id.) As for Sharp, the PCRA court explained

that "he did not appear to testify at the PCRA hearing. Nor did his attorney [Inzana] say anything

even suggesting that his client expected leniency because of something the Commonwealth said

or did." (Id. at 24 n.9.)

"Having not fostered any expectations of leniency," the PCRA court continued, "the

Commonwealth also did not elicit false testimony or misrepresent the facts at trial." (Id. at 24.) It

explained:

> When [the district attorney] questioned Rega's co-defendants and gave his closing
> argument, he was not privy to their private thoughts or their discussions with
> defense counsel. He knew, though, that he had never promised or suggested any
> degree of clemency. When Bair, Sharp, Fishel, and Susan Jones testified that they
> were not expecting special treatment because of their testimony, therefore, [the
> district attorney] had no reason to correct them. Entitled to fairly comment on the
> evidence adduced at trial, moreover, it was appropriate for him to reiterate during
> his closing statements testimony whose veracity he had no reason to doubt. See
> Commonwealth v. Rush, 646 A.2d 557, 563 (Pa. 1994) ("It is well established
> that a prosecutor, in his closing argument, can comment on the evidence
> introduced at trial as well as the legitimate inferences arising therefrom").

(Id. at 24-25.)

As set forth above, each of the PCRA court's factual determinations are binding on this

court unless Rega produced "clear and convincing evidence" that it was wrong. 28 U.S.C.

§ 2254(e)(1). He did not meet his burden. To understand why, the court sets forth the specific

allegations Rega made with respect to each witness and the PCRA court's specific findings

regarding those allegations.

### Bair

By January 9, 2001, Bair had "implicated himself fully" in the statements he had given to

the police. (ECF No. 54, PCRA Hr'g Tr., 12/14/09, at 42.) See Rega I, 933 A.2d at 1006 (in early

January 2001, Bair admitted to Trooper Davis "what transpired at the Gateway Lodge on the

night of December 21, 2000.") He had revealed that he was involved in other, unrelated criminal

activity with Rega. By February 2001, the Commonwealth had charged Bair with numerous offenses for his role in the Gateway Lodge crimes, including conspiracy to commit robbery, criminal homicide, robbery, and burglary. It also had charged him with robbery, arson, and burglary for his role in the unrelated criminal activity. (See ECF 10-21 at 107-12, Bair Sent. Hr'g Tr., 6/24/03, 2-7.)

The state trial court appointed Ingros, who was the public defender, and Hummel, to be Bair's attorneys. Ingros filed seven motions to continue Bair's criminal trials prior to Rega's June 2002 Gateway Lodge crimes trial. (Motions to continue, ECF No. 10-2 at 55-61.) The district attorney consented to each motion. (Id.) Ingros explained at a 2009 PCRA hearing that he filed the first few motions because he and Hummel were awaiting discovery, and that thereafter they moved to continue Bair's cases "pending resolution of the case against Mr. Rega who was the main defendant of all of it." (ECF No. 54, PCRA Hr'g Tr., 12/14/09, at 28.)

When he testified at Rega's trial, Bair stated that neither the district attorney nor Trooper Davis had made any promises to him in exchange for his testimony. (ECF No. 33 at 135, Trial Tr., 6/18/02, at 136.) During his cross-examination, the follow exchange occurred between English and Bair:

> Q.  Mr. Bair, you're the type of individual to lie when it's in your best interest, are you not?
>
> A.  Sometimes.
>
> Q.  Just like you're lying today hoping the [prosecution] will give you consideration?
>
> A.  No.
>
> Q.  You're not hoping for consideration in exchange for your testimony?
>
> A.  No. I'm not lying to prove anything.
>
> Q.  Are you trying to tell us you're not hoping the [Commonwealth] will look favorable on you because of your testimony?

A.  I'm hoping they will, but I'm not going to sit up here and lie.

(Id. at 171-72, Trial Tr., 6/18/02, at 172-73.)

On June 19, 2003, approximately one year after he testified against Rega, Bair pleaded

guilty to third-degree murder for his role in the Gateway Lodge crimes pursuant to a negotiated

plea agreement. On that same date, Bair pleaded guilty to one count each of robbery, burglary,

and arson in his unrelated criminal cases. The remaining charges against him were *nolle prossed*.

On June 24, 2003, the state trial court sentenced him to a term of 18 to 40 years of imprisonment

for third-degree murder, and concurrent terms of imprisonment for his other convictions. (ECF

10-21 at 109-12, Bair Sent. Hr'g Tr., 6/24/03, at 4-7.)

In his amended PCRA petition, Rega alleged that the prosecution suppressed "a deal" it

had reached with Bair prior to his June 2002 trial. (Amended PCRA petition, ECF No. 10-27 at

145.) Rega did not call Bair to testify at a PCRA hearing. Bair's attorneys, Ingros and Hummel,

did testify. In addition, Trooper Davis provided relevant testimony on all the witnesses at issue,

and Stan's attorney, Taladay, gave testimony that was relevant to Rega's claims as well.

Trooper Davis testified that the district attorney told Bair, Fishel, and Susan that the

prosecution would not make any deals with them before they testified at Rega's trials. (ECF

No. 71 at 117, PCRA Hr'g Tr., 5/21/10, at 115.)[12] He explained that this was in accordance with

the policy of the district attorney, who would not make or negotiate plea deals with accomplice

witnesses until after he or she testified against the primary defendant. (ECF No. 71 at 156, PCRA

Hr'g Tr., 5/21/10, at 154; see ECF No. 72 at 7, 15, 27, PCRA Hr'g Tr., 5/21/10, at 180, 188, 200.)

The policy was not limited to formal plea deals, Trooper Davis said. It meant that "there are no

deals. We will decide that after the trial, and everybody knows that." (ECF No. 72 at 7, PCRA

_____

[12] Pages 1 through 173 of the transcript of the May 21, 2010 hearing (3:30 p m. session) are filed at ECF No. 71, and
pages 175 through 294 are filed at ECF No. 72.

Hr'g Tr., 5/21/10, at 180; see id. at 15, PCRA Hr'g Tr., 5/21/10, at 188 ("I mean nothing.... No verbal, no formal, no anything[.]").) The reason for this policy, Trooper Davis explained, was that "[y]ou never know what a co-defendant is going to do[,]" (id. at 9-10, PCRA Hr'g Tr., 5/21/10, at 182-83), and that "all we have ever asked" is that witnesses testify truthfully. (Id. at 13, PCRA Hr'g Tr., 5/21/10, at 186.)

Stan's attorney, Taladay, confirmed that it was the district attorney's standard policy that, prior to the primary defendant's trial, he would not make any deals with accomplices or even engage in "any discussion about the particulars of what the plea bargain may involve." (ECF No. 54, PCRA Hr'g Tr., 12/14/09, at 138; see id. at 144-45, 164-67.)

Trooper Davis acknowledged the obvious point that Rega's accomplices had an "incentive to curry favor" with the prosecution. (ECF No. 72 at 15, PCRA Hr'g Tr., 5/21/10, at 188.) He agreed that Bair and Fishel did get "a break" because they cooperated. (ECF No. 71 at 166-68, PCRA Hr'g Tr., 5/21/10, at 164-66),[13] but said that they cooperated on their own initiative because they knew it was in their best interest:

> What I was trying to say earlier is that you never know what a defendant is going to do. So, I mean, you can't give somebody a deal up front, and we never gave anybody a deal. And these guys had all given me either a written statement, a taped statement, or both prior to ever meeting with an attorney. So they were all on the hook. It wasn't like we were asking these guys for deals or begging them to come talk to us. They were doing the exact opposite. They wanted to come to us. We didn't care. We could have prosecuted any single one of them and convicted them. And they all knew that.

(ECF No. 72 at 11-12; PCRA Hr'g Tr., 5/21/10, at 184-85.)

---

[13] The PCRA court observed that "it may be fair to assume that" the consideration that Bair and Fishel received after Rega's trial was due "at least in part because of their cooperation through Rega's trial(s)," (PCRA Ct. Op., ECF No. 10-1 at 25), but it stated that "[t]hat is not a foregone conclusion, though, because the sentence Stan Jones ultimately received was comparable to Fishel's and Bair's" even though the Commonwealth had elected not to call Stan as a witness. (Id. at 25 n.10.)

Ingros likewise testified that Bair began cooperating with the prosecution early on in the investigation because it was in his best interest do so, and not because of any deal or promise the prosecution made to him. (ECF No. 54, PCRA Hr'g Tr., 12/14/09, at 23-24, 32-34, 42-44.) Ingros encouraged Bair to cooperate with the prosecution for that very reason. (Id. at 23.) For example, on February 6, 2002, Ingros wrote to Bair advising him that he had "no problem" with Bair taking investigators "to the location where Rega and others allegedly practiced shooting the stolen weapon[,]" "since your continued cooperation is necessary to ensure that you receive some form of consideration at sentencing." (2/6/02 letter, ECF No. 10-2 at 67.)

Ingros's testimony was consistent with Trooper Davis's and Taladay's testimony in that he said that it was the district attorney's standard practice not to make promises to accomplices testifying against the principal defendant prior to the completion of their cooperation. "No specific deals," Ingros said. (ECF No. 54, PCRA Hr'g Tr., 12/14/09, at 41.) "There will be your guy can help himself and general claim that if he is helpful we will take that into consideration but there has never been a specific promise for anything since I have been in this county." (Id. at 41-42.)

Bair's other attorney, Hummel, testified that "there was never a time where there was any sort of a deal made, until subsequent to everything on Rega." (ECF No. 60 at 29, PCRA Hr'g Tr., 1/21/10, at 107.) He said: "I never had anybody who was going to testify against someone else be given a deal before the testimony. It does not occur here." (Id.)

Hummel testified that Bair was aware that there would be "no deals" until after Rega's trial was completed. (Id. at 32, PCRA Hr'g Tr., 1/21/10, at 118.) He said that Bair felt remorse for his involvement in the crimes and wanted to cooperate with the prosecution. (Id. at 32-33, PCRA Hr'g Tr., 1/21/10, at 119-24.) When asked whether Bair had to be "nudg[ed]," "cajol[ed]"

or had "to be promised anything in order to fulfill that cooperation[,]" (id. at 33, PCRA Hr'g Tr., 1/21/10, at 123), Hummel replied:

> Actually, the opposite…. He didn't have to be, no. Again, the cooperation came before that was even in the picture. I am sure [Bair] was aware that cooperation might be more beneficial to him than standing a firm line to go to trial and losing. Of course, he was–anybody is going to be aware of that, but there was never a time he came to me and said, hey, I will say this, if they offer me simple assault or anything like that. He had his agenda in cooperating and I never had to remind him of that.

(Id., PCRA Hr'g Tr., 1/21/10, at 123-24.)

Both Ingros and Hummel testified about what the PCRA court subsequently referred to as the "'the realm of possibility' conference." (PCRA Ct. Op., ECF 10-1 at 21.) It likely occurred prior to Rega's trial,[14] and Ingros testified that during it he told the district attorney the "outcome" that he (Ingros) "wanted to see[.]" (ECF No. 54, PCRA Hr'g Tr., 12/14/09, at 35.)[15] Specifically, Ingros informed the district attorney that he was "hoping" that the charge of criminal homicide would be dismissed and that Bair would get a sentence between 5 to 20 years for "burglary, maybe theft[.]" (Id. at 36.) Ingros testified that at the conference he "might have" asked the district attorney "is there any chance of that happing[?]" (Id.) According to Ingros, the district attorney "may have" responded that "it is not outside the realm of possibility." (Id.) "I took that as a good sign[,]" Ingros stated at the PCRA hearing, because it was "better than a hell no." (Id.) Ingros testified:

> …I felt if we were not on the same page we were close to being on the same page or at least in the same ballpark. Although, [the district attorney] didn't tell me what we would be getting, nothing was promised, I just took that to mean when he didn't reject that offhand that I wasn't far off base that he was thinking along the lines that I was.

---

[14] Ingros was not sure when the "realm of possibility" conference took place, but he believed it occurred prior to Rega's June 2002 trial. (ECF No. 54, PCRA Hr'g Tr., 12/14/09, at 67.)

[15] Ingros testified that prior to the conference he and Hummel "had been kicking around some ideas for what we had hoped to get out of this case based on what we perceived to be [Bair's] very minimal role in this along with his absence of any criminal history, his guilt[.]" (ECF No. 54, PCRA Hr'g Tr., 12/14/09, at 35.)

(Id.)

When Hummel testified about the "realm of possibility" conference, he said that nothing that was discussed during it was used to induce Bair to cooperate, since Bair's "cooperation had been going on long before then." (ECF No. 60 at 34, PCRA Hr'g Tr., 1/21/10, at 125.) Hummel recalled that during the conference, either he or Ingros told the district attorney what sentence they were hoping that Bair would receive and asked if it "was in the realm of possibilities." (Id. at 29, PCRA Hr'g Tr., 1/21/10, at 106-07.) The district attorney might have concurred that it was, but Hummel stressed that "there was never a time where there was any sort of a deal made, until subsequent to everything on Rega." (Id., PCRA Hr'g Tr., 1/21/10, at 107.) Hummel testified that he did not interpret the district attorney's response to their inquiry to be "a committal from [the district attorney] that that's where we would start negotiations or that was where we would end negotiations." (Id. at 34, PCRA Hr'g Tr., 1/21/10, at 127.) In fact, Hummel testified, he left the conference thinking that "[n]othing significant" had happened. (Id., PCRA Hr'g Tr., 1/21/10, at 126.)

To counter Rega's allegation that the prosecution had made any deals with Bair, or promises of leniency to him, the Commonwealth introduced Ingros's and Hummel's memoranda and letters at the PCRA hearings. In a memorandum to their file dated February 14, 2001, Hummel wrote that Bair waived his preliminary hearings and "has been and will cooperate with authorities. Explained to [Bair] his coop[eration] is for consideration later, no deals prior to testimony." (PCRA Commw. Ex. 1 at 1.) In a memorandum to their file dated April 4, 2001, Ingros addressed a criminal conference held on that date. He wrote: "No offer made or even discussed until such time as cases with all co-defendants have been resolved. [District attorney] won't even state whether a plea to robbery only will be within the realm of possibility." (PCRA Commw. Ex. 2 at 7.) On April 4, 2001, Ingros sent a letter to Bair advising him what had

occurred at the criminal conference. He informed Bair that "[n]o offer extended at this time due to the on-going nature of this case and the need to secure your full and complete cooperation in the investigation of the crime and the roles each of the co-defendants played in the crimes. Do not expect discussion of any plea offers until all cases have been resolved through trial or pleas." (Id. at 5.) Later that same month, on April 18, 2001, Ingros authored another memorandum to their file regarding a criminal conference held on that date. In it he wrote: "[d]ue to on-going homicide matter that will likely encompass these charges entirely, and also the need for [Bair] to testify against other co-defendants, no offer extended at this time." (Id. at 8.) On April 20, 2001, Ingros wrote to Bair that "[n]o offer extended at this time due to the on-going homicide investigation." (Id. at 6.)

On July 19, 2002 (approximately one month after Rega's June 2002 trial for the Gateway Lodge crimes), Ingros sent a letter to Bair's stepfather in which he referenced the "realm of possibility" conference. He wrote:

> I will tell you what I believe *should* happen with [Bair's] case. Understand, however, that no offer has yet been made by the DA, and when I attempted to solicit an offer from him a few weeks ago I was told that no discussions in that vein could take place until Rob Rega completed his remaining trials for rape, theft and assorted crimes. [Bair] will be asked to testify against [Rega] in at least some of these cases since he admitted to his own role in several of the thefts.
> What I am shooting for, in terms of a plea bargain, is guilty pleas to Burglary and several thefts, with a sentence of 5-15 or 5-20 years. I suggested this to the DA once before and he indicated that such an offer is not entirely out of the realm of possibility, but that [Bair] would have to produce for them. I am still hopeful we can pull this off, but I'm afraid I can't tell you much more right now since all discussions are on hold.

(7/19/02 letter, ECF No. 10-2 at 68.)

On November 7, 2002, Ingros wrote to Bair that there was "no update on your cases at this time. The DA is not prepared to let us know what his offer is until after all of Rega's cases are done." PCRA Commw. Ex. 2 at 1.

On May 21, 2003, not long after the conclusion of Rega's rape and sexual assault trial, the district attorney made a plea offer to Bair. Its terms were much harsher than those that Bair's attorneys had suggested during the "realm of possibility" conference. The district attorney proposed that Bair receive a sentence of 20 to 40 years of incarceration in exchange for a plea of guilty to third-degree murder in his Gateway Lodge crimes case and a plea of guilty to the "top count of all the other informations (i.e. Robbery on Nelson Mini Mart, Burglary on Right Sound, and Arson and Theft on Gateway Lodge Van)[.]" (PCRA Commw. Ex. 3.)

When Ingros informed Bair about the district attorney's offer in a letter dated June 12, 2003, he wrote that it was "well beyond what I had anticipated for your efforts" and "much higher than both of us were expecting[.]" (PCRA Commw. Ex. 2 at 3-4.) Ingros told Bair that he would try to negotiate a lesser sentence. (Id. at 4.) He was ultimately only able to reach a deal that subtracted two years off the proposed minimum end. As set forth above, on June 19, 2003, Bair pleaded guilty pursuant to the negotiated plea agreement and on June 24, 2003, the state trial court imposed a total aggregate sentence of 18 to 40 years of imprisonment. (ECF 10-21 at 109-12, Bair Sent. Hr'g Tr., 6/24/03, 4-7.)

In his post-hearing brief to the PCRA court, Rega argued that although Bair and the Commonwealth had not reached a "formal" or "firm" deal prior to his trial (PCRA Post Hr'g Br. at 125), they had engaged in plea negotiations that were subject to disclosure under Brady. (Id. at 123-27.) He also contended that the Commonwealth allowed Bair to testify falsely at Rega's trial that neither the district attorney nor Trooper Davis had made any promises to him in exchange for his cooperation. (Id.)

As set forth above, the PCRA court found as fact that, prior to Rega's June 2002 trial, the Commonwealth did not make any promise of leniency to Bair, or foster any expectation of leniency that Bair may have had. (PCRA Ct. Op., ECF 10-1 at 19-25.) Therefore, the PCRA

court held, the Commonwealth did not suppress any <u>Brady</u> material and Rega failed to establish

that Bair committed perjury at Rega's trial when he testified that neither the district attorney nor

Trooper Davis had made any promises to him. (<u>Id.</u> at 24-25.)

The PCRA court also rejected Rega's contention that it was negotiating Bair's plea deal

prior to his trial. It held:

> Ingros['s] and Hummel's testimony was likewise consistent with the
> conclusion that the Commonwealth was not negotiating their client's cases before
> Rega's trials, both testifying that [the district attorney] did not negotiate or make
> deals prior to the relevant co-defendant testifying. (12/14/2009, pp. 27, 41-42; <u>id.</u>,
> 01/21/2010, pp. 125-26). According to Ingros, while he obviously wanted as
> much leniency as possible for his client, [the district attorney] never indicated
> ahead of time what Bair would get for his cooperation, only that it would
> "probably" be taken into account. (<u>Id.</u>, 12/14/2009, pp. 25-27). Hummel,
> moreover, repeatedly reminded Shawn Bair that no deals would be made prior to
> his testimony, also reminding him that consideration was all he could ask for later
> in exchange for his full and honest cooperation. ([01/21/2010, pp.] at 118, 134-
> 35).

(<u>Id.</u> at 21.)

"The 'realm of possibility' conference," the PCRA court determined, "was not the

smoking gun Rega supposed it to be either." (<u>Id.</u>) It noted the "disparities between Ingros['s] and

Hummel's renditions of the 'realm of possibility exchange,'" and observed that, although it did

not find that Ingros's "recollection was accurate[,]" even if it was "the conversation falls far short

of indicating the existence of a formal or informal plea offer." (<u>Id.</u> at 22 n.7.)[16] "Bair…may well

have believed that he would ultimately receive a sentence not to exceed 20 years in exchange for

his testimony[,]" the PCRA observed. (<u>Id.</u> at 24.) "If so, however, it was because Attorney Ingros

---

[16] In its answer to Rega's federal habeas petition, the Commonwealth argues that Ingros's PCRA testimony showed
that his recollection of the "realm of possibility" conference was "quite sketchy" and "flawed." (ECF No. 29 at 28-
29.) Hummel's recollection, the Commonwealth argues, was more credible, and according to him nothing of
significance happened during the conference. (<u>Id.</u> at 30-31.) That is why, the Commonwealth points out, there is
no evidence that either Ingros or Hummel mentioned the "realm of possibility" conference to the district attorney on
any subsequent occasion, including after the district attorney made his plea offer to Bair in May 2003, even though
Ingros believed that the offer was too harsh and he was initially upset about it. (<u>Id.</u> at 32 (citing ECF No. 54, PCRA
Hr'g Tr., 12/14/09, at 94-95).)

had indiscreetly related the 'realm of possibility' conversation even though he fully understood that [the district attorney] would not in fact negotiate Bair's cases until after he testified." (Id.)

### Fishel

In early 2001, Fishel, like Rega, Bair, and Stan, was arrested for his role in the Gateway Lodge crimes, and charged with conspiracy to commit robbery, criminal homicide, robbery, burglary, and related crimes. Prior to Rega's June 2002 trial, Fishel's attorney, Wheeler, filed seven motions to continue Fishel's criminal trial. (Motions to continue, ECF No. 10-3 at 63-69.) The district attorney consented to each motion. (Id.)

At Rega's trial, Fishel testified that no one made any promises to him in exchange for his testimony. (ECF No. 34, Trial Tr., 6/19/02, at 5.) On cross-examination, English asked Fishel about the May 16, 2001, statement that he gave to Trooper Davis during a meeting at which the district attorney and his attorney, Wheeler, were also present. (Id. at 31.) The following exchange occurred between English and Fishel:

> Q. Now, during that–before or after the meeting, did you discuss with your attorney about testifying here today?
>
> A. I talked to my attorney, yes.
>
> Q. As part of this, you're hoping for leniency as part of your testimony?
>
> A. No.
>
> Q. You're not hoping for favorable treatment?
>
> A. No.
>
> Q. Do you anticipate that the [district attorney] will give you favorable treatment?
>
> A. No.
>
> Q. You recall no conversation for the fact that you've taken the stand now?
>
> A. No, I don't.

Q. Did you ever discuss with your attorney whether or not the [district attorney] would give you favorable treatment in exchange for your testimony?

A. No.

Q. Never? Once?

A. No.

Q. You understand you could be on trial for first degree murder?

A. Yes, I do.

(Id. at 32-33.) Towards the end of Fishel's cross-examination, English broached the subject again:

Q. Isn't it true, Mr. Fishel, that from the very beginning, you have told nothing but a pack of lies?

A. No.

Q. You admitted to numerous lies on the stand, isn't that correct?

A. Yes.

Q. And you're testifying today in an attempt to get favorable consideration and save your own skin in this case?

A. No.

Q. You have no expectation of favorable treatment?

A. That's not true.

(Id. at 50.)

On June 19, 2003, Fishel, like Bair, pleaded guilty to third-degree murder for his role in the Gateway Lodge crimes. The remaining charges filed against him were *nolle prossed*. (ECF No. 10-3 at 77-79, 87-88, Fishel Plea Hr'g Tr., 6/19/03, at 3-5, 13-14.) At his plea hearing, the state trial court asked Fishel if there have "been any promises other than your plea bargain to enter this plea?" Fishel replied: "No." (Id. at 85, Fishel Plea Hr'g Tr., 6/19/03, at 11.) On

June 24, 2003, the state trial court sentenced Fishel to the same term that Bair had received: 18 to 40 years of imprisonment.[17]

In his PCRA proceeding, Rega contended that, prior to his June 2002 trial, the district attorney and Wheeler had reached an "undisclosed deal" that Fishel would receive a sentence of no more than 20 years of imprisonment and that the homicide charge would be dropped. (PCRA Post Hr'g Br. at 117.) Rega presented the testimony of Fishel and Wheeler at the PCRA hearings to support his allegations.

Fishel testified that Wheeler advised him that they had to wait until Rega's cases were resolved before his could be, and that he "[w]orking something out with the [district attorney]." (ECF No. 54, PCRA Hr'g Tr., 12/14/09, at 233.) He also testified that Wheeler repeatedly told him that he would not receive a sentence of more than 20 years and that the homicide charge would be dismissed. (Id. at 234, 280.) On cross-examination, Fishel, who was still upset with the district attorney because he thought he should have received a more favorable plea deal, admitted that Wheeler advised him that the district attorney would not make any promises to him prior to Rega's trial. (Id. at 255, 280.)

Wheeler testified that at a criminal conference held prior to Rega's June 2002 trial, he asked the district attorney for some form of leniency for Fishel. (ECF No. 55, PCRA Hr'g Tr., 12/15/09, at 14.) According to Wheeler, his recollection was that the district attorney replied that if Fishel cooperated in Rega's prosecution, the Commonwealth would "not seek a plea on any of the homicide charges." (Id.) Wheeler testified that although there was "[n]othing in writing[,]" in his view they had reached a mutual understanding. (Id. at 15.) He testified that "[t]here was no

_____

[17] In October 2001, Fishel was charged with unrelated crimes of possession of marijuana and drug paraphernalia. He pleaded guilty to those charges at the same time that he entered his plea in his Gateway Lodge crimes case, and the state trial court sentenced him to 15 to 30 days, with credit for time served. (ECF. No 10-3 at 78-79, 88-89, Fishel Plea Hr'g Tr., 6/19/03, at 4-5, 14-15.)

34

formal agreement, and [Fishel] was aware of that all the way through." (Id. at 24.) But Wheeler

insisted that, although there was no formal agreement, the district attorney had "promised" him.

(Id. at 29, 34.) Wheeler also asserted that the district attorney made similar offers to Rega's other

co-defendants, Bair and Stan. (Id. at 34, 42.)

On June 25, 2002, less than a week after Rega's trial had concluded, Wheeler sent a letter

to the district attorney in which he wrote:

> Congratulations on the excellent result that you were able to obtain on
> Robert Rega's Murder One Trial. I am sure that you are very pleased with the
> result. Now that this trial is behind us, I would ask for you to advise me how you
> would like to handle the homicide charge against my client. As you know, we had
> a gentleman's agreement that you would dispose of the homicide charge against
> him as you have no evidence against him in this regard. Would you like for me to
> file a motion to dismiss this count of the information?
> I would also like to have a Criminal Conference on Fishel ASAP so that I
> can advise my client what he might be looking at and how we are going to
> proceed.

(6/25/02 letter, ECF No. 10-3 at 74.) Wheeler testified that he wrote this letter because "I felt that

after my client had provided his share of the *quid pro quo* that I needed to firm up the receipt of

the leniency that was referred to." (ECF No. 55, PCRA Hr'g Tr. at 12/15/09, at 21.) The district

attorney did not respond to Wheeler's letter. (Id. at 21-23.)

Wheeler admitted when he testified at the PCRA hearing that his memory of the events in

question was impaired because he was ill and receiving dialysis treatment three times a week.

(Id. at 16, 29.) He also admitted that he had been present in the courtroom when Fishel testified

during Rega's trial that no promises had been made to him in exchange for his testimony. When

Wheeler was asked why he, as an officer of the court, did not come forward to correct the record

if the district attorney had in fact made a promise to Fishel, Wheeler could not give an adequate

explanation. (Id. at 34-40.)

When he testified at the PCRA hearing, Trooper Davis said that he was present during a discussion the district attorney and Wheeler had on a stairway just before Fishel was to take the stand at Rega's trial. He said that Wheeler "was begging the [district attorney] to give him some kind of idea of what was going to happen to [Fishel] before he testified[,]" and asked the district attorney, "can you give me anything?" (ECF No. 71 at 116, PCRA Hr'g Tr., 5/21/10, at 114.) According to Trooper Davis, the district attorney responded: "No, absolutely not, you know, I want your client to be able to take the stand and say that he had no deals[.]" (Id. at 117, PCRA Hr'g Tr., 5/21/10, at 115.)

As set forth above, on June 19, 2003, Fishel entered his plea of third-degree murder. His sentencing was scheduled for June 24, 2003. The day before he was to be sentenced, Fishel wrote to Wheeler that he was "pulling" his "plea of murder." (6/23/03 letter, ECF No. 10-3 at 43.) He informed Wheeler:

> I figured since I helped the Commonwealth I'd be dealt with lenient not rigorous and severe. 18 to 40 is far [too] long…
> So be it. Let's go to trial. You always said you could beat murder and always told me this for over 2 years now. Looking forward to seeing you tomorrow.

(Id.)

The next day, on June 24, 2003, the state trial court sentenced Fishel to a term of 18 to 40 years of imprisonment. Rega did not direct this court to any evidence that Wheeler moved to withdraw Fishel's plea. Nor did he produce evidence that Wheeler filed a motion to enforce the agreement that he contended at the PCRA hearing he had reached with the district attorney.

In his post-hearing PCRA brief, Rega insisted that the Commonwealth and Wheeler had reached an undisclosed deal prior to his trial. In support, he relied heavily upon the PCRA testimony of Wheeler and the letter that Wheeler had sent to the district attorney in which he

referenced their alleged "gentleman's agreement" that the homicide charge against Fishel would

be dropped. (PCRA Post-Hr'g Br. at 117.)

The PCRA court rejected the testimony and evidence that Rega relied upon. It held:

> Among the attorneys representing Rega's co-defendants, Mark Wheeler was the only one to claim that he and [the district attorney] entered into a "gentleman's agreement," *i.e.*, a plea deal, prior to Rega's trial. Specifically, he testified that [the district attorney] told him that his client, Raymond Fishel, would get leniency if he testified, including that his homicide charges would be dropped. (Id., 12/15/2009, pp. 14-15, 23-24). His testimony, however, was wholly incredible.
>
> As was quickly evident from his testimony and demeanor, Wheeler's animosity toward [the district attorney] overrode his sense of propriety and professionalism, and the Court cannot but believe that his feelings colored his perceptions and testimony. The Court also had to question his commitment to the truth, as well as to his ethical obligations, when he testified on cross-examination about his failure to correct the record when his client allegedly lied during Rega's trial. (See id. at 34-40). Most glaringly, though, in attempting to bolster his testimony about the alleged "gentleman's agreement," Wheeler directly contradicted his colleagues. Responding to [the district attorney's] question concerning Wheeler's statement that the district attorney said he would drop the homicide charges against Fishel, for instance, Wheeler replied, "It wasn't only me; it was all the other co-defendants as well. I talked to the other attorneys. We were all disappointed." (Id. at 34). The other attorneys, however, stated unequivocally that no pre-trial deals or promises had been made. Wheeler insisted, moreover, that all the co-defendants were promised leniency, specifically claiming that "Matt Taladay [Stan's attorney] would not have his client testify if he was not going to get something for it." (Id. at 42). Once again, however[,] the other co-defendants' attorneys, including Taladay, said otherwise. Furthermore, Taladay had testified the previous day that his advice to Stan Jones was based on the fact that [Stan] had already implicated himself in the Gateway Lodge incident and cooperation was his best chance of getting anything better than a life sentence. (Id., 12/14/2009, pp. 141-44).
>
> Additionally, assuming Wheeler was trying to testify truthfully on December 15, 2009, the Court nonetheless deems him not to have been credible. Whether because of his health problems or for some other reason, Wheeler's memory was significantly impaired. By his own testimony, he had difficulty remembering his own children's birthdays. He also could not recall the penalty for second-degree murder. Furthermore, he claimed to remember conversations with the co-defendants' attorneys that, according to their testimony, never occurred. That being the case, the Court does not believe that Wheeler's recollection of his conversations with [the district attorney] even remotely approximated whatever exchange the two may have had, especially when that recollection contradicted Ingros, Hummel, Taladay, and Inzana.

The Court does not believe, therefore, that [the district attorney] departed from his established policy generally, or from the position he had taken with each of the other co-defendants, when dealing with Raymond Fishel's cases. Rather, without encouragement from the Commonwealth, Wheeler took it upon himself to promise his client a plea that did not include homicide and a sentence not in excess of 20 years. (See id., 12/14/2009, pp. 233-35 (Fishel's testimony regarding Wheeler's representations to that effect)). Wheeler was apparently not adverse to making unfounded promises, either, as when he guaranteed his client that he would not get convicted of murder if he went to trial. (See id. at 244).

\- - -

Fishel…may have believed that he would not be pleading to homicide and would spend no more than 20 years in prison. He only could have believed that, however, because Attorney Wheeler misrepresented reality.

(PCRA Ct. Op, ECF No. 10-1 at 22-24.)

The PCRA court likewise found that, since Rega did not produce credible evidence to support his claim that Commonwealth had any type of agreement with Fishel, or had made a promise of leniency to him, his related false-testimony claim had no merit. (Id. at 24-25.)

**Susan**

When Susan testified against Rega at his June 2002 Gateway Lodge crimes trial, she faced charges of burglary, theft by unlawful taking, receiving stolen property, criminal mischief, and conspiracy to commit burglary that were filed against her in an unrelated case. (Court summary for Susan, ECF No. 10-20 at 115.) These charges were for stealing car audio equipment from Right Sound Audio. She engaged in that criminal conduct on December 19 and 20, 2001, with Rega, Bair, and Stan. (ECF No. 10-4 at 91-92, 97-98, Susan's Plea and Sent. Hr'g Tr., 2/18/04, at 1-2, 7-8.) Susan also faced charges of possession of marijuana and of use/possession of drug paraphernalia. (Court summary for Susan, ECF No. 10-20 at 115.) This court refers to those two cases as Susan's "2001 criminal cases." Prior to Rega's trial, Susan's attorney, Morris, filed two motions to continue the 2001 criminal cases (one in November 2001 and the other in February 2002). (Motions to continue, ECF No. 10-2 at 75-76.) The district attorney consented to both motions. (Id.)

Susan admitted at Rega's trial that she had charges pending against her on the Jefferson County trial list. (ECF No. 31, Trial Tr., 6/15/02, at 155.) She testified that she had not yet been charged for her involvement in the Gateway Lodge crimes, but that Trooper Davis told her that she probably would be because she had admitted that she had handled the money stolen from the lodge. (Id. at 209, 249-50; see id. at 239-40.) She said that she was worried that charges would be filed against her for her conduct. (Id. at 249.)

In early 2003, well after Rega's June 2002 trial, the Commonwealth filed charges against Susan for her role in the Gateway Lodge crimes. Specifically, it charged her with one count each of conspiracy to commit robbery, burglary, and theft by unlawful taking, as well as one count of receiving stolen property.[18] That same year, a charge of welfare fraud was also filed against her. (Court summary for Susan, ECF No. 10-20 at 115-16.)

_____

[18] Rega makes much of the fact that the Commonwealth did not charge Susan with criminal homicide or conspiracy to commit it. In the district attorney's closing argument to the jury, however, he said that "Susan Jones is not guilty of second degree murder. She's not even close to being guilty of second degree murder." (ECF No. 35, Trial Tr., 6/20/02, at 184.)

Rega insists that Susan was an accomplice to the murder and in support of this argument he asks the court to take judicial notice of statements made by the district attorney at a post-trial hearing held on January 28, 2004, in which Rega challenged his May 2003 convictions for rape and sexual assault. The court will not do so because the district attorney did not say what Rega claims he did. At that hearing, Rega's counsel at the time, George N. Zanic, Esq., ("Zanic") moved for a new trial on the grounds that Susan lied at the May 2003 trial when she said that she had no deal with the Commonwealth. (ECF No. 10-28 at 126-27, Hr'g Tr., 1/28/04, at 12-13.) Zanic said:

> As you know, Your Honor, our entire defense was based on Susan Jones, the informant for the Commonwealth that brought [Rega's rape and sexual assault crimes] to light. Repeatedly, it was our position that Susan Jones was an accomplice in Mr. Rega's previous homicide case. And I repeatedly asked her, "Do you have a deal? What are you sentenced to?" [Susan testified] "No, I don't have a deal; there's none of that".
>
> Again, our position was she had a reason to come in and set Rob Rega up. Yet, over and over, she said no deal, no deal. Here we are-[the] trial was in May [2003]. Here we are in January, and Susan Jones never has gone to court.
>
> [The district attorney] tells me today there's still charges pending. I don't know where they've gone, but I think she was not forthcoming. She's never going to be prosecuted…. I tried to elicit that; yet, she was not forthcoming.

(Id.)

In response to Zanic's argument, the district attorney explained that Susan's charges were still pending (id. at 129-30, Hr'g Tr., 1/28/04, at 15-16), and he said that "she's an accomplice under our rules in this homicide case. Every time she testified, her testimony made it clear she was an accomplice." (Id. at 127, Hr'g Tr., 1/28/04, at 13.) The district attorney did not admit, as Rega asserts, that Susan was an accomplice to homicide. When both he and

(footnote continued on the next page)

As noted above, Susan testified against Rega at his May 2003 criminal trial. On February 18, 2004, she entered her pleas in all her criminal cases. In the 2001 criminal cases, she pleaded guilty to theft by unlawful taking and possession of drug paraphernalia. In her Gateway Lodge crimes case, she pleaded guilty to the charge of receiving stolen property, a felony of the third degree. She also pleaded guilty to the charge of welfare fraud. All other charges were *nolle prossed*. The state trial court sentenced her to an aggregate sentence of 15 years of probation. (ECF No. 10-4 at 97-101, Susan's Plea and Sent. Hr'g Tr., 2/18/04, at 7-11.) When it announced its sentence, the state trial court commented to Susan: "You got a break here, you know. I know you know the reasons you got it." (Id. at 101, Susan Plea and Sent. Hr'g Tr. at 11.)

In his PCRA proceeding, Rega alleged that Susan and the Commonwealth had reached the agreement that she would receive probation *before his June 2002 trial* and that the Commonwealth withheld that information. (PCRA Post-Hr'g Br. at 99.) In support of his allegation, Rega introduced at the PCRA hearing a letter that Susan had sent to Morris several months before his June 2002 trial. In that letter, which was dated February 27, 2002, Susan asked why her criminal conference had been continued to the June 2002 term:

> I would like to know the specific reason for this continuance IF I were [sic] to only receive probation? Than why the postponement, is there a change in the verbal conformation [sic] or the words more than likely, which isn't binding such as a verbal agreement? I would like a straight-forward reply.

(2/27/02 letter, ECF 10-2 at 85.)

Rega introduced the letter that Morris sent to Susan in response, which was dated March 6, 2002. In it, Morris wrote:

> The reason your case was continued was because the main defendants have not yet had their case[s] disposed of. The District Attorney apparently feels it is better to wait until these cases are disposed of until your case is completed. As far as I

Zanic spoke about the Gateway Lodge crimes case, they referred to it as "the homicide case" to distinguish it from Rega's May 2003 rape and sexual assault case.

know there is no change in the "verbal confirmation," which I presume you mean to be the proposed plea agreement. If you wish to withdraw the possibility of a plea agreement, please let me know and I will have your case put on the trial list as soon as possible. However, I think we should meet to discuss the pros and cons of doing this before you make such an important decision.

…[B]y requesting a continuance, you waived your right for a prompt trial. However, I am sure you could get a trial as soon as possible if that is your desire.

(3/6/02 letter, ECF 10-2 at 86.)

Susan and Morris both testified at the PCRA hearings. During her direct examination by Rega's counsel, Susan explained why she wrote her letter to Morris. She said that Morris attended a criminal conference in her case sometime prior to Rega's Gateway Lodge crimes trial. (ECF No. 56 at 37-39, PCRA Hr'g Tr., 12/17/09, at 139-45.) She sat outside the room where the conference was being held. When it was over, Susan testified, Morris told her there was "possibly a verbal agreement." (Id. at 38, PCRA Hr'g Tr., 12/17/02, at 141.) She clarified that Morris "pretty much didn't say a whole lot, it was just the way he said things and that was the feeling I got, that I was going to end up with just probation." (Id., PCRA Hr'g Tr., 12/17/09, at 142.) Sometime after this conference, Susan explained, Morris filed a motion to continue her 2001 criminal cases. Susan testified that she wrote her February 27, 2002, letter to Morris because she was nervous and frustrated and "[f]rom the way I understood it, I was going to end up with probation. I was wondering, if I am going to jail, my life was on hold until this was all done." (Id., PCRA Hr'g Tr., 12/17/09, at 144.)

During her cross-examination by the Commonwealth, Susan said she testified truthfully at Rega's June 2002 trial when she stated under oath that the prosecution had not made any promises to her. (Id. at 48-49, PCRA Hr'g Tr., 12/17/09, at 183-86.) She testified that the statements she gave under oath at Rega's May 2003 trial, when she said that no promises had been made to her and that she expected to serve time in jail on her pending charges, were also truthful. (Id. at 49-50, PCRA Hr'g Tr., 12/17/09, at 185-91.) When asked to explain the

inconsistency between what she had stated during her PCRA direct examination and what she had said at that trial, Susan replied that "[a]nything I said then was true." (Id. at 50, PCRA Hr'g Tr., 12/17/09, at 190.) She also agreed, after being reminded of how she had testified at Rega's trials, that in fact she was "not expecting probation" when she testified against him. (Id., PCRA Hr'g Tr., 12/17/09, at 191.)

When he testified at the PCRA hearing, Morris said that he did not have a recollection of the criminal conference that Susan referenced during her PCRA testimony. (ECF No. 54, PCRA Hr'g Tr., 12/14/09, at 179.) In discussing the February 27, 2002, letter that Susan sent to him, he said that in it she used "an odd term called verbal confirmation[.]" (Id. at 188.) Morris explained that in the letter he wrote back to Susan on March 6, 2002, he simply used the same terminology that she had used. (Id.) In response to the question whether the district attorney had asked Morris to file the motions for continuances in Susan's 2001 criminal cases, Morris replied: "I can say I filed them on my own." (Id. at 184.)

During his cross-examination by the Commonwealth, Morris agreed that his file for Susan's case showed no evidence of an alleged verbal agreement prior to Rega's June 2002 Gateway Lodge crimes trial. (Id. at 192-95.) His file indicated, Morris testified, that "the first of any discussion about an offer" was at a criminal conference held on July 16, 2003, two months after Rega's May 2003 trial for rape and sexual assault. (Id. at 195.) At that point in time, the 2001 criminal charges were pending against Susan, as were the 2003 charges filed against her in her Gateway Lodge crimes case. In Morris's notes documenting the July 16, 2003 criminal conference, he wrote that "[the district attorney] will make offer in all 3 cases at next [criminal conference.]" (PCRA Commw. Ex. 4.) Morris also wrote that Susan "will accept house arrest" and he made a note to himself not to forget to "mention her son" and "her 100% cooperation with Commonwealth[.]" (Id. See also ECF No. 54, PCRA Hr'g Tr., 12/14/09, at 193.)

Morris testified that the district attorney made his plea offer to Susan on January 28, 2004. (ECF No. 54, PCRA Hr'g Tr., 12/14/09, at 196-97.) He agreed that the prosecution did not make any promises to Susan prior to any of Rega's trials. (Id. at 197.) If there had been a promise, Morris said, he "would have written it down" in his file. (Id.) He also agreed that "[he] would not have offered house arrest if [he] already thought [he] had probation[.]" (Id. at 199.)

On re-direct examination, Rega's counsel asked Morris if, when he had testified that "the first discussion of an offer was in 2003[,]" he was "referring to discussion of a formal offer[?]" (Id. at 200.) Morris replied: "I guess [the district attorney] only makes one kind of offer. Here is the offer, take it or leave it pretty much." (Id.)

Trooper Davis testified that the Commonwealth made no deals with Susan, or made any promise of leniency to her, prior to Rega's trials. (ECF No. 71 at 117-19, PCRA Hr'g Tr., 5/21/10, at 115-17; ECF No. 72 at 15, PCRA Hr'g Tr., 5/21/10, at 188.) He said that the discussions that he had with the district attorney about what offer should be made to Susan did not occur until after she testified at Rega's May 2003 trial. (Id. at 117-18, PCRA Hr'g Tr., 5/21/10, at 115-16.) Trooper Davis agreed that Susan "got a break" when the district attorney offered her probation. (Id. at 175, PCRA Hr'g Tr., 5/21/10, at 173.) He explained that her cooperation certainly was one of the reasons she got that break. Another reason was that Stan and she had a special needs child and Stan was serving a long prison sentence for his role in the Gateway Lodge crimes. (Id. at 121, PCRA Hr'g Tr., 5/21/10, at 199.)

The PCRA court rejected Rega's allegation that there was a "proposed plea agreement" between Susan and the Commonwealth prior to his trial, or that the Commonwealth promised her that she would get probation or some other type of leniency. (PCRA Ct. Op., ECF 10-1 at 20-21, 24-25.) It further determined that to the extent that Susan had an expectation that she would

receive probation in exchange for her cooperation, it was not because of anything the Commonwealth said or did. Rather, "it was because of something her attorney said or that she errantly inferred." (Id. at 24.) Because Rega failed to establish that the prosecution made a promise to Susan prior to his trial, the PCRA court held that Rega's related claim that she testified falsely at his trial had no merit. (Id. at 24-25.)

The PCRA court was not persuaded by Rega's argument that the statement made by the state trial court at Susan's February 24, 2004, plea and sentencing hearing established that she and the Commonwealth had reached an agreement prior to his June 2002 trial. There is no disputing that Susan ultimately received consideration for her cooperation, and the state trial court's comment is a reflection of that consideration. The PCRA court explained, however, that credible evidence introduced at the PCRA hearings convinced it that the Commonwealth had made no promises of leniency to Susan or reached any type of agreement with her prior to Rega's June 2002 trial. (Id. at 20-21, 24-25.)

**Sharp**

Because he initially provided Rega with a false alibi, Sharp was charged with hindering apprehension. He also was charged with the unrelated crimes of receiving stolen property and conspiracy. (Court summary for Sharp, ECF No. 10-2 at 87.) Prior to Rega's June 2002 trial, Inzana filed four motions to continue Sharp's criminal cases. (Motions to continue, ECF No. 10-3 at 24-27.) The district attorney consented to these motions. (Id.)

On December 17, 2003, Sharp pleaded guilty to one count of hindering apprehension and the state trial court sentenced him to a term of probation of 5 years. He also pleaded guilty to the charge of receiving stolen property, and for that the state trial court sentenced him to a concurrent term of 5 years of probation. (ECF No. 10-3 at 37-41, Sharp Plea and Sent. Hr'g, 12/17/03, at 2-6.) The state trial court said to Sharp during his hearing: "Do you understand

you're receiving this sentence, in part, because of your cooperation later with the police?" (Id. at 39, Sharp Plea and Sent. Hr'g, 12/17/03, at 4.)

In his amended PCRA petition, Rega contended that, prior to his June 2002 trial, Sharp and the Commonwealth had reached an undisclosed agreement that he would only receive a term of probation if he cooperated. (Amended PCRA petition, ECF No. 10-27 at 148-52.) Inzana's PCRA testimony did not support Rega's allegations. He testified that he advised Sharp that it was in his best interest to cooperate with the prosecution. (ECF No. 54, PCRA Hr'g Tr., 12/14/17, at 218, 224.) He gave that advice to Sharp, he said, because he understood that the prosecution would take Sharp's cooperation into consideration when it came time to formulate a plea agreement. (Id. at 218-21.) Inzana explained:

> Again, I can't say I…said [to Sharp] you are likely to get a lesser sentence. I can say I thought his best bet at anything was going to be [to] cooperate. I have to be careful to say that I said I think he is going to get a lesser sentence. In this case…my theory…behind this was I couldn't go to trial prior to [Rega's trial] because if I went to trial and lost we were going to get hammered. If [Sharp] wasn't going to help in any way then…he had…nothing to put on the table at a later date and quite frankly he was not one of the main players in terms of an actor who cooperated at the scene of the murder so he had more to lose, I think, than anybody in terms of going from a lower degree felony and getting a lot of jail time for something he very well and maybe should have gotten probation even from day one.

(Id. at 227-28.) Inzana stated that he thought the term of probation that Sharp received "was fair and equitable not necessarily because he testified[,] but it could have been worse had he not." (Id. at 228.)

According to Inzana, in his discussions with the district attorney regarding Sharp, "there was never any conversation about my guy is going to plead and in return he's going to get something." (Id. at 223.) The first and only offer that the district attorney made to Sharp, Inzana testified, was the one contained in a letter dated December 11, 2003, almost a year and a half after Rega's trial. (Id. at 225-26.)

The PCRA court found that Inzana's testimony showed that the district attorney did not make any offers or engage in any plea negotiations prior to Rega's trial. (PCRA Ct. Op., 10-1 at 20.) Inzana advised Sharp to cooperate, the PCRA determined, because it was in his best interest to do so, and not because of any express or tacit agreement with the district attorney. (Id.) The decisions that Inzana made and the advice that he gave to Sharp "stemmed from [his] understanding" of Sharp's "potential liability, not from any promises or suggestions coming from the Commonwealth." (Id.) The PCRA court found that in Inzana's discussions with the district attorney, the district attorney "said nothing more than that should Sharp…testify, he would consider [his] cooperation when it came time to assemble a plea deal[.]" (Id.) The PCRA court also noted that Sharp did not testify at a PCRA hearing and Rega did not even establish that he had an expectation of leniency, let alone that his counsel had reached any type of understanding with the prosecution. (Id. at 24 n.9 ("Nor did [Sharp's] attorney say anything even suggesting that his client expected leniency because of something the Commonwealth said or did.").)

**Discussion**

### 1. This Court Must Presume That the PCRA Court's Findings Of Fact Are Correct

Rega did not direct this court to the required "clear and convincing" evidence to overcome the presumption of correctness that this court must afford to each of the PCRA court's findings under § 2254(e)(1). He cites to portions of the testimony and documentary evidence introduced at the PCRA hearings that he contends support his allegations, but none of it is sufficient to satisfy the burden imposed upon him by AEDPA.

Some of the documentary evidence that Rega introduced at the PCRA evidentiary hearing supported a finding that both Susan and Fishel had reached at least tacit agreements with the prosecution, particularly Susan's letter to her attorney, Morris, and Wheeler's letter to the district attorney that referenced their "gentleman's agreement" regarding his client, Fishel. But other

evidence summarized above cut against a finding that either had reached any type of agreement, and this court cannot conclude that the PCRA court's findings with respect to them were clearly wrong. Some of Susan's PCRA testimony supported the PCRA court's findings, as did testimony given by Morris, Trooper Davis, and the other attorneys that testified at the PCRA hearings, aside from Wheeler.

As for Wheeler, the PCRA court rejected the entirety of his testimony and, therefore, Rega's reliance upon it does not advance his <u>Brady</u> claims. Although there can be the rare case where "[a] federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable [under § 2254(d)(2)] or that the factual premise was incorrect by clear and convincing evidence [under § 2254(e)(1),]" <u>Miller-El</u>, 537 U.S. at 340, there is no basis on the record before this court to disturb the PCRA court's determination that Wheeler's PCRA testimony was not believable. <u>See</u> <u>Vickers</u>, 858 F.3d at 850 (even in pre-AEDPA cases, "'federal habeas courts [had] no license to redetermine credibility of witnesses who demeanor ha[d] been observed by the state trial court, but not by them,'") (quoting <u>Marshall v. Lonberger</u>, 459 U.S. 422, 434 (1983) (bracketed text added by the court of appeals.))

Testimony given by Trooper Davis and the other attorneys provided support for the PCRA court's findings that, contrary to Wheeler's contentions, the Commonwealth had no agreement with, or had made any promise of leniency to, Fishel. Other evidence from the state court record also supported the PCRA court's credibility determination. Wheeler did not speak up when Fishel testified under oath at Rega's trial that no promises had been made to him and that he had no expectation of leniency. As the Commonwealth points out, that Wheeler did not do so supports the PCRA court's conclusion that it was because Wheeler knew at the time that Fishel was truthfully testifying. <u>Tarver v. Hopper</u>, 169 F.3d 710, 717 (11th Cir. 1999) ("If [the witness's attorney] really believed an agreement existed with the district attorney, then his client

committed perjury by testifying that no agreement existed; and [the witness's attorney] would have been required to call upon [the witness] to correct his testimony or withdraw from representation."). Wheeler did not interject when Fishel stated at his June 19, 2003, plea hearing that no promises had been made to him, and this fact provides further evidence to support the PCRA court's findings. (ECF 10-3 at 85, Fishel Plea Hr'g Tr., 6/19/03, at 11.) The significant difference between what Rega alleged the district attorney had promised Fishel (that the homicide charge would be dropped and that he would serve no more than 20 years) and the crime to which Fishel's pled and the sentence he received (third-degree murder and a term of 18 to 40 years), supports the PCRA court's findings that Wheeler and the district attorney had not reached a mutual understanding prior to Rega's trial.[19]

Rega also relies upon the fact that the attorneys for each witness at issue requested, and received, multiple continuances of their client's criminal trials. In some cases, that can be evidence that there was an express or tacit agreement or that the government made a promise of leniency to the witness if he or she cooperated. United States v. Risha, 445 F.3d 298, 302 (3d Cir. 2006). In this case, however, it does not amount to "clear and convincing evidence" that any of the PCRA court's findings were wrong, as such evidence can also tend to show nothing more than that the attorneys understood that it was in their client's best interest to delay the client's criminal trials until after Rega's so that the client could receive consideration in exchange for cooperation. Shabazz v. Artuz, 336 F.3d 154, 163-64 (2d Cir. 2003) (recognizing that the witness and the prosecution had "independent incentives" to delay the resolution of the witness's criminal case until after the petitioner's trial, and refusing to disturb the state court's finding that the

---

[19] The same is true for Bair. Rega relies upon the "realm of possibility" conference to support his contention that Bair's attorneys were negotiating a plea deal with the district attorney prior to Rega's June 2002 trial. During that conference, Bair's attorneys suggested an outcome (dropping the homicide charge and a sentence of between 5 to 20 years) that was nowhere close to either the eventual offer the district attorney made to Bair in May 2003, or the plea that Bair made and the sentence that he received.

prosecution made no promise of leniency to the witness); id. at 164 (concluding that "the adjournments themselves do not evidence an agreement. This is especially true in light of [the prosecutor's] testimony–which the state court accepted as true–that he would not promise them anything with respect to their pending cases in exchange for their testimony against petitioner.").

Each of the witnesses may have hoped that he or she would receive consideration in exchange for cooperation, but under the circumstances that fact is not sufficient to establish that any of the PCRA court's findings of fact were clearly erroneous. See, e.g., Bell v. Bell, 512 F.3d 223, 233 (6th Cir. 2008) (en banc) ("The fact that [the witness] desired favorable treatment in return for his testimony in [the petitioner's] case does not, standing alone, demonstrate the existence of an implied agreement with [the prosecutor]. A witness's expectation of a future benefit is not determinative of the question of whether a tacit agreement subject to disclosure existed…. Although [the witness] may have been seeking more lenient treatment in his own case, we find no evidence of a corresponding assurance or promise from [the prosecutor]."); Collier v. Davis, 301 F.3d 843, 849 (7th Cir. 2002) (the petitioner did "not show a Brady violation or evidence an understanding as interpreted by Giglio. [The witness's] general and hopeful expectation of leniency is not enough to create an agreement or an understanding."); Shabazz, 336 F.3d at 163-64 (same); Knox v. Johnson, 224 F.3d 470, 482 (5th Cir. 2000) (deferring to the state court's finding that the prosecution "did not make a deal with [the witness] in exchange for his testimony, did not fail to disclose an offer to [the witness], and did not offer false testimony[.]" The record reflected only a "unilateral hope on [the witness's] part rather than a deal, whether implicit or explicit, between [the witness] and the State."); Hill v. Johnson, 210 F.3d 481, 486 (5th Cir. 2000) (state court found that there was no express or implied deal with the witness; holding that evidence in the record that the witness had a subjective belief of an implied

deal did "not come close to rebutting by clear and convincing evidence that we must accord to the state court's findings.")

Finally, the receipt by each witness of more favorable treatment because he or she cooperated with the Commonwealth (a point the state trial court made at both Susan's and Sharp's plea and sentencing hearings) also is not clear and convincing evidence that the PCRA court was wrong. Bell, 512 F.3d at 234 ("although we do not take issue with the principle that the prosecution must disclose a tacit agreement between the prosecution and a witness, it is not the case that, if the government chooses to provide assistance to a witness following trial a court must necessarily infer a preexisting deal subject to disclosure under Brady…. To conclude otherwise would place prosecutors in the untenable position of being obligated to disclose information prior to trial that may not be available to them or to forgo the award of favorable treatment to a participating witness for fear that they will be accused of withholding evidence of an agreement."); Shabazz, 336 F.3d at 165 ("The government is free to reward witnesses for their cooperation with favorable treatment in pending criminal cases without disclosing to the defendant its intention to do so, *provided* that it does not promise anything to the witnesses prior to their testimony.") (emphasis in original).

In conclusion, the PCRA court had several hearings on the allegations that Rega makes in Claim 1(a) and Claim 2. He did not convince it that his allegations had merit, and it made specific findings of fact that this court must presume are correct under § 2254(e)(1). Considering the totality of the evidence that the PCRA court had before it, this court cannot conclude that Rega has identified "clear and convincing evidence," § 2254(e), that any of the findings of fact made by the PCRA court were wrong. Therefore, this court proceeds with its analysis with the facts as found by the PCRA court: that the Commonwealth had no express or tacit agreement

with any of the witnesses, that it made no promise of leniency to any of them, and that it was not the source of any expectation of leniency that a witness may have had.

### 2. The Pennsylvania Supreme Court's Decision Withstands Review Under § 2254(d)

In his appeal to the Pennsylvania Supreme Court, Rega argued that the PCRA court erred in finding that there was no information subject to disclosure under <u>Brady</u> and also in rejecting his claim that the Commonwealth presented false testimony at his trial. (Br. for Appellant, ECF No. 10-25 at 19-30.) In support of these claims, Rega relied upon the United States Supreme Court's decisions in <u>Giglio v. United States</u>, 405 U.S. 150, 155 (1972), and <u>United States v. Bagley</u>, 473 U.S. 667 (1985). He contended that the Commonwealth committed <u>Brady</u> violations with respect to Susan and Fishel because it suppressed at least tacit agreements that it had reached with each prior to his June 2002 trial. (<u>Id.</u> at 19-24.) Rega did not argue to the Pennsylvania Supreme Court that either Bair or Sharp had reached an agreement with the Commonwealth prior to his trial. He argued, as he does in this habeas case, that the discussions that their attorneys had with the Commonwealth should have been disclosed because in them the district attorney indicated that he would take their client's cooperation into account when it was time to resolve their criminal cases. (<u>Id.</u> at 24-27.) Specifically, Rega argued, as he does here, that the Commonwealth "concedes that [the district attorney] led Ingros to believe that if Bair cooperated against Rega the Commonwealth would take it into consideration in disposing of the charges against him." (Appellant's Reply Brief, ECF No. 10-26 at 72.) He made a similar allegation with respect to Sharp. (<u>Id.</u> at 76) ("the Commonwealth does not deny that it suppressed information regarding an offer of consideration in exchange for cooperation.").

The Pennsylvania Supreme Court affirmed the PCRA court's decision. <u>Rega II</u>, 70 A.3d at 780-81. It explained that "[w]hile Rega references conflicting evidence from which contrary inferences might be gleaned…the relevant review at this stage is limited to an examination of the

record to determine whether the material findings of" the PCRA court "are supported by it." Id. at 781 (citation omitted). Given the applicable review, the supreme court "decline[d] [Rega's] invitation, in effect, to reweigh differing portions of the post-conviction evidence." Id. It concluded that "the record plainly supports the PCRA court's finding of no agreements or incentives, other than maintaining the possibility for later negotiation based on the witnesses' cooperation." Id. Rega's trial attorneys "were well aware of this incentive," the supreme court held, "as they questioned various of the Commonwealth's witness[es] about their desires for leniency in their own criminal cases." Id. at 781 n.3.

There is no dispute that the Pennsylvania Supreme Court adjudicated Claim 1(a) (the suppressed-evidence claim) on the merits and that AEDPA's standard of review at § 2254(d) applies to this court's review of it. Rega contends that the Pennsylvania Supreme Court did not adjudicate Claim 2 (his false-testimony claim) because it "did not even mention, much less reach the merits of," it. (ECF 22 at 93.) Therefore, he argues, § 2254(d)'s standard of review does not apply to Claim 2 and this court must review it *de novo*. (Id.) This argument has no merit. The PCRA court expressly denied Rega's false-testimony claim on the merits for the reasons already discussed. (PCRA Ct. Op., ECF 10-1 at 24-25.) In his subsequent appeal to the Pennsylvania Supreme Court, Rega raised his suppressed-evidence and his false-testimony Brady allegations in a single claim that he designated "Claim I." (Br. for Appellant, ECF No. 10-25 at 3, 12, 19-30.) The supreme court denied Rega's false-testimony claims on the merits for the same reason it denied his suppressed-evidence claims: because it found that the PCRA court's factual determinations precluded relief.[20] Rega II, 70 A.3d at 780-81. Thus, the Pennsylvania Supreme

---

[20] When it set forth the basis for Rega's claim for relief, the Pennsylvania Supreme Court also cited, in addition to Brady and Giglio, the United States Supreme Court's decision in Napue v. Illinois, 360 U.S. 264 (1959), which is one of the seminal cases addressing the prosecution's knowing use of false testimony. Rega II, 70 A.3d at 781.

Court adjudicated Rega's false-testimony claims on the merits and § 2254(d)'s standard of review applies to this court's review of that claim too.

The court has already concluded that all the findings of fact that the PCRA court made when it ruled upon Claims 1(a) and 2 must be presumed to be correct under § 2254(e)(1). The Pennsylvania Supreme Court did not disturb any of the PCRA court's findings because there was support for them in the record. Rega II, 70 A.3d at 781. To overcome the burden imposed upon him by § 2254(d)(2), Rega must prove that the Pennsylvania Supreme Court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Rega did not meet this burden. For all the reasons discussed above, the Pennsylvania Supreme Court had before it the requisite evidence necessary for its determination of the facts to withstand review under § 2254(d)(2)'s deferential standard.

Next, the court considers whether Rega met his burden of establishing that the Pennsylvania Supreme Court's decision to deny Claim 1(a) and Claim 2 was "contrary to…clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1). Rega contends that the Pennsylvania Supreme Court's decision was "contrary to" United States Supreme Court precedent because the facts of this case are "materially indistinguishable" from the facts of Giglio and Bagley. (ECF No. 22 at 57.) This argument is not persuasive. In Giglio, an assistant United States attorney ("DiPaola"), promised the defendant's co-conspirator, Robert Taliento ("Taliento"), that he would receive immunity if he testified against the defendant. 405 U.S. at 152 (the post-trial evidence "confirm[ed] petitioner's claim that a promise was made to Taliento by one assistant, DiPaola, that if he testified before the grand jury and at trial he would not be prosecuted."); id. at 153 ("The heart of the matter is that one Assistant United States Attorney [DiPaola]–the first one who dealt with

Taliento–now states that he promised Taliento that he would not be prosecuted if he cooperated with the Government."). The government did not disclose that promise to the defense, id., and Taliento testified falsely at the petitioner's trial that "[n]obody told me I wouldn't be prosecuted." Id. The Supreme Court held that "evidence of any understanding or agreement as to a future prosecution [of Taliento] would be relevant to his credibility and the jury was entitled to know of it." Id. at 155. Because the government did not disclose DiPaola's promise to the defense and did not correct Taliento's false testimony, the Supreme Court determined that it violated the defendant's due process rights.

Here, this court is bound by the PCRA court's factual determinations that the Commonwealth did not have an agreement with any of the witnesses, make a promise of leniency to any of them, or foster an expectation of leniency.[21] At most, as the Pennsylvania Supreme Court found and Commonwealth acknowledges, the prosecution conveyed only that there was the "possibility for later negotiation based on the witnesses' cooperation." Rega II, 70 A.3d at 781. That understanding was obvious to Rega's defense, his attorneys pointed it out to the jury in both opening and closing arguments, and it is not comparable to DiPaola's express promise to Taliento that he would not be prosecuted. Thus, the facts of this case are significantly different from Giglio's case and the Pennsylvania Supreme Court's decision was not "contrary to"

---

[21] Because the PCRA court determined that the Commonwealth made no promise of leniency to any of the witnesses at issue, this case is factually distinguishable from the court of appeals's decisions cited by Rega, including Boone v. Paderick, 541 F.2d 447 (4th Cir. 1976), which he argues is "particularly on point here[.]" (ECF No. 75 at 9 n.5.) In Boone, a detective told the witness "that he knew that he [the witness] was involved in the robbery…, that the police department would soon make arrests in the case, and that he better cooperate." 541 F.2d at 449. The witness "did not at once agree to cooperate but later did so upon [the detective's] *promise that he would not arrest him for the Sandler burglary or for any other offenses which he knew [the witness] to have committed, and that he would use his influence with the Commonwealth attorney in order to see that he would not be prosecuted*." Id. (emphasis added.). Nothing stated to any witness in this case is comparable to the specific promises that the detective made to the witness in Boone.

it.[22] Collier, 301 F.3d at 849 ("unlike Giglio, [the petitioner] has proffered no evidence of an explicit promise, agreement, or statement made to [the witness] either by police officers or state's attorneys. We contrast that lack of evidence with the testimony of both [a detective] and the trial prosecutor…that there was no agreement with [the witness].").

Rega likewise did not show that his case is "materially indistinguishable" from Bagley. In that case, the two principal witnesses assisted the Bureau of Alcohol, Tobacco and Firearms ("ATF") in conducting an undercover investigation of the defendant. Bagley, 473 U.S. at 670. Prior to the defendant's trial, the government did not "disclose that any 'deals, promises or inducements' had been made" to those witnesses. Id. The defendant later moved under 28 U.S.C. § 2255 to vacate his conviction on the ground that the government withheld information that established that each witness had signed contracts with the ATF that he would be paid a monetary sum in exchange for his assistance. Id. at 671. The contracts provided that the payment was contingent "upon the accomplishment of the objective sought to be obtained by the use of such information to the satisfaction [of the government.]" Id. By failing to disclose the contracts, the Supreme Court held, the government deprived the defense of "evidence that the defense might have used to impeach" the two witness "by showing bias or interest." Id. at 676.

---

[22] In his discussion of Giglio (ECF No. 22 at 23-25, 58), Rega notably failed to mention the key fact of the case, which was DiPaola's express promise to Taliento. Rega focused solely on another piece of post-trial evidence that Supreme Court mentioned, but did not base its decision upon. That evidence was an affidavit from the United States Attorney ("Hoey") in which he attested that he told Taliento "that if he did testify he would be obligated to rely on the 'good judgment and conscience of the Government' as to whether he would be prosecuted." Giglio, 405 U.S. at 153. The Supreme Court stated that Hoey's affidavit "contains at least an implication that the Government would reward the cooperation of the witness, and hence tends to confirm rather than refute the existence of some understanding for leniency." Id. at 153 n.4. Rega equates what Hoey communicated to Taliento in Giglio to that which the district attorney conveyed to Bair, Fishel, Susan, and Sharp in this case. The problem with Rega's argument is that the Supreme Court in Giglio found that the government violated the defendant's due process rights because it did not disclose the express promise that DiPaola had given to Taliento. Although Hoey's affidavit was evidence that the Supreme Court concluded tended to support a finding that there existed an understanding of leniency, other evidence (DiPaolo's affidavit) established that DiPaola made an express promise of leniency to Taliento. In this case the PCRA court found, after considering all the evidence introduced at the numerous hearings held before it, that the Commonwealth did not promise or otherwise foster an expectation of leniency. This court is bound by the PCRA court's finding, and for that reason too Giglio is distinguishable.

In contrast to <u>Bagley</u>, in this case Rega did not establish that Commonwealth deprived him of information his defense could have used to show bias or interest. This court is bound by the PCRA court's findings that the Commonwealth did not make an agreement with any witness or promise any witness that he or she would receive any level of leniency. The Commonwealth did convey to them that their cooperation would be taken into account after they testified against Rega, but, once again, it was obvious that they all had a clear incentive to cooperate with the Commonwealth and, as the Pennsylvania Supreme Court held, Rega's trial attorneys "were well aware of this incentive" and emphasized it to the jury. <u>Rega II</u>, 70 A.3d at 781 n.3;[23] <u>see</u> <u>Shabazz</u>, 336 F.3d at 164 ("The existence of pending prosecution against a government witness provides an inherent incentive for cooperation, and this incentive–namely the pending charges against [the two witnesses at issue]–was disclosed to petitioner.").

In an effort to undercut the conclusion that his defense was aware of the incentive his accomplices had to cooperate with the prosecution, Rega alleges that the Commonwealth did not disclose information about Bair's, Fishel's, and Susan's pending charges. (ECF No. 6 ¶¶ 39, 69, 82; ECF No. 22 at 37.) He did not cite any evidence in the record to support these allegations and

---

[23] For this same reason, Rega's reliance upon <u>Breakiron v. Horn</u>, 642 F.3d 126 (3d Cir. 2011), to support his contention that the Commonwealth violated the <u>Brady</u> rule is not persuasive. In <u>Breakiron</u>, a key Commonwealth witness was a jailhouse informant who testified that the petitioner had confessed to him. 642 F.3d at 130-31. After an evidentiary hearing conducted in the petitioner's federal habeas case, the district court found as fact that the Commonwealth suppressed two categories of evidence that are relevant here: (1) that the jailhouse informant sought benefits for himself when he offered his inculpatory information; and, (2) that the witness was "a suspect in another criminal investigation pending at that time[.]" <u>Id.</u> at 133. The district court granted the petitioner habeas relief on his first-degree murder conviction. In the subsequent appeal, the Commonwealth did not dispute that it suppressed <u>Brady</u> information. The only issue before the Court of Appeals for the Third Circuit was whether the evidence was material to the petitioner's robbery conviction. <u>Id.</u> at 133-34. Whereas in <u>Breakiron</u> the witness at issue was a jailhouse informant and the Commonwealth's withheld evidence that deprived the defense of knowledge about the inducements made to him to provide his testimony against the petitioner, in this case Bair, Fishel, and Susan were Rega's accomplices, defense counsel was aware of the charges Sharp and they faced, and, therefore, defense counsel knew about the incentive that they all had to cooperate with the prosecution. Because Rega failed to demonstrate that the Commonwealth suppressed <u>Brady</u> information, this court does not need to reach the issue whether the alleged suppression was material, which was the only issue that was before the court of appeals in <u>Breakiron</u>. Additionally, in <u>Breakiron</u>, the petitioner's claim was premised on new evidence developed at a federal hearing and, unlike in this case, there was no state court adjudication to which the federal habeas court owed deference under § 2254(d) or (e)(1).

for that reason alone they are rejected. The record also shows that these allegations are without

any merit. At the 2005 post-sentence hearing, English testified that the defense received the

criminal records on "all the witnesses. I'm pretty sure that came from the DA's office." (ECF No.

47, Post-Sent. Hr'g Tr., 4/4/05 Tr., at 58.) At the PCRA hearing in 2009, English once again

testified that defense counsel were aware of the open charges against the witnesses and also

stated they knew that they each had an incentive to cooperate with the prosecution so that he or

she might receive leniency in their own cases. (ECF No. 55, PCRA Hr'g Tr., 12/15/09, at 65-69,

82, 89-91, 315.)[24]

Because Rega failed to demonstrate that the Pennsylvania Supreme Court's decision was

"contrary to" Giglio or Bagley, the only remaining inquiry for this court is whether he

established that its decision amounted to "an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1).

As the Commonwealth points out, no decision by the United States Supreme Court dealt with a

fact pattern similar to that presented by this case where, at most, the prosecution only

communicated to the witnesses that there was "the possibility for later negotiation based on" his

or her "cooperation." Rega II, 70 A.3d at 782. Rega is also correct that "AEDPA does not

'require state and federal courts to wait for some nearly identical factual pattern before a legal

rule must be applied.'" Panetti v. Quarterman, 551 U.S. 930, 953 (2007) (quoting Carey v.

Musladin, 549 U.S. 70, 81 (2006) (Kennedy, J., concurring in judgment)). "Nor does AEDPA

prohibit a federal court from finding an application of a principle unreasonable when it involves

a set of facts 'different from those of the case in which the principle was announced.'" Id.

(quoting Lockyer v. Andrade, 538 U.S. 63, 76 (2003)). Nevertheless, a state court decision may

---

[24] During his PCRA testimony in 2010, Elliott stated that he was aware of the open charges against Susan. (ECF No. 59, PCRA Hr'g Tr., 1/29/10, at 23-24.)

not be overturned on habeas review merely because the decision conflicts with decisions of any court other than the United States Supreme Court. Decisions from other courts are relevant only to the extent that may be persuasive for purposes of determining whether the state court's decision was an "unreasonable application of" the law of the United States Supreme Court. See Musladin, 549 U.S. at 76-77 ("Given the lack of holdings from this Court[,]" and that "lower courts have diverged widely" on the question presented, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" (quoting 28 U.S.C. § 2254(d)(1), bracketed text added by Supreme Court); Price v. Vincent, 538 U.S. 634, 643 n.2 (2003) (citing lower federal and state court cases to show that the state court's adjudication was not objectively unreasonable).

Rega relies upon United States v. Risha, 445 F.3d 298 (3d Cir. 2006). In that case, an accomplice witness testified at the defendant's federal trial that his cooperation "would not have any impact on the disposition of the state firearm charges against him." Risha, 445 F.3d at 300. The defendant raised a Brady claim in his post-trial motions. At the hearing the district court held on his motion, the defense attorney who had represented the witness in his state criminal case "suggested that he expected [the witness's] federal testimony against [the defendant] to affect the disposition of the state charges." Id. at 301. A state prosecutor testified that he told the witness that he would take his state and federal cooperation "into consideration in resolving the state charges." Id. at 300 (internal quotations omitted). He testified "that he never specifically stated that [the witness] would receive more lenient treatment, and that he did not have authority to make ultimate decisions regarding sentencing recommendations." Id. at 300-01 (internal citations omitted). The district court found as fact that "it is clear that [the witness] understood from [his state defense attorney and the state prosecutor] that testifying against [the defendant] in the federal case would impact the disposition of state charges[,]" id. at 301 n.2, and it granted the

defendant a new trial. In the government's subsequent appeal, the Court of Appeals for the Third Circuit observed that "[t]here can be no dispute that the information in question is favorable to the defense because [the witness's] expectation of leniency in the state proceedings could have been used to impeach him." Id. at 303 n.5. It remanded the case for a determination of whether the federal prosecution had constructive knowledge of the witness's "expected consideration[.]" Id. at 299.

Rega contends that Risha supports a finding that the Commonwealth withheld Brady information because it led Bair, Fishel, Susan, and Sharp to believe that it would take their cooperation into consideration when the time came to resolve their criminal cases. Risha is distinguishable because it was decided on direct review of a federal defendant's conviction. Thus, the federal court in Risha had no state-court findings of fact that had to be presumed to be correct under 28 U.S.C. § 2254(e)(1). In contrast, in this case, this court is bound by PCRA court's findings that there was no express or tacit agreement between the Commonwealth and any of the witnesses, that the Commonwealth neither promised nor fostered any expectation of leniency that a witness may have had, and that, to extent that any witness had such an expectation, it "stemmed from their attorneys' ill-advised statements or their own subjection ideas of what their cooperation would get them." (PCRA Ct. Op., ECF 10-1 at 24.) Because the Pennsylvania Supreme Court adjudicated Rega's Brady claims on the merits, this court is prohibited from granting him habeas relief unless he overcomes § 2254(d)'s standard of review, another provision of AEDPA that did not apply in Risha.

In contrast to Risha, other courts of appeals have held that when the government did not promise the witness that he or she would receive leniency, and when the prosecution is not the source of the witness's expectation of leniency, there is no Brady violation. For example, in Tarver v. Hopper, 169 F.3d 710 (11th Cir. 1999), a decision cited by the Commonwealth, the

petitioner argued that the prosecution had reached a pre-trial agreement with an associate of his who testified against him at his trial. The district court found that the petitioner did not establish that the state suppressed information of a pre-trial deal. It concluded that "whatever exchange may have taken place between [the witness's attorney] and the [prosecutor] did not ripen into a sufficiently definite agreement before [the petitioner's] trial[,]" and, therefore, "no disclosure under Giglio was required." Tarver, 169 F.3d at 717.

The prosecutor in Tarver conveyed to the witness in that case no more than the district attorney communicated to Bair, Fishel, Susan, and Sharp in this case–that their cooperation "would be taken into consideration" after the petitioner's trial. Id. at 716. The Court of Appeals for the Eleventh Circuit found that the prosecutor's statement was "too preliminary and ambiguous to demand disclosure." Id. at 717. It explained that "'[t]he [Giglio] rule does not address nor require the disclosure of all factors which may motivate a witness to cooperate. The simple belief by a defense attorney that his client may be in a better position to negotiate a reduced penalty should he testify against a codefendant is not an agreement within the purview of Giglio.'" Id. (quoting Alderman v. Zant, 22 F.3d 1541, 1555 (11th Cir. 1994) (bracketed texted added by court of appeals). It explained:

> We have, however, recognized that a promise in this context is not "a word of art that must be specifically employed." Brown v. Wainwright, 785 F.2d 1457, 1464-65 (11th Cir.1986). And, "[e]ven mere 'advice' by a prosecutor concerning the future prosecution of a key government witness may fall into the category of discoverable evidence." Haber v. Wainwright, 756 F.2d 1520, 1524 (11th Cir. 1985).
>
> But not everything said to a witness or to his lawyer must be disclosed. For example, a promise to "speak a word" on the witness's behalf does not need to be disclosed. See McCleskey v. Kemp, 753 F.2d 877, 884 (11th Cir. 1985). Likewise, a prosecutor's statement that he would "take care" of the witness does not need to be disclosed. See Depree v. Thomas, 946 F.2d 784, 797-98 (11th Cir. 1991). Some promises, agreements, or understandings do not need to be disclosed, because they are too ambiguous, or too loose or are of too marginal a benefit to the witness to count.

Id.

In Hill v. Johnson, 210 F.3d 481 (5th Cir. 2000), the petitioner claimed "that the district attorney failed to reveal implied understandings of leniency between himself and several witnesses, failed to correct false and misleading testimony, and failed to disclose impeachment evidence." 210 F.3d at 484. The state court rejected his contentions and, after conducting an evidentiary hearing, found "that there were no deals, express, implied or otherwise offered to any witness that were not disclosed to [the petitioner's] trial attorneys." Id. at 486. The district court denied the petitioner's federal habeas petition, and the Court of Appeals for the Fifth Circuit denied a certificate of appealability. It held that the petitioner "neither points to a Supreme Court decision holding that the subjective beliefs of the witnesses regarding the possibility of future favorable treatment are sufficient to trigger the State's duty to disclose under Brady[ ] and Giglio, nor gives us cause to believe that the state court's conclusions involved an unreasonable application of the facts of law existing at the time of its decision." Id. at 486 (footnote omitted); see id. at 487-88 (rejecting the petitioner's claim that the district court erred in deny discovery because "[n]one of the evidence he seeks can transform [his] contention that parties left a meeting with the district attorney entertaining the belief that some unspecified consideration may be forthcoming in the future into a viable claim that the district attorney withheld from [him] and his counsel information regarding a deal for leniency in return for witness testimony.").

In Collier v. Davis, 301 F.3d 843 (7th Cir. 2002), the petitioner argued in his federal habeas proceeding that the state withheld Brady material because the witness at issue "had an informal agreement or understanding that the State would be lenient in exchange for his testimony against [the petitioner.]" Collier, 301 F.3d at 847. After holding evidentiary hearings on the petitioner's claims, the state court found that "that no promise was made to [the witness] in return for his testimony[,]" id., and that the witness did not testify falsely at the petitioner's trial

when he was asked about, but did not reveal the existence of, an agreement. Id. at 846-47. The district court denied the petitioner's Brady claim, and on appeal to the Court of Appeals for the Seventh Circuit the state argued that "only a bilateral understanding of leniency is sufficient to require Brady disclosure, regardless of what [the witness] may have thought." Id. at 849. In affirming the district court's decision, the court of appeals held:

> After a thorough review of the record, we are convinced that [the petitioner's] evidence does not show a Brady violation or evidence of an understanding as interpreted in Giglio. [The witness's] general and hopeful expectation of leniency is not enough to create an agreement or an understanding. See United States v. Baskes, 649 F.2d 471, 477 (7th Cir. 1980) (witness's hopeful expectation that he could avoid criminal proceedings if he testified against the accused did not amount to an undisclosed promise of leniency). Further, unlike in Giglio, [the petitioner] has proffered no evidence of an explicit promise, agreement, or statement made to [the witness]–either by police officers or state's attorneys.
>
>     - - -
>
> Given our deference to the findings of the Indiana state courts, we cannot conclude that their resolution of [the petitioner's] case was contrary to Brady because [the petitioner] has not proved that an understanding actually existed. If there was no understanding, there was no impeachment evidence to disclose.

Id. at 849-50.

These decisions demonstrate the objective reasonableness of the Pennsylvania Supreme Court's resolution of Claim 1(a) and Claim 2, and show that its decision to deny them was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Therefore, Rega did not satisfy the "unreasonable application of" clause of § 2254(d)(1).

In conclusion, because this court is bound by the PCRA court's findings of fact, and because Rega did not overcome the burden imposed upon him by § 2254(d), he is not entitled to habeas relief on either Claims 1(a) and Claim 2. Because jurists of reason would not find it

debatable that these claims lack merit, a certificate of appealability with respect to those claims is denied.[25]

## Claim 1(b)

In Claim 1(b), Rega argues that the Commonwealth violated its <u>Brady</u> obligations because it failed to disclose evidence that Susan had a medical condition, a pseudotumor cerebri, that impaired her memory.

### Background

When Susan testified at Rega's June 2002 Gateway Lodge crimes trial, the defense cross-examined her extensively about the various version of events that she gave to the police in January 2001, and attempted to portray her as a liar. (ECF No. 31, Trial Tr., 6/15/02, at 214-45, 250-51.) She had mentioned during her direct examination, when the district attorney had presented her with a copy of an interview she had given to the police in order to refresh her recollection, that she had "a health condition," (<u>id.</u> at 212), but defense counsel did not ask her about it. When Susan testified almost a year later at Rega's May 2003 rape and sexual assault trial, she was more specific and stated that she had a condition that affects her memory. (<u>See</u> ECF No. 60 at 51, PCRA Hr'g Tr., 1/21/10, at 193.)

Rega's appellate counsel explored the issue of Susan's health condition on direct appeal, and requested that the Commonwealth produce information it had regarding Susan's "brain tumors or abnormalities, or treatment or surgeries related thereto." (Motion to compel, ECF No. 10-12 at 75.) Rega's appellate counsel, Taylor, later testified at a PCRA hearing that they

---

[25] AEDPA codified standards governing the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition. 28 U.S.C. § 2253 ("A certificate of appealability may issue...only if the applicant has made a substantial showing of the denial of a constitutional right."). Where the district court has rejected a constitutional claim on its merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).

asked for this information because his co-counsel, Shenkemeyer, and Rega "had probably gotten together to discuss that particular issue with regard to [Susan]," and he supposed "that [Rega] was familiar with information in her history and the drug abuse, that she had psychological problems and memory problems[.]" (ECF No. 60 at 51, PCRA Hr'g Tr., 1/21/10, at 193.)

When English testified at the post-sentencing hearing on April 4, 2005, he said that Rega gave trial counsel "extensive" information "about [Susan's] character and her history[,]" (ECF No. 47, Post-Sent. Hr'g Tr., 4/4/05, at 58), but they did not know that she had a "brain tumor which might've affected her memory[.]" (Id. at 59.) In response to the question whether the cross-examination of Susan would have changed if the defense had known about her medical condition, English answered: "I don't know whether I would have brought it up or not…. I don't know that the question of her testimony was whether or not she was accurate[,] it was whether or not she was truthful. That was the main issue with her." (Id. at 89.) He explained that there are a number of ways "to attack a witness on cross-examination[,]" and "one of them is to prove they are intentionally misstating that truth, that they are lying." (Id.)

> Another way you might attack a witness depending on the case would be that their perception is not as good as it could be. Say as a witness to an accident they say they saw but they wear glasses and they didn't have their glasses on, so I put memory into the perception category. That her perception of events may be inaccurate. She couldn't see, hear, whatever she's testifying about. That wasn't the nature of [Susan's] testimony. Her testimony was very specific about things that happened and that were said in her presence and I didn't see–my attack on her was not so much with, well, you were not in the room at the time or you couldn't really hear what was said or you don't remember what was said. My attack on her was you're lying. Would I have brought it up? I can't say right now.

(Id. at 89-90.)

On April 12, 2005, the district attorney sent appellate counsel a letter in which he wrote:

> After the hearing last week regarding the above-referenced matter, I endeavored to search the voluminous files in this case to see if anything of value could be found regarding a couple of the issues raised during the questioning at

said hearing. In that regard, I have enclosed the following items and information for the following reasons:

- - -

3. A one-page letter dated March 8, 2002, from Susan Jones to myself which requests a conference in order to discuss the "problem" with her head. I do not recall ever having a conference with her regarding this problem, however, we had a conference with her in preparation for trial and her testimony. I do not recall her ever telling myself or Tpr. Davis that she could not remember any of the details of this case because of a "problem". In fact, I do not recall any discussion at all about this "problem".

(4/12/05 letter, ECF No. 10-12 at 76-77.)

In his PCRA proceeding, Rega claimed that the Commonwealth violated its <u>Brady</u> obligations because it did not disclose information about Susan's medical condition. In support of this claim, he introduced Susan's March 8, 2002 letter to the district attorney. In it, she wrote:

I would like a conference with you to discuss a matter of great importance. I have a problem with my head. My brain is floating in fluid and it could be caused by the beatings that I've taken from my husband over the years. So could you please schedule a conference to speak to one another?

(3/8/02 letter, ECF No. 10-4 at 67.)

When Susan testified at the PCRA hearing, she said that she also told Trooper Davis about her "memory loss problems" when she gave him a written statement on January 16, 2001. (ECF No. 56 at 41, PCRA Hr'g Tr., 12/17/09, at 153.) She said that Trooper Davis and the other officer who was with him "would ask me questions to help jiggle my memory." (<u>Id.</u>, PCRA Hr'g Tr., 12/17/09, at 154.) Rega's counsel asked Susan whether the officers's questions were "open-ended…or did they suggest certain facts to you about details they knew about the case?" (<u>Id.</u>) Susan replied: "There might have been some that suggested certain facts that would help jiggle [my memory] and I would know the answer to whatever the rest of it was." (<u>Id.</u>)

Susan testified that she told the police that she smoked marijuana to relieve the pain of her pseudotumor cerebri. (<u>Id.</u> at 43, PCRA Hr'g Tr., 12/17/09, at 162.) She said that she believed that she had discussed her condition with Rega during the course of their friendship and that her

memory loss issues would have come up during those conversations as well. (Id. at 43-44, PCRA Hr'g Tr., 12/17/09, at 164-67.)

When English testified at the PCRA hearing, he said that the Commonwealth did not disclose Susan's March 8, 2002 letter to the defense prior to Rega's June 2002 trial. (ECF No. 55, PCRA Hr'g Tr., 12/15/09, at 312-13.) He testified that if the Commonwealth had disclosed the letter, the defense would have used it when it cross-examined Susan. (Id. at 313-14.) English explained, however, that although the defense would have used the letter to add to "the pile of reasons why you shouldn't trust Susan[,]" (id. at 314), "the gist against Susan Jones wasn't that she didn't remember, it was just that she was a liar." (Id. at 313-14; see id. at 288-89 ("the primary goal was to say that she was lying, I can tell you that. That was our main strategy there.") During his cross-examination of English, the district attorney recited to him the testimony he had given at the April 4, 2005 hearing, in which he had stated that he could not say whether, under the circumstances, the defense would have utilized Susan's memory issues to attack her credibility. (Id. at 289-90.) English said: "I would give you the same answer today…. Her credibility, her honesty was what we were attacking and not as much her reliability in a physical sense, like she didn't see it." (Id. at 290.)

Elliott testified that the Commonwealth did not disclose Susan's March 8, 2002 letter to the defense. (ECF No. 59, PCRA Hr'g Tr., 1/19/10, at 26.) He said that he probably would have used the letter during Susan cross-examination to try and make the point that the police may have coached her or filled in some of the gaps in her memory. (Id. at 27.) In response to the question whether the use of the letter "would have been consistent with your attacks on" Susan that she was a liar, Elliott replied:

> Well, yes and no. I don't know if it was consistent. It appears our position at trial was she was a liar and purposely fabricating information so if we had an

additional argument she couldn't remember any ways that would have been a different argument. Would we have used it? Probably.

(Id. at 27-28.)

At the PCRA hearing Rega presented the testimony of Dr. Jonathan Mack, who was qualified by the PCRA court as an expert in the field of forensic neuropsychology. He testified that he believed that Susan had a pseudotumor cerebri when she testified at Rega's June 2002 trial, and that that condition can cause "increased intracranial pressure which in itself can cause memory loss." (ECF No. 61, PCRA Hr'g Tr., 1/22/10, at 163.) Dr. Mack stated that "the effects of some of the medications [Susan] was on also would impair or could further impair her memory and attention and overall mental clarity." (Id.)

Dr. Mack testified that a qualified expert such as himself could have made the same diagnosis about Susan based upon information about her that was available at the time of trial. (Id. at 170.) But when asked if he would have been able to assist the defense in developing the argument that Susan "was susceptible to being coached by [the] prosecution in having memory gaps filled in?" Dr. Mack replied: "That's a leap. Without my testing her, that's a leap." (Id.)

On cross-examination, Dr. Mack acknowledged that he was "not current" on the "literature" regarding pseudotumor cerebri. (Id. at 176-77.) He admitted that Susan's pre-2003 medical records do not indicate that she complained of memory loss, even though she outlined other issues that she was experiencing, such as depression, helplessness, and headaches. (Id. at 177-82.)

The PCRA court found that the "Commonwealth failed to disclose…evidence of Susan Jones's memory impairment," and in particular her March 8, 2002, letter to the district attorney and her statements to Trooper Davis. (PCRA Ct. Op., ECF NO. 10-1 at 25.) It denied Rega relief

on Claim 1(b) because it concluded that the impact of the Commonwealth's suppression "was relatively minor" and that Rega failed to satisfy <u>Brady</u>'s materiality prong. (<u>Id.</u> at 25-27.)

The Pennsylvania Supreme Court agreed. It found that the PCRA court record showed that Susan "suffered from a health condition causing some degree of memory impairment[,]" <u>Rega II</u>, 70 A.3d at 781, but determined "that an exploration by the defense of the memory impairment concern at trial would not have created a reasonable probability of a different outcome." <u>Id.</u> at 781-82. In support of this conclusion, the supreme court pointed out that Susan "was able to recall significant details at trial which were consistent with her previous statements to law enforcement authorities[.]" <u>Id.</u> at 782. It further observed that there was "a wealth of other incriminating evidence" introduced at the trial that established Rega's guilt, including the testimony of Bair, Fishel, and Stan. <u>Id.</u> Additionally, Rega did not convince the supreme court that there was a reasonable probability that the defense strategy would have changed had the Commonwealth disclosed the information at issue. <u>Id.</u> at 782 n.4. "[A]s the Commonwealth observes," the Pennsylvania Supreme Court noted, Susan "did allude to her health condition at trial in response to the prosecutor's questions directed at her failure to recall specific details[,]" <u>id.</u> (citing ECF No. 31, Trial Tr., 6/15/02, at 212), and there was evidence in the PCRA record that Rega "likely knew of [Susan's] medical condition prior to his trial." <u>Id.</u> (citing to Susan PCRA testimony at ECF No. 56 at 42-44, PCRA Hr'g Tr., 12/17/09, at 160-67.) Trial counsel did not explore the issue with Susan on cross-examination, and "[t]his lends some credence," the supreme court concluded, "to the Commonwealth's suggestion that the pervasive focus of [Rega's] trial attorneys during [Susan's] cross examination (which rested on their successful efforts to stress that [Susan] repeatedly lied to law enforcement officials) was strategic." <u>Id.</u>

**Discussion**

It was Rega's burden before the Pennsylvania Supreme Court to prove that the Commonwealth's failure to disclose the evidence at issue in Claim 1(b) was material. In United States v. Bagley, 473 U.S. 667 (1985), the United States Supreme Court formulated the standard to be used to determine whether suppressed evidence is material. Evidence is material, it stated, only if it could be shown that "'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Kyles v. Whitley, 514 U.S. 419, 433-34 (1995) (quoting Bagley, 473 U.S. at 682 (opinion of Blackmun, J.)).

> [A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant). Bagley's touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial." Bagley, 473 U.S., at 678, 105 S.Ct., at 3381.

Id. at 434 (additional internal citations omitted). The materiality test "is not a sufficiency of evidence test[,]" id., and the impact of the suppressed evidence must be "considered collectively, not item by item." Id. at 436.

Rega did not demonstrate that the Pennsylvania Supreme Court's decision was "contrary to" Brady's materiality standard as articulated by the United States Supreme Court. It cited to Bagley and set forth the appropriate inquiry a court must make in deciding whether withheld evidence had a material impact on a defendant's trial. Rega II, 70 A.3d at 781-82.

The next question for this court is whether Rega demonstrated that the Pennsylvania Supreme Court's decision was an "unreasonable application of" United States Supreme Court

law. He did not meet that burden either. The Pennsylvania Supreme Court weighed the strength of the suppressed information against the evidence introduced at Rega's trial that established his guilt in order to evaluate the impact of the suppressed evidence, which is a permissible inquiry. See, e.g., Strickler, 527 U.S. at 294 (the petitioner did not establish the suppressed evidence was material because "the record provides strong support for the conclusion that that the petitioner would have been convicted of capital murder…even if [the witness at issue] had been severely impeached."). It also contemplated the impact the nondisclosure had on the defense's strategy, which is another appropriate inquiry. Bagley, 473 U.S. at 676 (materiality must be evaluated in terms of how evidence could have been "used effectively" by the defense); id. at 683 (if the withheld evidence impacted "the course that the defense" pursued, it may be material); see Kyles, 514 U.S. at 441 (materiality must be assessed in light of what "competent counsel" would have done with the suppressed evidence). The Pennsylvania Supreme Court was not persuaded that Rega's trial counsel would have altered their attack on Susan's credibility that much, if at all, had the information at issue been disclosed. There was some testimony from Rega's trial counsel that supported the conclusion that they would have used information of Susan's medical condition during cross-examination, but other testimony from them supported a finding that they would have spent little time exploring the issue with her, since their strategy was to convince the jury that Susan was lying, not that she misremembered things. That trial counsel would have steered clear of asking Susan about her medical condition, or not made it an important part of its cross-examination of her, also has some support in the trial record, which showed that defense counsel did not ask Susan about her health condition even though she expressly referenced it during her direct examination when the district attorney was attempting to refresh her recollection.

Ultimately, this court cannot conclude that Pennsylvania Supreme Court's decision that Rega did not satisfy <u>Brady</u>'s materiality prong "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Richter</u>, 562 U.S. at 103. Therefore, its determination withstands review under § 2254(d)(1)'s "unreasonable application of" clause.

The only remaining inquiry for this court is whether Rega established that the Pennsylvania Supreme Court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). He did not. To the extent that the Pennsylvania Supreme Court made any factual determination that precluded Rega relief on Claim 1(b), those findings had the necessary evidence in the state court record to survive review under § 2254(d)(2).

Based upon all the foregoing, Claim 1(b) is denied. Because jurists of reason would not find it debatable that this claim lacks merit, a certificate of appealability with respect to that claim is denied.

**Claim 3**

In Claim 3, Rega argues that his constitutional rights were violated because of the cumulative effect that the suppressed evidence and false testimony had on his trial. This claim does not entitle to him federal habeas relief. The PCRA court and the Pennsylvania Supreme Court found only one category of suppressed evidence (the evidence related to Susan's memory impairment), and it rejected Rega's claim that the Commonwealth introduced or failed to correct false testimony. Therefore, there was no errors to aggregate. For this reason, the PCRA court

denied Rega's "cumulative prejudice" <u>Brady</u> claim[26] (PCRA Ct. Op., ECF No. 10-1 at 27), and

the Pennsylvania Supreme Court affirmed the PCRA court's disposition of Rega's <u>Brady</u> claims.

<u>Rega II</u>, 70 A.3d at 780-82.

This court already determined that it must review Rega's claims with the facts as found

by the PCRA court, 28 U.S.C. § 2254(e)(1), and that the Pennsylvania Supreme Court's

adjudication of Rega's <u>Brady</u> claims at Claims 1(a), 1(b), and 2 withstand review under

§ 2254(d). For those same reasons, Claim 3 is denied. Because jurists of reason would not find it

debatable that Claim 3 lacks merit, a certificate of appealability with respect to that claim is

denied.

## B. Ineffective Assistance of Counsel Claims

In Claims 4 through 9, Rega contends that his trial counsel provided him with ineffective

assistance of counsel during the guilt-phase of his trial. The test to evaluate ineffective assistance

of counsel claims in both federal courts and the Pennsylvania state courts is set forth in

<u>Strickland v. Washington</u>, 466 U.S. 668 (1984). <u>See</u>, <u>e.g.</u>, <u>Commonwealth v. Sepulveda</u>, 55 A.3d

1108, 1117-18 (Pa. 2012) ("In order to obtain relief on a claim of ineffectiveness, a PCRA

petitioner must satisfy the performance and prejudice test set forth in <u>Strickland</u>[.]");

<u>Commonwealth v. Kimball</u>, 724 A.2d 326, 330-33 (Pa. 1999). <u>Strickland</u> recognized that the

Sixth Amendment's guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the

right…to have the Assistance of Counsel for his defence" entails that defendants are entitled to

be represented by an attorney who meets at least a minimal standard of competence.[27] 466 U.S.

---

[26] Rega's cumulative prejudice claim was Claim IX in his amended PCRA petition (ECF No. 10-27 at 178-81.) In his brief to the Pennsylvania Supreme Court, he raised it as an argument to support Claim I, which is the claim in which he raised all his <u>Brady</u> allegations. (Br. of Appellant, ECF No. 10-25 at 29.)

[27] Rega argues that his appellate counsel provided him with ineffective assistance for failing to raise on direct appeal the claims of trial counsel's ineffectiveness that are at issue in Claims 4 through 9. Since the Fourteenth Amendment guarantees a criminal defendant pursuing a first appeal as of right certain "minimum safeguards

(footnote continued on the next page)

at 685-87. "[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance[.]" Titlow, 134 S.Ct. at 18.

Under Strickland, it is Rega's burden to establish that his "counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." Id. at 687. The Supreme Court emphasized that "counsel should be 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment[.]'" Titlow, 134 S.Ct. at 17 (quoting Strickland, 466 U.S. at 690) (emphasis added). "[T]he burden to 'show that counsel's performance was deficient' rests squarely on the defendant." Id. (quoting Strickland, 466 U.S. at 687). The Supreme Court observed in Strickland that:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel's was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

466 U.S. at 689 (internal citations and quotations omitted); see Richter, 562 U.S. at 104 ("A court considering a claim of ineffective assistance must apply a 'strong presumption' that

necessary to make that appeal 'adequate and effective,'" Evitts v. Lucey, 469 U.S. 387, 392 (1985) (quoting Griffin v. Illinois, 351 U.S. 12, 20 (1956)), including the right to the effective assistance of counsel, id. at 396, the Strickland standard applies to a claim that direct appeal counsel was ineffective. See Smith v. Robbins, 528 U.S. 259, 285 (2000); United States v. Cross, 308 F.3d 308, 315 (3d Cir. 2002). Here, the Pennsylvania Supreme Court in Rega II denied the guilt-phase claims of trial counsel's ineffectiveness that are at issue in Claims 4 through 9, and it did so based upon its review of the extensive record Rega developed during his PCRA hearings. 70 A.3d at 780 n.2; id. at 782-89. Appellate counsel cannot be found to be ineffective for failing to raise a meritless claim. See, e.g., United States v. Sanders, 165 F.3d 248, 253 (3d Cir. 1999).

counsel's representation was within the 'wide range' of reasonable professional assistance.")

(quoting Strickland, 466 U.S. at 689).

The Supreme Court instructed that "[i]t should go without saying that the absence of evidence cannot overcome the 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.'" Titlow, 134 S.Ct. at 17 (quoting Strickland, 466 U.S. at 689). It advised:

> "Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, —, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. Strickland, 466 U.S., at 689-690, 104 S.Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." Id., at 689, 104 S.Ct. 2052; see also Bell v. Cone, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); Lockhart v. Fretwell, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. Strickland, 466 U.S., at 690, 104 S.Ct. 2052.

Richter, 562 U.S. at 105.

Strickland also requires that Rega demonstrate that he was prejudiced by his counsel's alleged deficient performance. This places the burden on him to establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

> [The petitioner] "need not show that counsel's deficient performance 'more likely than not altered the outcome of the case'–rather, he must show only 'a probability sufficient to undermine confidence in the outcome.'" Jacobs v. Horn, 395 F.3d 92, 105 (3d Cir. 2005) (quoting Strickland, 466 U.S. at 693-94). On the other hand, it is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." [Richter, 562 U.S. at 104] (citing Strickland, 466 U.S. at 693). Counsel's errors must be "so serious as to deprive the defendant of a

fair trial." Id. at [104] (citing Strickland, 466 U.S. at 687). The likelihood of a different result must be substantial, not just conceivable. Id.

Brown v. Wenerowicz, 663 F.3d 619, 630 (3d Cir. 2011).

The Supreme Court in Strickland noted that although it had discussed the performance component of an effectiveness claim prior to the prejudice component, there is no reason for an analysis of an ineffectiveness claim to proceed in that order. 466 U.S. at 697. If it is more efficient to dispose of an ineffectiveness claim on the ground that the petitioner failed to meet his burden of showing prejudice, a court need address only that prong of Strickland. Id.

### Claim 4

In Claim 4, Rega contends that his trial counsel were ineffective for failing to retain and utilize a crime scene reconstruction expert. To support this claim, Rega relies upon the PCRA testimony of Robert Tressel, a former police officer and an investigator from the Cobb County, Georgia, Medical Examiner's Office, who was qualified at the PCRA hearing as an expert in forensic crime reconstruction. (ECF No. 56 at 3-5, PCRA Hr'g Tr., 12/17/09, at 3-9.) Rega argues that if his trial attorneys had presented testimony from an expert such as Tressel, they could have undermined the Commonwealth's theory that he shot Laugh "from behind, execution-style" (ECF No. 6 ¶ 150), and they also could have created reasonable doubt in the jury's mind that he was the one that shot and killed Lauth.

### Background

In his opening statement, the district attorney said that Bair would testify that Rega told Lauth right before he shot him to "say his last prayer[.]" (ECF No. 30, Trial Tr., 6/14/02, at 33.) The district attorney also said that Dr. Eric Vey, the forensic pathologist who performed the autopsy on Lauth, would testify that the bullet wounds indicated that Lauth was "on [his] knees" when he was shot. (Id.)

When he testified at the trial, Bair did not reference Rega's alleged statement to Lauth. During his direct examination of Dr. Vey, the district attorney twice asked if the forensic evidence indicated that Lauth was on his knees when he was shot, and each time English objected because it called for speculation and Dr. Vey did not answer the question. (Id. at 125-28.) Dr. Vey testified that the bullets that entered Lauth followed a downward path through his body from back to front. (Id. at 124-25, 129, 132.) He explained that Lauth was shot either three or four times,[28] the wound to his left scalp indicated that a bullet entered the body at a downward angle, another wound indicated that that bullet entered perpendicular to the skin surface, all the bullets traveled through the body in the downward direction, and Lauth could not have been standing when he was shot. (Id. at 122, 126-29, 142-43.) In his closing argument, the district attorney made no reference to Dr. Vey's testimony, the positioning of Lauth when he was shot and killed, or where the shooter stood when he shot Lauth. (ECF No. 35, Trial Tr., 6/20/02, at 175-218.)

Rega argues that testimony from a crime scene reconstruction expert such as Tressel could have rebutted the prosecution's theory that Rega shot Lauth execution style while on his knees, but the prosecution failed to develop evidence to support that theory and abandoned it. Although Tressel testified at a PCRA hearing that, in in his opinion, Lauth was likely lying facedown on the floor when he was shot (ECF No. 56 at 12, 14-15, 17-18, PCRA Hr'g Tr., 12/17/09, at 37-38, 46-51, 60-62), he acknowledged that it was possible that Lauth was kneeling at the time. (Id. at 15, 23, PCRA Hr'g Tr., 12/17/09, at 51, 81.) Tressel also testified that there was no "scientific way" to determine "the angle of the body" because the three bullets that

---

[28] Lauth had four gunshot wounds on his body. Dr. Vey testified that one of the wounds was on his left occipital scalp (which would have killed him instantly), one was on his neck, and one was on his left shoulder. (ECF No. 30, Trial Tr., 6/14/02, at 121, 129-32.) He also had a grazing gunshot wound on his right hand. (Id. at 120.) The bullet that made that wound could have been one that grazed his hand and then entered Lauth's body. (Id. at 143.) Therefore, Dr. Vey explained, it is possible that only three bullets were fired at Lauth. (Id.)

entered Lauth did not have exit wounds and two of them were lodged in organs and could have changed position once they were inside the body. (Id. at 14-15, PCRA Hr'g Tr., 12/17/09, at 48-49.) On cross-examination, Tressel admitted that he formed his conclusions without having viewed the autopsy diagram or the exhibits that were used when Dr. Vey testified at the trial. (Id. at 26, PCRA Hr'g Tr., 12/17/09, at 95-96.) As a result, Tressel was not aware of the exact nature of the injury that Lauth had sustained to his hand, which he acknowledged suggested that it was possible that Lauth was holding it up and shielding his head when at least one of the bullets was fired at him. (Id. at 26-27, PCRA Hr'g Tr., 12/17/09, at 95-100.)

Rega argues that testimony from an expert such as Tressel could have supported the theory that Fishel shot Lauth, and that such testimony would have discredited Fishel's and Bair's trial testimony, because they stated that Rega was the shooter. In support of it, Rega cites to a portion of Fishel's trial testimony that he contends shows that "just before Mr. Lauth was shot," Fishel was in "the exact same area from where Mr. Tressel testified the deadly shots were fired." (ECF No. 6 ¶ 162 (citing ECF No. 34, Trial Tr., 6/19/02, at 17).) What Fishel actually stated when he testified was that, when Rega began shooting at the lock on the freezer door, he "[j]umped off to the side of the kitchen" by where the telephone was located "[b]ecause Mr. Rega was firing the gun towards me at the same time" and he was worried a bullet would ricochet and hit him. (ECF No. 34, Trial Tr., 6/19/02, at 17-18.) The telephone was located in the vicinity of laundry area. (Crime scene diagram, ECF 10-4 at 79.)

Tressel testified at the PCRA hearing that in his opinion, when the shooter fired one of the three shots at Lauth, the shooter was standing in the entryway of the kitchen, "near the laundry room area," (ECF No. 56 at 14, PCRA Hr'g Tr., 12/17/09, at 47), but he admitted that he could only identify a "general vicinity[,]" of where the shooter was standing. (Id. at 15, PCRA Hr'g Tr., 12/17/09, at 50; see id. at 20, PCRA Hr'g Tr., 12/17/09, at 70-71.) In fact, according to

Tressel, the shooter could have been standing anywhere from thirty-six inches to ten feet from Lauth. (Id. at 20, 22, 29, PCRA Hr'g Tr., 12/17/09, at 69-72, 78-79, 107.) He also based his opinion that the shooter was standing near the laundry area on the fact that a shell casing was found there, but he admitted on cross-examination that the shell casing would have bounced around before it landed in the laundry room area and that the shooter could have been standing in a range of locations when he fired the bullet at issue. (Id. at 20, 22, PCRA Hr'g Tr., 12/17/09, at 71, 78.) Tressel acknowledged that his opinion "does not establish who the shooter was[.]" (Id. at 28, PCRA Hr'g Tr., 12/17/09, at 101.)

**Discussion**

The Pennsylvania Supreme Court denied Claim 4 because it determined that Rega failed to show he that was prejudiced by trial counsel's decision not to utilize the services of a crime scene reconstruction expert. Rega II, 70 A.3d at 789. It held that "[e]ven if the PCRA court had credited [Rega's] post-conviction evidence, which it did not, we do not envision that the difference between whether Mr. Lauth was killed while on his knees or prone would have made a material difference in the jurors' culpability assessment." Id.

Rega argues that this court should review Claim 4 *de novo* because the Pennsylvania Supreme Court required him to prove, in establishing prejudice, that counsel's failure to retain an expert such as Tressel "would have" impacted the jury's verdict, not whether, as stated in Strickland, there was a "reasonable probability" that the outcome of his trial "would have been different." 466 U.S. at 694. If the Pennsylvania Supreme Court did in fact apply a more demanding prejudice standard than that required by Strickland, then its adjudication was "contrary to" Strickland under § 2254(d)(1) and Rega is correct that this court must review Claim 4 *de novo*. Williams, 529 U.S. at 405-06.

The United States Supreme Court cautioned, however, that federal courts reviewing a state prisoner's habeas petition should not be too quick to assume that the state court applied the wrong law, even if the state court was imprecise in language it used in evaluating a claim. Woodford v. Visciotti, 537 U.S. 19, 23-24 (2002) (*per curiam*) (finding the Court of Appeals for the Ninth Circuit's "readiness to attribute error [to the state court] is inconsistent with the presumption that state courts know and follow the law," and is "also incompatible with § 2254(d)'s 'highly deferential standard for evaluating state-court rulings,' which demands that state court decisions be given the benefit of the doubt."). This is particularly so when a commonly-applied and well-known inquiry such the Strickland prejudice prong is at issue. Id. Cf. Titlow, 134 S.Ct. at 15 (observing how common ineffective assistance of counsel claims under Strickland are and that it is "a claim state courts have now adjudicated in countless criminal cases for nearly 30 years[.]").

Rega did not convince this court that the Pennsylvania Supreme Court actually applied a more difficult prejudice inquiry than Strickland requires when it denied Claim 4. At the beginning of its decision, it cited opinions that articulated the well-known and appropriate inquiry. Rega II, 70 A.3d at 780 n.2 (citing Commonwealth v. Gibson, 951 A.2d 1110, 1120-21 (Pa. 2008) (setting forth Strickland's elements and articulating the proper prejudice inquiry); Sepulveda, 55 A.3d at 1117-18 (same)). In Visciotti, the United States Supreme Court pointed out that it too has stated imprecisely Strickland's prejudice standard at points in some of its decisions, and noted that the California Supreme Court's shorthand reference to the Strickland standard that was not entirely accurate "can no more be considered a repudiation of the standard than can this Court's own occasional indulgence in the same imprecision." 537 U.S. at 24 (citing Mickens v. Taylor, 535 U.S. 162, 166 (2002); Williams, 529 U.S. at 393).

Because Rega did not demonstrate that the Pennsylvania Supreme Court's decision was "contrary to" <u>Strickland</u>, the appropriate question for this court in evaluating Claim 4 is whether it decision withstands review under § 2254(d)(1)'s "unreasonable application of" clause.[29] Rega did not show that the Pennsylvania Supreme Court's decision that he was not prejudiced "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement[,]" <u>Richter</u>, 562 U.S. at 103, and therefore, he is not entitled to relief on Claim 4.

Alternatively, Claim 4 fails even under a *de novo* review. It fails because this court concludes in its independent judgment that Rega did not establish that he was prejudiced by his trial counsel's decision not to utilize a crime scene reconstruction expert. Rega's argument that there is a reasonable probability that testimony from an expert such as Tressel would have created reasonable doubt in the jury's mind that Rega was not the shooter is unconvincing. It is premised upon Fishel's single comment that, at one point during the chaos of Rega firing the gun, Fishel "[j]umped off to the side of the kitchen" near the laundry area to avoid being hit. For reasons already discussed, Tressel's PCRA testimony did not show that the defense could have made a remotely persuasive argument that Fishel was the shooter.

Because Rega did not demonstrate that this is a case in which there is a reasonable probability that a crime scene reconstruction expert could have aided his defense, this case is distinguishable from <u>Hinton v. Alabama</u>, 134 S.Ct. 1081 (2014) (per curiam), a decision upon which he relies. In <u>Hinton</u>, the defendant argued that his trial counsel's performance was deficient because counsel failed to request funding to hire an expert in order to challenge the

---

[29] Rega argues that the Pennsylvania Supreme Court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts[,]"28 U.S.C. § 2254(d)(2), but its decision did not turn a factual determination. To the contrary, it answered a question of law or a mixed question of law and fact, and § 2254(d)(1) applies to such questions. In any event, if § 2254(d)(2) review applies to Claim 4, Rega did not overcome it because the Pennsylvania Supreme Court had sufficient evidence in the record to deny Claim 4.

state's evidence that bullets recovered from the crime scenes had been fired from the gun recovered from his home. 134 S.Ct. at 1086-89. To support his claim, the defendant presented at a post-trial hearing the testimony of three experts in toolmark evidence who all stated that the bullets had not been fired from the defendant's gun. Id. at 1086. The Supreme Court agreed that the defendant proved that his trial attorney provided deficient representation and it remanded the case for consideration of Strickland's prejudice prong. Id. at 1986-90. In reaching its holding, the Supreme Court found that "the core of the prosecution's case was the state experts' conclusion that the six bullets had been fired from the [defendant's] revolver[.]" Id. at 1088.

In Siehl v. Grace, 561 F.3d 189 (3d Cir. 2009), another decision relied upon by Rega, the petitioner became a prime suspect in his estranged wife's murder because a fingerprint and blood sample from the crime scene matched his. Id. at 191-92. The forensic expert retained by the petitioner's trial counsel provided the defense with a preliminary analysis in which he agreed that the fingerprint was a match. Id. at 191. In his analysis, the expert pointed out issues with his preliminary conclusion which should have indicated to the petitioner's counsel that further forensic assistance was required. Id. at 191, 196. Counsel did not pursue such assistance, and in fact stipulated that the fingerprint was the petitioner's fingerprint. That evidence was a key piece of evidence relied upon by the Commonwealth at trial to establish the petitioner's guilt. Id. at 191-92. In his PCRA proceeding, the petitioner claimed that his trial counsel were ineffective for stipulating that it was his fingerprint and "for failing to secure the assistance of a competent forensic expert at trial[.]" Id. at 192. The state court denied his request for PCRA relief, and the district court denied his subsequent federal habeas petition. The Court of Appeals for the Third Circuit reversed. It held that the state court's decision was objectively unreasonable because the Commonwealth's forensic evidence was a significant part of its case against the petitioner and because the petitioner, in the limited PCRA record he was able to develop, included a forensic

expert's report that opined that the fingerprint did not come from the petitioner. Id. at 191-93, 196. The court of appeals remanded the case to the district court for *de novo* review and evidentiary hearing. Id. at 196.

In contrast to Hinton and Siehl, the Commonwealth in this case did not rely upon forensic evidence to persuade the jury that the petitioner was the shooter. The expert testimony relied upon by Rega in this case (Tressel's PCRA testimony) is not comparable to the expert evidence proffered by the defendant in those cases to support their ineffective assistance claims.

Based upon all the foregoing, § 2254(d)'s standard of review applies to Claim 4, and Rega did not overcome it. Alternatively, Claim 4 fails even under a *de novo* review. Because jurists of reason would not find it debatable that Claim 4 lacks merit, a certificate of appealability with respect to that claim is denied.

### Claim 5

In Claim 5, Rega contends that his trial counsel were ineffective when they did not rely upon Franks v. Delaware, 438 U.S. 154 (1978), to support the motion to suppress the letters seized from his mobile home on June 7, 2002. Under Franks, when a warrant is obtained upon a false statement made in a supporting affidavit, the fruits of the search warrant must be excluded if the remaining material, following the excision of the falsity, is independently insufficient to support a finding of probable cause. 438 U.S. at 155-56. If the suppression court determines that a Franks hearing is required, a defendant must prove by a preponderance of the evidence that: (1) "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit[,]"; and, (2) the "false statement is material to the finding of probable cause[.]" Id. "If the defendant is able to ultimately meet this burden, 'the Fourth Amendment requires that…the fruits of the search [must be] excluded to the same extent as if probable cause was lacking on the face of the affidavit." United States v. Yusuf, 461 F.3d

374, 383 (3d Cir. 2006) (quoting <u>United States v. Frost</u>, 999 F.2d 737, 743 (3d Cir. 1993), which

quoted <u>Franks</u>, 438 U.S. at 156) (textual alterations in <u>Yusuf</u>).

**Background**

On June 7, 2002, shortly before Rega's trial was scheduled to commence, Corporal

Jeffrey Lee ("Corporal Lee") swore out an affidavit in support of a warrant to search Rega's

mobile home, which was being occupied at the time by his mother, Joan Rega ("Joan").

(Affidavit of probable cause, ECF No. 66 at 1-3.) In it, Corporal Lee detailed efforts on the part

of Rega to enlist his mother in a jury-tampering scheme. He explained that the list of prospective

jurors had been given to defense counsel, who then shared those documents with Rega. Corporal

Lee explained that on May 30, 2002, and on June 2, 2002, Rega, who was confined at

SCI Houtzdale, had telephone conversations with his mother that were lawfully recorded.

Corporal Lee listened to the recordings of their conversations and attested:

> I am familiar with the voices of both Robert Gene REGA and Joan REGA. [Their
> recorded conversations] show quite clearly that Joan REGA has received juror list
> information containing names of prospective jurors. Furthermore, said
> conversations show that she has disseminated this information to other friends and
> family members and acquaintances. The conversation on May 30, 2002 shows
> that Joan REGA was saying that "Betty's sister-in-law" is on the panel. It also
> shows that Joan is examining the list of juror names and is marking the list as she
> consults with others. Joan REGA makes mention of the fact that she is going to
> SCI Houtzdale on Saturday to visit Robert Gene REGA. Then, in the June 2, 2002
> conversation, Robert REGA asks Joan REGA if "without saying anything, what
> did Gram say, will she do it, yes or no". In Joan REGA's reply to that question,
> she states that "Betty" is willing to talk to her "sister-in-law", but that she just
> needs to know what questions to ask her about being on "Robert's jury". Robert
> REGA then silences his mother and severely reprimands her because she "never
> thinks before she talks". He is quite angry at her and he obviously knows that he
> is being tape-recorded.

(Id. ¶ 4, ECF No. 66 at 2.)[30] Based upon this information, Corporal Lee alleged that "[t]here is probable cause to believe that juror questionnaires/lists, etc. will be found in the above-referenced mobile home and that there will be markings identifying the targeted juror(s)." (Id. at ¶ 6, ECF No. 66 at 3.)

A magistrate district judge issued the search warrant (the "first search warrant"), and it permitted officers to search Rega's mobile home for "Jefferson County Jury Questionnaires, Jury List *and any or all papers, documents containing names of prospective jurors* for pending criminal case[.]" (ECF No. 66 at 1 (emphasis added).) The police executed the first search warrant on June 7, 2002. They did not find any jury-related documents. During the course of their search, however, the officers found a letter from Rega to his mother in which Rega instructed her to find someone to provide him with an alibi in exchange for $500.00. Later that same day, Trooper Michael Pisarchick applied for another warrant to search the mobile home (the "second search warrant"), which when it was issued permitted the search for "[a]ny or all papers, letter or documents directly attributed to Robert Gene REGA concerning his pending criminal case[.]") (Second search warrant, ECF No. 66 at 4.) The police executed the second search warrant on the evening of June 7, 2002, and they obtained numerous letters that showed that Rega was attempting to tamper with the testimony of witnesses. (ECF No. 34, Trial Tr., 6/19/02, at 172-85.)

The Commonwealth notified defense counsel that it intended to introduce the letters at the upcoming trial. On June 13, 2002, defense counsel made an oral motion to suppress the letters. The court held a hearing on that motion that evening. To support the argument that the letters should be suppressed, defense counsel introduced the transcript of the May 30, 2002,

---

[30] When Rega and his mother spoke of "Gram" and "Betty," they were referring to Elizabeth Edwards ("Edwards"), who is the grandmother of Rega's ex-wife, Renee. Edwards's sister-in-law, Janet, was on the list of prospective jurors. (Affidavit of probable cause ¶ 5, ECF No. 66 at 3.)

recording of Rega and Joan's phone conversation, in which Joan stated: "I am going to [the] post office [at] exactly 9:00 to mail out the things that you sent to me." (ECF No. 67, Hr'g Tr., 6/13/02, at 31.) Defense counsel argued that this transcript showed that Corporal Lee was aware when he applied for the first search warrant that the jury list and/or questionnaires would not be in the mobile home because Joan had mailed them back to Rega. (Id. at 4-5.) Although defense counsel suggested that Corporal Lee's affidavit of probable cause contained a material falsehood or omission and argued that the letters seized during the execution of the second search warrant were the fruits of that initial illegal search, they did not raise a Frank violation and in fact argued to the court that its review should be limited to the four corners of the affidavit.

When he testified at the suppression hearing, Corporal Lee stated that the police were not searching for only the "jury list," but also "copies or reproductions of that jury list as well as any papers that would contain information about any prospective juror." (Id. at 30.) At the conclusion of the hearing, the trial court denied the suppression motion. (Id. at 60-70.) The Commonwealth introduced the letters at Rega's trial. In his closing argument, the district attorney argued to the jury that that the letters showed Rega's consciousness of guilt. (ECF No. 35, Trial Tr., 6/20/02, at 190-93.)

In his PCRA proceeding, Rega contended, as he does in his federal habeas petition in Claim 5, that his trial counsel were ineffective because they should have raised a Franks violation in the motion to suppress. The Pennsylvania Supreme Court was not persuaded. It observed that the recorded phone conversations between Rega and his mother indicated that she had distributed the jury information "to friends and family" and that "*common sense dictated that in the process, [she] easily could have copied some of that information onto other papers and documents besides the official lists and questionnaires.*" Rega II, 70 A.3d at 783 (quoting Rega I,

933 A.2d at 1012) (emphasis added in <u>Rega II</u>).[31] Therefore, it concluded, Rega did not demonstrate that the <u>Franks</u> violation he contended his counsel should have raised had merit. <u>Id.</u> at 783-84; <u>see id.</u> at 780 n.2 ("To the degree any underlying claim is not directly available for review, our assessment of it here is employed solely as a means of determining the viability of extant derivative claims."). For this reason, the Pennsylvania Supreme Court denied Claim 5, as counsel cannot be ineffective for failing to raise a meritless claim. <u>Id.</u>; <u>see id.</u> at 70 A.3d at 780 n.2 (citing <u>Gibson</u>, 951 A.2d at 1120-21 for the proposition that "a derivative claim cannot be sustained where an underlying one is unmeritorious.").

**Discussion**

Rega acknowledges that § 2254(d)'s standard of review applies to this court's review of Claim 5. He argues that the Pennsylvania Supreme Court's decision was an "unreasonable application of"[32] <u>Franks</u> and <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983) (held that the government entity seeking a warrant must establish "a fair probability that the contraband or evidence of a crime will be found in a particular place."). In support, he contends that the Pennsylvania Supreme Court read something into Corporal Lee's affidavit that was not there (that Joan could have copied documents), that probable cause cannot be based upon mere speculation, and that its holding relieved the Commonwealth of its burden of proving probable cause.

---

[31] <u>Franks</u> dealt with a situation in which it was claimed a "false statement" was set out in the search warrant affidavit. The Pennsylvania Supreme Court commented that, given its disposition of Claim 5, it did not need to decide whether the reasoning of <u>Franks</u> extends to material omissions. <u>Rega II</u>, 70 A.3d at 784 n.7.

[32] Rega does not contend that the Pennsylvania Supreme Court's adjudication was "contrary to" any decision of the United States Supreme Court. (ECF No. 22 at 122.) He does contend that its adjudication was an "unreasonable determination of the facts" under § 2254(d)(2), but he does not present argument to support that contention. (<u>Id.</u>) Nevertheless, if the standard of review at § 2254(d)(2) applies, Rega did not overcome it because the record contained the requisite evidence for the Pennsylvania Supreme Court's decision to withstand review under § 2254(d)(2).

None of Rega's arguments are persuasive. In his affidavit of probable cause to support the first search warrant, Corporal Lee explained that Joan had disseminated the jury information to family and friends and was actively engaged in assisting Rega in his jury-tampering scheme. Probable cause determinations require the issuer to make a "practical, common sense-decision[,]"Gates, 462 U.S. at 238, and the Pennsylvania Supreme Court did not engage in mere speculation when it concluded that the Commonwealth would have established probable cause had a Franks issue been raised by trial counsel. It noted that, "the Commonwealth established probable cause, through Joan Rega's own words, that she had been enlisted to aid [Rega] in very serious misconduct aimed at undermining the justice system." Rega II, 70 A.3d at 783 n.6. The Pennsylvania Supreme Court did not relieve the Commonwealth of any burden. As in this federal habeas case, in the PCRA proceeding it was Rega's burden to show both that his underlying Franks claim had merit and that his trial counsel were ineffective for failing to raise it.

Based upon the forgoing, Rega did not demonstrate that the Pennsylvania Supreme Court's decision to deny Claim 5 was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Therefore, this court cannot conclude that its decision was "unreasonable application of" "clearly established Federal law, as determined by the Supreme Court of the United States[.]"28 U.S.C. § 2254(d)(1). Because jurists of reason would not find it debatable that Claim 5 lacks merit, a certificate of appealability with respect to that claim is denied.

## Claim 6

In Claim 6, Rega contends that his trial counsel were ineffective because on two separate occasions during his trial the courthouse was closed and his counsel failed to object on the basis

that his right to a public trial, as recognized in <u>Waller v. Georgia</u>, 467 U.S. 39 (1984), was violated by the closure.

**Background**

The first occasion that Rega alleges the courthouse was closed was on Saturday, June 15, 2002. Rega's trial had started the day before, on Friday, June 14, 2002, and on that date the trial court announced:

> For those of you who are spectators, I appreciate your quietness. I just want to make this announcement now, we are going to have a Saturday session starting at 8:30. Since the courthouse is generally not open, the doors will only be open until court starts at 8:30 and again for lunch to leave people out and again at one o'clock and then at the end of the day they'll be locked. So if you want to be here, be here from 8:00 to 8:30.

(ECF No. 30, Trial Tr., 6/14/02, at 109.)

The second occasion that Rega alleges the courthouse was closed was the session that began on Thursday, June 20, 2002, which was the last day of the guilt-phase of his trial. On that day, the court began instructing the jury at 6:00 p.m., and the jury announced its verdict at 1:05 a.m. the following morning. Rega contends that since the courthouse doors were locked and closed to the public at 5:00 p.m. each business day, regardless of whether court remained in session later than 5:00 p.m., he was deprived of his right to a public trial on that occasion too.

Rega raised Claim 6 during his PCRA proceeding. He contended that when the right to a public trial is violated, it is a structural error in which prejudice must be presumed. Therefore, he argued, when litigating the claim that trial counsel were ineffective for failing to object to the alleged court closures, prejudice must be presumed for that claim as well. (Br. for Appellant at 27, ECF No. 10-25 at 38.)

The Pennsylvania Supreme Court rejected Rega's argument. <u>Rega-II</u>, 70 A.3d at 786-87. It acknowledged that "various courts have found a violation of the right to a public trial to be in

the nature of a structural error." Id. at 786 (citations omitted.) It held, however, that because there was no objection, the only claim available to Rega was that his trial counsel were ineffective for failing object to the alleged court closures, and to prevail on that claim he must establish that he was prejudiced, as required by Strickland. Id. at 787 (citing Sepulveda, 55 A.3d at 1117-18, which set forth Strickland's elements).

The Pennsylvania Supreme Court determined that Rega did not demonstrate that he was prejudiced by his trial counsel's decision not to object to the alleged courthouse closures, and it denied Claim 6. It explained:

> The only fact-based argument [Rega] offers concerning the prejudice component of the ineffectiveness inquiry is as follows:
>
>> On the Saturday that the courthouse was closed, [Susan], a key Commonwealth witness, testified falsely and misleadingly that she had no deal with the prosecution and had not been told how she would be treated in her pending criminal cases. See Claim I. Thus, the salutary purpose of conducting public trials was lost when [Susan] testified while the courthouse was closed, undermining confidence in the fairness of [Rega's] trial.
>
> Brief for Appellant at 27. As discussed, however, the PCRA court found as a fact, supported by creditable evidence, that the Commonwealth did not enter into any agreements with its witnesses prior to or during [Rega's] trial. In any event, in line with the Commonwealth's position, [Rega] has failed to demonstrate that there were not spectators in the courtroom in the Saturday session, that any spectators were turned away from the courthouse, or that the presence or absence of a certain number of spectators had any impact whatsoever on [Susan's] testimony. Accord Brief for the Commonwealth at 47 (observing that [Rega] "did not produce a single witness who testified that they were turned away and not able to watch [Rega's] trial at any point in time"). For these reasons, the post-conviction court did not err in denying relief on this claim.

**Discussion**

The Pennsylvania Supreme Court's decision easily withstands review under § 2254(d). There can be no dispute that, at the time it adjudicated Claim 6, there was no "clearly established Federal law, as determined by the Supreme Court of the United States[,]"28 U.S.C. §2254(d)(1),

pertaining to whether a petitioner who raises a structural error via a claim alleging ineffective assistance of counsel must establish <u>Strickland</u>'s prejudice prong. <u>Weaver v. Massachusetts</u>, 137 S.Ct. 1899, 1907 (2017) (collecting cases and setting forth the split among inferior courts on the issue).[33] "[A] state court's resolution of a question that the [United States] Supreme Court has not resolved can be neither contrary to, nor an unreasonable application of, the Court precedent." <u>Rountree v. Balicki</u>, 640 F.3d 530, 537 (3d Cir. 2011) (citing <u>Kane v. Garcia Espitia</u>, 546 U.S. 9 (2005)). For this reason alone, Claim 6 fails.

Although the "clearly established law" for temporal purposes under § 2254(d)(1) is the law as it stood at the time the Pennsylvania Supreme Court made its adjudication in <u>Rega II</u>, it is of course notable that in 2017 the United States Supreme Court granted certiorari in <u>Weaver</u> to resolve the disagreement among the inferior courts. In its June 2017 decision, the Supreme Court held that the violation of the right to a public trial is a structural error that, when not preserved by the defendant's counsel at trial and then on direct review, must be raised within the context of an ineffective assistance of counsel claim and the defendant must show that he was prejudiced by his counsel's error. <u>Weaver</u>, 137 S.Ct. at 1908-14. Therefore, subsequent law from the United States Supreme Court serves only to reinforce that the Pennsylvania Supreme Court did not err in requiring Rega to demonstrate how he was prejudiced by trial counsel's decision not to object to the alleged courtroom closures.

Rega argues that the Pennsylvania Supreme Court erred in the manner in which it evaluated the prejudice component of Claim 6 because it observed that he did not demonstrate

---

[33] For example, some courts of appeals had held, as the Pennsylvania Supreme Court did, that prejudice must be shown in order to establish a Sixth Amendment ineffective assistance claim, even when counsel failed to object to what the petitioner contended was a structural error. <u>Weaver</u>, 137 S.Ct. at 1907 (citing <u>Purvis v. Crosby</u>, 451 F.3d 734, 738 (11th Cir. 2006), and <u>United States v. Gomez</u>, 705 F.3d 68, 79-80 (2d Cir. 2013)). Other courts of appeals had held that "when a defendant shows that his attorney unreasonably failed to object to a structural error, the defendant is entitled to a new trial without further inquiry." <u>Id.</u> (citing <u>Johnson v. Sherry</u>, 586 F.3d 439, 447 (6th Cir. 2009), and <u>Owens v. United States</u>, 483 F.3d 48, 64-65 (1st Cir. 2007)).

that any spectators were turned away from the proceedings due to the alleged court closure on the day that Susan testified. The Pennsylvania Supreme Court made that observation because of the way in which the parties briefed, and the PCRA court evaluated, Claim 6, which focused on whether anyone who wanted to attend that June 15, 2002 trial session was prevented from doing so. The supreme court's point was that Rega did not establish that the closure "had any impact whatsoever on [Susan's] testimony." Rega II, 70 A.3d at 787.

Based upon all the foregoing, Claim 6 is denied. Because jurists of reason would not find it debatable that it lacks merit, a certificate of appealability with respect to that claim is denied.

### Claim 7

In Claim 7, Rega contends that his trial counsel were ineffective for failing investigate and discover information to impeach Bair, Fishel, Susan, and Sharp. Specifically, he argues that trial counsel should have impeached them with evidence that they had all been engaged in plea negotiations or had reached deals with the Commonwealth, and that they had a motive to curry favor with the Commonwealth because they had pending criminal charges or, in the case of Susan, faced criminal exposure for her role in the Gateway Lodge case. (ECF No. 22 at 131-32.) He contends that counsel could have impeached Susan and Fishel because they used marijuana. According to Rega, this information "should have been used to impeach [Susan's] and [Fishel's] about their ability to recall and relate events." (Id. at 131-32.)[34] Rega contended that, to the extent that counsel could have discovered information about Susan's pseudotumor cerebri, they should have used that information to impeach her ability to recall and relate events.

---

[34] In his petition, Rega faulted trial counsel for not impeaching Bair with the alleged incredulity of his testimony that he was able to hear a "gurgling" sound when Rega shot Lauth. (ECF No. 6 at 98-99.) When he briefed Claim 7, Rega did not discuss that allegation. (ECF No. 22 at 129-36.) He did not raise it in his appeal to the Pennsylvania Supreme Court. (Br. for Appellant, ECF No. 10-25 at 42-43.)

**Background**

In denying this claim, the Pennsylvania Supreme Court held:

> In his brief discussion of this claim, [Rega] fails to acknowledge that a fair amount of the information he claims was available to trial counsel to develop by way of cross-examination was disclosed to the jury on the Commonwealth's direct examination or otherwise. For example, the jurors knew very well that various key Commonwealth witnesses were subject to open charges. See e.g., N.T. June 18, 2002, at 135-36 (reflecting testimony from prosecution witness Shawn Bair that he presently lives at Jefferson County prison, he had criminal charges on the trial list, and he understood he was a co-defendant and his testimony against [Rega] could also be used against him). Moreover, trial counsel capitalized, extensively, on such evidence. For example, in his closing remarks, counsel explained:

>> I am going to talk a little bit about Susan Jones, Stan Jones, Shawn Bair and Ray Fishel.... When you look at their testimony, the first thing you do is [consider whether] they have any interest in the outcome of this case? Now, each one, I submit to you, has an interest in the outcome of this case. What I mean by that is, each one wants to please the Commonwealth with the testimony that they have offered today. When the time comes these defendants are obviously thinking I want the Commonwealth to give me a favorable plea agreement or treat me in an otherwise favorable way. The witnesses were obviously thinking two things; I can please the Commonwealth by offering this testimony, but I can also implicate and put the blame for these events on Robert Rega. They have an obvious interest in this case, and to suggest otherwise I suggest to you is absurd.

> N.T., June 20, 2002, at 150-51; see also id. at 152-68 (referencing trial counsel's discussion of the relevant Commonwealth witnesses as "co-defendants" and accomplices, in terms of the seriousness of the charges facing them, e.g., felony murder, and in terms of their desire to "curry favor with the Commonwealth").

> Lacking such context, [Rega's] discussion of this claim is, at the very least, misleading. At most, the argument provides insufficient basis to negate the postconviction court's central rationale supporting the denial of relief on the claim, as follows:

>> By the time [the relevant witnesses] stepped down from the witness stand...,the jurors understood that they were unsavory characters not averse to lying to the authorities or engaging in other criminal acts.... Additional knowledge of their criminal activity or learning that Jones suffered from occasional memory problems would not have likely changed [the] outcome, especially

> when the witnesses' testimony was consistent in all material
> respects.

Rega II, 70 A.3d at 788-89 (quoting PCRA Ct. Op., ECF No. 10-1 at 38) (bracketed text add by the supreme court.)

**Discussion**

Rega argues that the Pennsylvania Supreme Court's decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding[,]"28 U.S.C. § 2254(d)(2), because it ignored his argument that the Commonwealth had reached "quid pro quo agreements" with the each of the witnesses, and that counsel should have learned of those agreements. (ECF No. 22 at 140.) This court has already explained in its discussion of Claim 1(a) and Claim 2 that the PCRA court rejected Rega's allegation that there was either an express or tacit agreement between the Commonwealth and any of the witnesses, that this court is bound by the PCRA court's findings under § 2254(e)(1), and that the Pennsylvania Supreme Court had sufficient evidence in the record before it to reject any allegation by him that there existed any quid pro quo agreements. Therefore, Rega's argument that the Pennsylvania Supreme Court's adjudication of this claim cannot withstand review under § 2254(d)(2) has no merit.

Rega argues that the Pennsylvania Supreme Court's decision was an "unreasonable application of" Strickland, but he did not demonstrate that its adjudication "was so in lacking justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. For that reason, the Pennsylvania Supreme Court's withstands review under § 2254(d)(1)'s "unreasonable application of" clause.

Finally, Rega argues, as he did in Claim 4, that the Pennsylvania Supreme Court applied an incorrect and more-demanding prejudice standard than Strickland requires. In support of this argument, he cites to that portion of the Pennsylvania Supreme Court's decision in which it quoted the PCRA court's conclusion that "[a]dditional knowledge of their criminal activity or learning that [Susan] suffered from occasional memory problems *would not have likely* changed [the] outcome" of his trial. (ECF No. 22 at 141 (emphasis added) (quoting Rega II, 70 A.3d at 789, which quoted the PCRA court's opinion)). Rega's argument that the state courts did not apply the appropriate prejudice inquiry is unconvincing. As previously discussed, a federal habeas court should use caution before it concludes that the state court applied the wrong law, particularly when it evaluated a common claim such as an ineffective assistance of counsel claim. Visciotti, 537 U.S. at 23-24. At the beginning of its decision, the Pennsylvania Supreme Court cited to decisions that set forth the proper inquiry under Strickland, Rega II, 70 A.3d at 780 n.2 (citing Sepulveda, 55 A.3d at 1117-18, and Gibson, 951 A.2d at 1120-21), and, the PCRA court in its decision recited the proper prejudice standard when it discussed the elements that Rega was required to prove in order prevail on his claims of ineffective assistance. (PCRA Ct. Op., ECF No. 10-1 at 2.)

If this court were to accepted Rega's argument that the Pennsylvania Supreme Court's adjudication was "contrary to" Strickland, it would still deny Claim 7. Even under a *de novo* review, this court affords the presumption of correctness to all the PCRA court's findings of fact, 28 U.S.C. 2254(e)(1). Under the facts as found by the PCRA court, there were no agreements, plea negotiations, or promises of leniency that trial counsel could have used to impeach the witnesses's testimony. A review of the trial transcript also shows that trial counsel utilized the information that did exist–that Bair, Fishel, and Susan had a motive to lie because of their

involvement in the Gateway Lodge crimes–and urged the jury not to credit their testimony for that reason.

As for Susan's medical condition, Rega did not establish that his trial counsel were deficient for not discovering that she had a pseudotumor cerebri. Therefore, he did not satisfy Strickland's performance prong (that "counsel's representation fell below an objective standard of reasonableness"). 466 U.S. at 688. He also did not demonstrate that he was prejudiced by counsel's failure to impeach Susan with that information. Susan's medical condition may have impacted her memory to some extent. However, in light of all the relevant testimony given at the PCRA hearings, Rega did not demonstrate that the value of that information was such that, if counsel had tried to impeach her testimony with that information, "there is a reasonable probability that" the outcome of his trial would have been different. Strickland, 466 U.S. at 694.

Based upon all the foregoing, § 2254(d)'s standard of review applies to Claim 7, and Rega did not overcome it. Alternatively, Claim 7 fails even under a *de novo* review. Because jurists of reason would not find it debatable that this claim lacks merit, a certificate of appealability is denied with respect to that claim.

## Claim 8

In Claim 8, Rega contends that he was denied the effective assistance of trial counsel because English had a conflict of interest that actually affected his representation of Rega.

### Background

Commonwealth witness Lea Ann Smader ("Smader") (formerly Lea Ann Gillen) worked at the Gateway Lodge at the time of Lauth's murder. She was friendly with both Rega and Blair and testified at Rega's trial that Bair "did anything [Rega] told him to do[,]" thereby supporting the Commonwealth's theory that Rega controlled Bair and was the ringleader of the Gateway

Lodge robbery.[35] (ECF No. 31, Trial Tr., 6/15/02, at 114.) English cross-examined Smader and attempted to establish that she had more loyalty to Bair than to Rega. She acknowledged that she considered Bair to be a closer friend. (Id. at 118-20.)

After Smader was excused, the following discussion occurred at sidebar:

Mr. English:  I don't think this means anything. I hope it doesn't, but I think I should tell everybody. It just came to me at the end as [Smader] was walking out, I believe I represented her in something. I believe I represented [Smader] in a criminal matter, and I am not sure if it was this county or Clarion County or what it is. It is not–I remembered the name sort of, but I sort of put it together right at the end. Was she ever charged with a crime?

Mr. Burkett:  I think you did. It was just some bad checks that she got an ARD for.

Mr. English:  It was something real minor. I don't know that it is really an issue.

Mr. Burkett:  I think she even mentioned it to me months ago.

Mr. English:  It doesn't have anything to do with this case or any confidentiality issue.

Mr. Burkett:  As far as I am concerned from what I heard, the most that could have happened is you represented her on bad checks and an ARD.

Mr. English:  I just thought–I don't know if we should ask her about it. I just want to put it out there.

The Court:  I don't think there is any need to ask her. You didn't ask her anything about the case. Nothing came out about it. I appreciate you coming forward. Now everybody is reporting everything to the Court. I don't have any problem with that. I don't see any legal problem, not just from what I know of the law or conflicts. There is nothing I can see. Did you tell [Rega] for any reason?

Mr. English:  I haven't told him that yet.

---

[35] Rega contends that Smader told the police when she was interviewed on December 23, 2000, "that they should investigate Rega[.]" (ECF No. 22 at 142.) At the trial, she testified that what she told the police was that they should interview *both Rega and Bair* about the Gateway Lodge crimes. (ECF No. 31, Trial Tr., 6/15/02, at 123-24, 129.) Smader was interviewed by the police for a second time on January 4, 2001, "concerning her past and current relationship with Shawn BAIR and Robert REGA." (Smader's statement to the police, ECF No. 10-4 at 17.) She told the interviewing officer that "[i]f Rob is involved in the homicide, Shawn is too, because Shawn will do anything Rob tells him to do." (Id.)

The Court:  He has left anyhow. I don't think it is a problem. If you want to disclose it is probably better that you do it now.

Mr. English:  To him, yeah. I don't even recall what it was for.

The Court:  All right.

(Id. at 131-33.)

After the sidebar concluded, the court recessed for lunch. (Id. at 133.) When it resumed, the prosecution called its next witness and there is no evidence that the issue regarding Smader was mentioned again during the trial.

In the PCRA proceeding, Rega contended that English had an actual conflict of interest and that he rendered ineffective assistance by representing Rega while operating under that conflict. In support, he argued that English's failure to question Smader about her case "goes to the very heart of the conflict[,]" because that case gave her "a motive to curry favor with the Commonwealth when she spoke with Pennsylvania State troopers" and, therefore, she should have been cross-examined about that case. (PCRA Post-Hr'g Br. at 87.)

Due to this actual conflict of interest, Rega asserted, prejudice must be presumed under the circumstances in accordance with Supreme Court's decisions in Strickland and Cuyler v. Sullivan, 446 U.S. 335 (1980). Strickland identified the very limited categories of ineffective assistance claims in which the court presumes prejudice rather than requiring a defendant to demonstrate it. 466 U.S. at 692. In relevant part, it held:

> One type of actual ineffectiveness claim warrants a similar, though more limited, presumption of prejudice. In Cuyler v. Sullivan, 446 U.S., at 345-350, 100 S.Ct., at 1716-1719, the Court held that prejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, see, e.g., Fed.Rule Crim.Proc. 44(c), it is reasonable for the criminal justice system to maintain a fairly rigid rule of

presumed prejudice for conflicts of interest. Even so, the rule is not quite the per se rule of prejudice that exists for the Sixth Amendment claims mentioned above. Prejudice is presumed only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance." <u>Cuyler v. Sullivan</u>, supra, 446 U.S., at 350, 348, 100 S.Ct., at 1719, 1718 (footnote omitted).

<u>Id.</u>

In support of his contention that English labored under an actual conflict of interest, Rega introduced at the PCRA hearing evidence that Smader was arrested in Clarion County in December 1999 for a series of theft-related offenses, including two counts of theft by deception, bad checks, and aiding consummation of a crime. (Criminal information, ECF No. 10-4 at 15-16.) English was appointed to represent her on January 10, 2000. (Order of appointment, ECF No. 10-4 at 14.) She entered the Accelerated Rehabilitative Disposition ("ARD") program. (10/15/01 ARD letter, ECF No. 10-4 at 18.) There was no dispute that she was in the ARD program at the time she was interviewed by the police on December 23, 2000, and January 4, 2001. Smader had completed the ADR program near the end of 2001, well before she testified at Rega's trial on June 15, 2002.

During the PCRA hearing, Rega's attorney asked English if there was a reason he did not "inquire as to [Smader's] interest in currying favor from the prosecution at the time she was interviewed by the police in Mr. Rega's case?" (ECF No. 55, PCRA Hr'g Tr., 12/15/09, at 151.) He responded: "I can tell you that the fact that I previously represented [Smader]…in no way influenced my conduct of Mr. Rega's defense." (<u>Id.</u>)

In denying this claim, the PCRA court applied <u>Commonwealth v. Small</u>, 980 A.2d 549 (Pa. 2009), which recognized that under <u>Cuyler</u> and Pennsylvania Supreme Court precedent applying that decision, when a defendant failed to object at trial to a conflict, prejudice must be presumed "only if a defendant shows counsel actively represented conflicting interests and the

actual conflict adversely affected counsel's performance." Small, 980 A.2d at 563 (citing

Commonwealth v. Spotz, 896 A.2d 1191, 1232 (Pa. 2006), which cited Commonwealth v.

Hawkins, 787 A.2d 292, 297-98 (Pa. 2001), and Commonwealth v. Buehl, 508 A.2d 1167, 1175

(Pa. 1986)). The PCRA court found that Rega failed to demonstrate that English's prior

representation adversely affected his performance. It determined that the above-quoted sidebar

exchange demonstrated that:

> Attorney English was not operating under a conflict of interest when he cross-
> examined the witness. He did not even remember until she was leaving the
> witness stand that he may have represented her. And even then, he did not recall
> the substance of the representation until reminded by the district attorney. Thus,
> his decision to ask her some questions and not others could not have been
> motivated by the representation and any continuing obligation he may have felt to
> a former client.

(PCRA Ct. Op., ECF No. 10-1 at 17.) The court further held that English's PCRA hearing

testimony that his prior representation of Smader "in no way influenced" his conduct at Rega's

defense counsel, (ECF No. 55, PCRA Hr'g Tr., 12/15/09, at 151), "was entirely credible." (PCRA

Ct. Op., ECF No. 10-1 at 17-18.)

In his appeal to the Pennsylvania Supreme Court, Rega reiterated his argument that the

fact that English did not question Smader about her prior ADR case evidenced that there was an

actual conflict. The Pennsylvania Supreme Court was not persuaded. It noted that "[g]iven the

caseloads experienced by public defenders and other criminal-law attorneys, the scenario in

which a defense attorney forgets that he previously represented a prosecution witness in a

different case is not as uncommon as would be desired." Rega II, 70 A.3d at 788 (citation

omitted). It held that the PCRA court's finding that English's "did not remember the previous

representation prior to the cross-examination, that he adequately raised issues concerning the

witness's credibility, and that exploration of the witness's previous experience with the criminal

justice system, even if permissible, would not have impacted the outcome of [Rega's] trial." Id. at 788.

**Discussion**

Rega contends that that the Pennsylvania Supreme Court's decision was "contrary to" Cuyler because by holding that, even if he had cross-examined Smader about her Clarion County case, it "would not have impacted the outcome of [Rega's] trial[,]" Rega II, 70 A.3d at 788, it was requiring him to prove that he was prejudiced. If this court accepts that argument, it must review Rega's claim *de novo*. Even under that standard of review, however, Claim 8 still fails.

Under Cuyler, "a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." 446 U.S. at 348. Thus, it is Rega burden to demonstrate, among other things, that English's prior representation of Smader "actually affected the adequacy of his representation[,]" in order for the court to presume that he was prejudiced by English's alleged ineffectiveness. Id. at 349. He did not meet that burden. The PCRA credited English's testimony that his prior representation of Smader did not impact his representation of Rega and this court is bound by that determination under § 2254(e)(1). Rega's argument that English did not ask Smader about her Clarion County case because he was concerned that he would violate a duty to her is not persuasive. The sidebar discussion about Smader, English's PCRA testimony, and the PCRA court's crediting of that testimony, all establish that English did not recall the details of his prior representation of Smader. There is no evidence in either the trial or PCRA record that would support a finding that English recalled during Rega's trial that Smader had been in the ADR program when she spoke to the police on December 23, 2000, and January 4, 2001, or that he declined to use that information to impeach her because he did not want to violate his duty of loyalty to her.

Rega contends in his petition that he "never waived the conflict. He was never colloquied on the record about the conflict, nor is there any evidence in the record that he was even informed of the conflict, since all of-record discussion about this issue took place outside his presence." (ECF No. 6 ¶ 234.) He did not address that allegation in his brief, however. (ECF No. 22 at 141-48.) Importantly, Rega did not make that allegation to the PCRA court (Amended PCRA Pet., ECF No. 10-27 at 104-11; Post-Hr'g Br. at 83-87, 89-91), thus depriving it of the opportunity to determine whether it was credible.[36] Finally, in a collateral proceeding such as this, it is Rega's burden to produce evidence to support his claims, and the absence of evidence in the record redounds to his detriment. See Higgason v. Clark, 984 F.2d 203, 208 (7th Cir. 1993) ("On collateral attack, a silent record supports the judgment; the state receives the benefit of a presumption of regularity and all reasonable inferences."); cf. Titlow, 134 S.Ct. at 17 ("[i]t should go without saying that the absence of evidence cannot overcome the 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.'") (quoting Strickland, 466 U.S. at 689).)

Based upon all the foregoing, even if the court assumes without deciding that Claim 8 is subject to *de novo* review, it has no merit and is denied. Because jurists of reason would not find it debatable that this claim lacks merit, a certificate of appealability is denied with respect to that claim.

### Claim 9

Rega contends that his trial counsel were ineffective because the trial court ordered a plain clothes police officer, Earl Pontius ("Pontius"), to sit at the defense table and counsel did not object to this alleged highly-prejudicial arrangement.

---

[36]  It appears that the first time Rega raised this argument was in his brief to the Pennsylvania Supreme Court. (Br. for Appellant, ECF No. 10-25 at 41.)

**Background**

In its decision denying this claim, the PCRA court summarized the relevant background:

[Rega] claims that [Pontius's] presence had a chilling effect on his communication with counsel and signified his dangerousness to the jury. Neither inference, however, can reasonably be extrapolated from the record.

A deputy sheriff from Elk County, Pontius was brought in because of security concerns including Rega's apparent indifference to whether others got hurt or died during an escape attempt and potential threats against members of the jury and his own attorneys. ([PCRA Hr'g Tr.], 12/15/2009, pp. 138-38, 304; id., 01/19/2010, pp. 86-88, 228-29). (See also [jury selection transcript ("JST"] JST, 06/13/2002, pp. 72-73). It was thus not without cause that Pontius was seated at the defense table throughout the trial. It was also with proper precautions designed to safeguard Rega's presumption of innocence. Pontius reviewed the jury list to make sure he would not be recognized, for instance; dressed in plain clothes; forewent any indicia of official position, such as a badge or visible weapon; and sat beside [Rega], who talked to him throughout the trial. (Id.; [PCRA Hr'g Tr.], 12/15/2009, p. 142, 304-05; id., 01/19/2010, pp. 90, 229). It was the Court's intention that Pontius would thus appear to be a family member or part of the defense team (JST, 06/13/2002, p. 74), and except for Rega's speculation, there is nothing to suggest that the jury thought otherwise.

There is also no evidence indicating that Pontius's presence chilled communications between attorneys and client. In front of Rega, Pontius took an oath to be bound by the rules governing attorney/client privilege. (Id. at 72-76). Rega noted that he would feel "a lot more comfortable" with that assurance. (Id. at 74). Michael English clearly and unequivocally testified, moreover, that Pontius's presence did not chill his and Rega's communications:

> Q. I think I know the answer to this, but I'm going to ask it anyway. Did his presence chill your communications between you and Mr. Rega?
>
> A. No, it did not.
>
> Q. Mr. Rega talked freely to you during the trial?
>
> A. Again, I can tell you it did not inhibit me, and I never got any impression that it inhibited [Rega]. It was one more person for [Rega] to talk to.
>
> Q. Did [Rega] appear to enjoy his presence there?
>
> A. Well, he talked to him. I don't think the feeling was reciprocal. He sat there quietly and did his job most of the time.

(PCRA [Hr'g Tr.], 12/15/2009, p. 305).

Perhaps, most tellingly, before commencing the first day of trial, the Court asked Rega directly, "Do you have any problems with Mr. Pontius?" ([Trial Tr.], 06/14/2002, p. 5) "No," was his unqualified response. (Id.). The first time Rega purported to have a problem with Pontius, in fact, was in his affidavit in support of his PCRA petition, and because he elected not to testify at the PCRA hearing, that document is not part of the substantive evidence the Court will consider.

As evidenced by the record, then, the Court did not interfere with Rega's ability to freely communicate with counsel or even vaguely suggest to the jury that he was dangerous by inserting Earl Pontius at counsel table during the trial.

(PCRA Ct. Op., ECF No. 10-1 at 13-14) (footnote omitted). For these reasons, the PCRA court held that Rega's counsel were not ineffective for deciding not to object to Pontius being seated at the defense's table beside Rega. (Id.)

The Pennsylvania Supreme Court affirmed the PCRA court's decision. Rega II, 70 A.3d at 785-86. It "agree[d] with the PCRA court that [Rega] has failed to establish either that his communication with his attorneys were impacted, or that the trial court abused its discretion in the form of the increased security fashioned to address [Rega's] expressed proclivity toward violation in response to his criminal prosecution for first degree murder and attendant restraints on his liberty." Id. at 786. It also explained:

In terms of the assertion of a suggestion of dangerousness, there is a well-developed line of judicial decisions reflecting trial courts' discretionary authority to implement security measures, even where these carry some measure of potential prejudice, when required to further an essential state interest. See, e.g., Hellum v. Warden, U.S. Penitentiary-Leavenworth, 28 F.3d 903, 907-08 (8th Cir. 1994). The United States Supreme Court has explained that courts "have never tried, and could never hope, to eliminate from trial procedures every reminder that the State has chosen to marshal its resources against a defendant to punish him for alleged criminal conduct." Holbrook v. Flynn, 475 U.S. 560, 567, 106 S.Ct. 1340, 1345, 89 L.Ed.2d 525 (1986). While [Rega] now contends that there was no evidence of a relevant threat in the first instance, both of his trial attorneys testified, on post-conviction, that they had been apprised of a letter [Rega] had written to his mother in which he proposed a violent escape attempt. See N.T., Dec. 15, 2009, at 138-39; N.T., Jan. 19, 2010, at 229-30. Although [Rega] seems to imply that there was no specific risk relative to the courtroom setting, in the exercise of its discretion, the trial court was not obliged to believe that [Rega's] proclivity toward violence would be limited to the one specific avenue which had already been uncovered. In short, [Rega's] presentation fails to establish an abuse of discretion on the trial court's part in the relevant regards.

Id. at 785 n.8.

**Discussion**

There is no basis for this Court to grant Rega habeas relief on this claim. In the brief argument that he devotes to the Pennsylvania Supreme Court's adjudication (ECF No. 22 at 153), he contends that it was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), but he did not meet his burden of proving that contention. He did not overcome the presumption of correctness that this court must afford to any of the findings of fact made by the trial and PCRA court under 28 U.S.C. § 2254(e)(1).

Based upon all the foregoing, Claim 9 is denied. Because jurists of reason would not find it debatable that this claim lacks merit, a certificate of appealability is denied with respect to that claim.

**Claim 13**

Rega contends that, even if none of his guilt-phase and sentencing-phase claims individually are sufficiently prejudicial to require relief, the cumulative prejudice incurred requires that he be granted relief. The Pennsylvania Supreme Court denied this claim on the merits, concluding "[n]othing in [Rega's] presentation…individually or cumulatively, has persuaded us that he is entitled to post-conviction relief." Rega II, 70 A.3d at 794. Rega admits that § 2254(d)(1) applies to this claim, and he argues that the Pennsylvania Supreme Court's adjudication was "an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1). (ECF No. 22 at 259.) He did not establish that the supreme court's adjudication of the guilt-phase portion of this claim was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

Based upon all the foregoing, the guilt-phase portion of Claim 13 is denied. Because jurists of reason would not find it debatable that this claim lacks merit, a certificate of appealability is denied with respect to that claim.

## IV. Sentencing-Phase Claim

In Claim 10, Rega contends that his trial counsel provided him with ineffective assistance at his capital sentencing hearing because they failed to investigate and present available mitigating evidence, and failed to investigate his prior criminal record in order to rebut one of the aggravating circumstances the Commonwealth presented to the jury. He argues that his appellate counsel were ineffective for failing fully to investigate and to properly present these claims in his direct appeal.

### Background

The jury reached its guilty verdicts early in the morning of June 21, 2002. Rega's capital sentencing hearing was held later that afternoon. Under Pennsylvania law, the Commonwealth had the burden of proving at least one statutorily-defined aggravating circumstance accompanied the murder. 42 Pa. Cons. Stat. § 9711(c)(iii), (d). The jury could find an aggravating circumstance to be present only if all members agreed that it was. Id. § 9711(c)(1)(iv). Rega could introduce, and the jury could consider, mitigating evidence. Id. § 9711(e). The Commonwealth had to prove aggravating circumstances beyond a reasonable doubt, but Rega could prove mitigating circumstances by only a preponderance of the evidence. Id. § 9711(c)(1)(iii). Unlike the finding of aggravating circumstances, each juror was free to regard a particular mitigating circumstance as present despite what other jurors believed. The jury could impose the death penalty only if it found that the statutorily-defined aggravating circumstances

proven by the Commonwealth outweighed any mitigating circumstance proven by Rega. Id. § 9711(c)(1)(iv). The verdict had to be a sentence of life imprisonment in all other cases. Id.

The Commonwealth asked the jury to find two aggravating factors. The first was that Rega killed Lauth during the commission of a felony (robbery), 42 Pa. Cons. Stat. § 9711(d)(6). To prove it, the Commonwealth relied upon the evidence that it had entered during the guilt phase of the trial. Since the jury had already found Rega guilty of robbery beyond a reasonable doubt, it was virtually guaranteed that it would find this aggravating circumstance. The second aggravating circumstance was that Rega "has a significant history of felony convictions involving the use or threat of violence to the person." 42 Pa. Cons. Stat. § 9711(d)(9). To prove that history, the Commonwealth presented the testimony of an assistant district attorney. He was shown numerous documents that he identified as criminal complaints, informations, and sentencing orders regarding Rega's prior felony convictions. (ECF No. 36, Trial Tr., 6/21/02, at 41-59.) Through his testimony, the Commonwealth established that Rega's prior record consisted of twelve burglary convictions, and one criminal trespass conviction. (Id.) One of these convictions was a burglary Rega committed at his neighbor's house in 1985 when he lived Tulsa, Oklahoma. The other eleven burglary convictions were for crimes that occurred at commercial properties. Rega committed them in New Jersey in 1986 and 1987, and four of them were burglaries of the Terrance Room, a restaurant at which Rega worked and that was owned by his parents. The criminal trespass conviction was for an offense that Rega committed many years later, in June 1992, in Washington Township, Pennsylvania. In that case, he forcibly entered a remote radio site that was owned by WDSN Radio Station. During cross-examination, Rega's trial counsel elicited testimony to demonstrate that the 1992 criminal trespass was "a property crime," of a "commercial place," and that "no assaults or injuries" occurred in that case. (Id. at 61, 67.)

Pennsylvania law lists specific mitigating circumstances that a defendant may present to the jury, including what is referred to as the "catch all," which includes "[a]ny evidence of mitigation concerning the character" of the defendant. 42 Pa. Cons. Stat. § 9711(e)(8). In support of Rega's mitigation case, his "[c]ounsel's strategy…was to appeal to the jury's sentimentality and present [him] 'as a human being whose life had value and who had people who cared about him and loved him deeply and who had a family and two beautiful daughters that would miss him terribly if he was executed.'" Rega I, 933 A.2d at 1026 (quoting English's post-sentence hearing testimony, ECF No. 47, Post-Sent. Hr'g Tr., 4/4/05, at 115.)

> When counsel discussed the mitigation defense with [Rega], he indicated a desire to kill himself if he was convicted, and expressed ambivalence about the penalty phase. [Post-Sent. Hr'g Tr., 4/4/05, at 115.] Despite this general ambivalence, [Rega] was adamant about two things. First, [Rega] did not want his counsel to attack his mother in any way and make her look like a bad parent. Id. at 117. Second, [Rega] was against any kind of psychological testimony, and would not cooperate in this regard. Id. at 118, 155. After discussing their strategy with [Rega], counsel honored his wishes not to pursue any psychological evidence or evidence of his upbringing.

Id.

In support of Rega's mitigation case, defense counsel presented the brief testimony of his mother, Joan, his ex-wife, Renee, her grandmother, Edwards, and Rega's two young daughters. "Each witness consulted with Attorney English for the first and only time shortly before testifying." Id. His mother, Joan, stated that she loved Rega, that he had always treated her well, that his father had neglected him and had been cruel to him, that he was placed in foster care for a time when he was between nine and ten years old, and that he was a loving father and good provider to his two young daughters, over whom he had custody after his separation from his wife. (ECF No. 36, Trial Tr., 6/21/02, at 79-85.)

Renee testified that Rega was a loving and caring father to his daughters. (Id. at 87-88.) Her grandmother, Elizabeth, testified that she loved Rega and that he was a good person. (Id. at

89-91.) Rega's six-year-old daughter, Autumn, and his seven-year-old daughter, Amber, both stated that they loved their father. (Id.)

In the Commonwealth's closing argument, the district attorney reminded the jurors that they had already found that Rega murdered Lauth during the commission of a felony and, therefore, the aggravating circumstance at § 9711(d)(6) was established. (Id. at 112.) In discussing the § 9711(d)(9) aggravating circumstance (that Rega had a significant history of felony convictions involving the use or threat of violence to the person), the district attorney reiterated that Rega had "twelve prior convictions for burglary" and he reminded the jury that one of those convictions was of a residence (the Oklahoma burglary). (Id. at 107.) He also mentioned Rega's criminal trespass conviction, but inaccurately gave the impression that that offense also involved a residence. (Id.) ("You also heard testimony showing a conviction for criminal trespass that's going into someone's residence without consent.") He urged the jury that Rega's "significant prior history" "ought to be a substantial factor in your decision" to impose the sentence of death. (Id. at 108.)

English gave the defense's closing argument. He said that although Rega had an "extensive criminal history" "there has been no allegation…that Mr. Rega committed or threatened to commit any act of violence during any of these crimes[,]" and he also pointed out that those crimes were committed when he was in his "late teens[,]" and many occurred at "a restaurant owned by his own parents." (Id. at 113.) He asked the jury to reject a sentence of death because Rega's "life has value[,]" particularly to his two children. (Id. at 115.)

In its instruction to the jury, the court explained that "[i]n deciding whether the defendant has a significant history the factors you should consider include the number of previous convictions, *the nature of the previous crimes* and their similarity to or relationship with the murder in this case." (Id. at 121 (emphasis added).) It instructed:

> In deciding whether aggravating outweigh mitigating circumstances do not simply count their number, compare the seriousness and importance of the aggravating and mitigating–of the aggravating along with mitigating circumstances…. When voting on the general findings you are to regard a particular aggravating circumstance as present only if you all unanimously agree that it is present. On the other hand each of you is free to regard a particular mitigating circumstance as present despite what other jurors may believe. This different treatment of aggravating and mitigating circumstances is one of the law safeguards against unjust death sentences…. Remember the Commonwealth must [prove] any aggravating circumstance beyond a reasonable doubt while the defendant only has to prove any mitigating circumstance by a preponderance of the evidence.

(Id. at 122-23.)

In announcing its verdict, the jury explained that it unanimously found both of the aggravating factors that the Commonwealth urged it to find. The single mitigating factor found by one or more of the jurors was the age of Rega's children. The jury concluded that the aggravating circumstances outweighed the mitigating circumstance and, therefore, it sentenced Rega to death. (Sent. verdict sheet, ECF No. 37.)

In his post-sentence motion, Rega's appellate counsel raised the claim that trial counsel were ineffective for failing to investigate and present available mitigating evidence, "specifically for not obtaining his school and medical records, family social history, a psychiatric evaluation, and other related information[,]" and also for failing to "hire a private mitigation specialist." (Post-Sent. Op., ECF No. 10 at 57.) English, Elliott, and Rega's mother, Joan, provided relevant testimony during the evidentiary hearings held on April 4, 2005, and April 5, 2005. (ECF Nos. 47, 48.) Appellate counsel presented the testimony of Dr. William Long, a clinical psychologist who had reviewed Rega's school records and some information that was contained in a pre-trial investigation report that had been prepared in one of his criminal cases. (ECF No. 47, Post-Sent. Hr'g Tr., 4/4/05, at 65, 78-79.) Dr. Long acknowledged that Rega refused to be interviewed. (Id. at 64, 74.)

Based on his review of the school records and pre-sentence report, Dr. Long reached three conclusions. First, he concluded that [Rega] may have suffered brain damage due to Scarlet Fever, which led to a temperature over 106 degrees when [Rega] was six years old. He asserted that this diagnosis was consistent with [Rega's] school records indicating developmental delays, difficulty learning, emotional issues, a tendency to engage in inappropriate behavior, and his need for special education. Second, Dr. Long concluded that brain-injured individuals generally may appear to be more intelligent than they really are. Third, Dr. Long concluded that [Rega's] parents and upbringing may have contributed to his learning and behavioral difficulties.

Rega I, 933 A.2d at 1025.

In denying Rega's request for post-sentence relief, the trial court held that Rega did not establish that trial counsel were ineffective "in deciding not to pursue an aggressive mitigation defense." (Post-Sent. Op., ECF No. 10 at 57.) It found that Rega "made an informed decision not to present a more elaborate mitigation case and clearly instructed his counsel to that end. He refused to submit to a psychological assessment and otherwise refused to cooperate with the gathering and presentation of psychological evidence." (Id. at 58) (internal record citations omitted.) "In fact," the trial court explained, "counsel testified that [Rega] was unconcerned with, even opposed to, presenting mitigation evidence." (Id.)

The Pennsylvania Supreme Court affirmed that decision in Rega I. It held that "[a] review of the record, specifically the post-trial testimony, demonstrates, first, that [Rega] instructed counsel not to pursue a mitigation defense based on evidence regarding [his] mental health or abusive upbringing, and, second, that [Rega] knowingly and voluntarily waived his right to have counsel present further mitigation." Rega I, 933 A.2d at 1026. See id. at 1026-27 ("To explain the reason for the limited nature of their investigation, counsel testified that they were complying with [Rega's] wishes, and, additionally, that their decision to attempt to portray [him] as a good father and family man reflected their own professional judgment based on strategic decisions and discussions with [him]."); id. at 1027 ("Counsel specifically testified that [Rega] was opposed to

the idea of presenting psychological evidence and refused to submit to a psychological assessment."); id. (Rega was not "interested in presenting any evidence that would cast his mother in a poor light or indicate that he was poorly parented.")

In his PCRA proceeding, Rega once again contended that his trial counsel were ineffective for failing to investigate and present available mitigating evidence, and he claimed that his appellate counsel were deficient for failing properly to litigate this claim on direct appeal. In support, Rega introduced at the PCRA hearings testimony from his family and friends that he had a "traumatic and brutal childhood" that "was filled with neglect and relentless sexual, physical and emotional abuse[,]" (ECF No. 6 ¶ 266), and that he "was intensely victimized by both a mother and father with vicious tempers." (Id. ¶ 267; see id. ¶¶ 268-301) (summarizing lay witness testimony given at PCRA hearings).) He introduced his educational, medical, and social service records, which he claimed indicated that he had cognitive impairments, organic brain damage, social and emotional problems, and had suffered from parental physical and mental abuse and neglect. (Id. ¶¶ 302-06.) Additionally, he presented testimony from Dr. Mack, the forensic psychologist discussed earlier (who also gave testimony regarding Susan's medical condition), Dr. Faye Sultan, a licensed clinical and forensic psychologist who was qualified by the PCRA court as an expert in the treatment of victims of physical, sexual, and emotional abuse, and Kathleen Kaib, a licensed social worker and mitigation specialist. (Id. ¶¶ 307-32.) Their testimony, Rega argued, represented the type of expert evidence that could have been introduced at his sentencing hearing to persuade the jury that he had organic damage (id. ¶ 309), "suffered at the time of the offense from serious mental and emotional problems resulting from his traumatic childhood," (id. ¶ 312), suffered "severe trauma" and was "reared in a chaotic and abusive family environment[,]" (id. ¶ 318), and that he was uncared for and neglected by his parents. (Id. ¶ 319-20.)

Rega raised the related claim that his trial counsel were ineffective for failing to obtain available information that could have been used to rebut the § 9711(d)(9) aggravating circumstance, which the Commonwealth heavily relied upon to secure a death sentence, and that his appellate counsel were deficient for not litigating and developing evidence to support this claim on direct appeal. To support these claims, Rega introduced at the PCRA hearings evidence to establish that, more than a year before his trial, the Commonwealth provided his trial counsel with notice that it would be seeking to prove the § 9711(d)(9) aggravating circumstance. (Notice of aggravating circumstances, ECF No. 10-4 at 19-20.) It subsequently provided trial counsel with a list of the prior convictions it would be relying upon to support that aggravator. (ECF No. 55, PCRA Hr'g Tr., 12/15/09, at 172-73.) Rega's trial counsel did not obtain any records pertaining to, or do any investigation into, his prior convictions, and they did not ask their investigator to do so either. (Id. at 176-79, 200-01, 219; ECF No. 59, PCRA Hr'g Tr., 1/19/10, at 154-55.) Had they done so, Rega argued, his counsel would have been able to present evidence to establish as a fact that his prior criminal history was non-violent, that he (and his accomplices in them) did not encounter other individuals during the commission of his prior crimes, and that his prior crimes were much less serious than the Commonwealth's summary and argument made them appear to be.

For example, Rega's PCRA evidence showed the following about his 1985 Oklahoma burglary conviction, which was the only one that involved a residential property. It was based on an incident that took place in June 1985, when Rega was nineteen years old. His accomplice was a thirty-eight-year-old acquaintance. They broke into Rega's neighbor's house and took a coin jar. No one was in the home at the time the crime occurred. (ECF No. 57, PCRA Hr'g Tr., 12/18/09, at 91-92; Oklahoma PSI, ECF No. 10-4 at 49-53.) Given the nature of the offense and Rega's age, the writer of the pre-sentence investigation for that case referred to him as "a Non-Violent

112

Intermediate Offender" and recommended that he receive either a deferred sentence or a term of probation "and be given Court permission to return to his mother's home in New Jersey." (Oklahoma PSI, ECF No. 10-4 at 52.)

As for the other burglaries that he committed in 1986 and 1987, Rega presented additional criminal justice system records that he argued trial counsel could have used to establish that Rega committed them at commercial structures when they were unoccupied. He broke into those structures at hours when the establishments were closed, which was information that his trial counsel could have used to argue that he did so in order to minimize the chance that he would encounter anyone and that violence would occur. Four of Rega's burglaries were of his parents's restaurant and he committed them because his father was not paying him for his work there. (ECF No. 6 ¶ 390 (summarizing evidence); see Jefferson Co. PSI, 10-4 at 54-55, and 10-2 at 25-32; police reports for burglaries at Richies Music Center and the Terrance Room, ECF No. 10-23 at 46-56; police reports for burglaries at D&R Boat World, ECF No. 10-23 at 39-43.) As for his 1992 criminal trespass conviction, it took place after 11:00 p.m. when no one was on the premises, and the sentencing court recommended Rega for the boot camp program. (Jefferson Co. PSI, ECF No. 10-4 at 55, 62.)

In disposing of Rega's claims, the PCRA court first noted that the Pennsylvania Supreme Court had already held in Rega I that Rega "waived a more thorough mitigation defense." (PCRA Ct. Op., ECF No. 10-1 at 49) (citing Rega I, 933 A.2d at 1024-29.) The PCRA court then reviewed the merits of Rega's current allegations. (Id. at 49-58.) It "acknowledge[d] that there existed prior to trial a wealth of information that could have been utilized as mitigation evidence at the penalty hearing" and also that trial counsel "*likewise could have more fully ascertained the nature and circumstances of the offenses underlying the (d)(9) aggravating circumstance had they obtained copies of the records pertinent to [Rega's] earlier convictions*." (Id. at 49-50

(emphasis added.)). Nevertheless, the PCRA court concluded, Rega was not entitled to relief on his claims because English's and Elliott's PCRA hearing testimony proved once again that Rega "had repeatedly instructed them to spend their time and resources working on the guilt phase, not the penalty phase[,]" and that Rega "was adamant that he would not submit to any sort of psychological assessment and that his attorneys were not to investigate his past or inquire into his mental health." (Id. at 50.) The PCRA court found that PCRA hearing testimony from one of Rega's appellate attorneys, Schenkemeyer, "also corroborated trial counsels' averments that Rega directed them not to pursue mitigation." (Id. at 52.)

In Rega's subsequent appeal, the Pennsylvania Supreme Court acknowledged, as the PCRA court had, that Rega's counsel made "various missteps" and that both the post-sentence and PCRA records showed that they lacked at least some of the "relevant training and experience" required of an attorney representing a defendant facing a capital sentencing hearing. Rega II, 70 A.3d at 791. Specifically, it observed that *"[i]t cannot reasonably be disputed, for example, that counsel should have reviewed files from the criminal convictions which the Commonwealth offered in support of the aggravating circumstance involving a significant history of prior crimes entailing the use or threat of violence."* Id. at 791 n.11 (emphasis added) (citing Rompilla v. Beard, 545 U.S. 374, 377 (2005) for the proposition that "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial").

The Pennsylvania Supreme Court denied Rega's request for sentencing-phase relief. It did so, it explained, because it had already found in Rega I that Rega had instructed his trial counsel not to pursue mental health or abusive upbringing mitigating evidence. Rega II, 70 A.3d at 790-

92. The supreme court concluded it had previously ruled upon the central matter at issue, which is that Rega "waived mitigation in relevant part."[37] Id. at 792 n.13. As a result, Rega was not entitled to PCRA relief unless there was a "manifest error" in its previous ruling. Id. at 792 (citing Commonwealth v. Uderra, 862 A.2d 74, 93-94 (Pa. 2004) ("[W]here the Court's reasoning and holding on direct appeal encompass the claim sought to be raised on collateral review, and there is no irrefutable, manifest error in the disposition, the previous litigation doctrine should be deemed to apply.").

The Pennsylvania Supreme Court held that Rega did not meet his burden because there was support in the record for the PCRA court's determination that evidence introduced at his post-conviction hearings once again established that Rega's trial counsel were acting in accordance with his instructions and desire not to present mitigating mental health or abusive upbringing evidence. Id. at 790-92. Accordingly, the supreme court held, its holding in Rega I that he "waived mitigation in relevant part," would not be disturbed and it rendered Rega unable to satisfy Strickland's prejudice prong. Id. at 792 n.13 (citing Schriro v. Landrigan, 550 U.S. 465, 475 (2007), and explaining: "In terms of the application of this Court's previous holding on direct appeal that [Rega] waived mitigation in relevant part, we observe that the United States Supreme Court has determined that, in such circumstances, a lawyer's failure to undertake an otherwise adequate mitigation investigation will not be deemed prejudicial.").

---

[37] The PCRA places the burden on the petitioner to demonstrate "[t]hat the allegation of error has not been previously litigated[.]" 42 Pa. Cons. Stat. § 9543(a)(3). "[A]n issue has been previously litigated if:… (2) the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue[.]" Id. § 9544(a)(2). A finding that an issue has been previously litigated "simply relieves Pennsylvania courts of the burden of revisiting issues which are res judicata." Boyd v. Waymart, 579 F.3d 330, 369 (3d Cir. 2009) (en banc) (separate opinion of Hardiman, J.). The Commonwealth expressly states that the Pennsylvania Supreme Court's ruling on Claim 10 is not grounds to argue the claim is procedurally defaulted, and it acknowledges that this court must review Claim 10 on the merits. (ECF No. 29 at 70-71; ECF No. 77 at 10-11.)

**Discussion**

Rega contends that this court should review Claim 10 *de novo* because, *inter alia*, the Pennsylvania Supreme Court failed to recognize that he was raising in his PCRA proceeding a fundamentally different claim of trial counsel's ineffectiveness from the one he had raised on direct appeal. (ECF No. 22 at 202-17.) As for his related ineffective assistance of appellate counsel claim, Rega contends that it was properly presented during his PCRA proceeding and was not previously litigated on direct appeal as a matter of law and fact. (Id. at 218.) Rega argues in the alternative that, if this court determines that the Pennsylvania Supreme Court adjudicated Claim 10 on the merits, he overcame the burden imposed upon him by § 2254(d)'s deferential standard of review. (Id. at 223-37.)

The Commonwealth's position is that the Pennsylvania Supreme Court adjudicated Claim 10 in Rega I and Rega II and that its decision withstands review under § 2254(d). (ECF No. 29 at 70-71; ECF No. 77 at 10-11). It argues that the record supports the supreme court's holding that Rega waived a more thorough mitigation investigation and that, "[i]f anything, the picture became even more clear during the PCRA proceedings." (Id. at 65.) The Commonwealth argues that this case is analogous to Landrigan because Rega "specifically instructed" his trial attorneys "not to pursue mitigation evidence." (ECF No. 77 at 11.) Significantly, the Commonwealth does not discuss Rega's specific allegation that his trial counsel were ineffective for failing to investigate his prior criminal records in order support the argument that the jury should not find the § 9711(d)(9) aggravating factor or give it little to no weight. It does not dispute Rega's description of both the relevance of those records and the ways in which his trial counsel and his appellate counsel could have utilized them had they conducted a proper investigation.

This court does not need to resolve whether AEDPA's standard of review at § 2254(d) applies to Claim 10 in its entirety, or to some parts of it. If § 2254(d)'s deferential standard of review applies, Rega overcame it for the reason discussed below. Even if this court affords deference under both § 2254(e)(1) and § 2254(d)(2) to the state courts's finding of fact that he instructed his counsel not to investigate mitigating evidence pertaining to his mental health or abusive upbringing and to concentrate their efforts on obtaining an acquittal, that did not relieve trial counsel of their independent duty to investigate and present available evidence to challenge the § 9711(d)(9) aggravating factor, and they were ineffective for failing to do so.

In a capital case, counsel "must make sufficient 'efforts to discover *all reasonably available* mitigating evidence *and evidence to rebut any aggravating evidence that may be introduced by the prosecutor*.'" Blystone v. Horn, 664 F.3d 397, 420 (3d Cir. 2011) (quoting Wiggins v. Smith, 539 U.S. 510, 524 (2003) (emphasis supplied by Wiggins, quotation marks in it omitted by the court of appeals); see Rompilla, 545 U.S. at 383-90. Additionally, "'[t]he investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered.'" Id. at 422 (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, Guideline 11.4.1.(C)). The state court found that Rega gave his counsel reason to believe it would be fruitless for them to investigate mental health and abusive upbringing mitigating evidence because he would not cooperate with the development of that evidence or allow it to be introduced at his sentencing hearing. However, it does not follow that Rega's conduct relieved his counsel of their duty to investigate his prior criminal record in order to rebut the § 9711(d)(9) aggravator and persuade jurors not to find it or, if they did, to give it little or no weight in their deliberations. In fact, investigating and rebutting that aggravating circumstance would have

provided trial counsel with the means of attacking the Commonwealth's case for a death sentence while at the same time steering clear of subject matters Rega insisted they avoid.

The Pennsylvania Supreme Court acknowledged that trial counsel "should have reviewed files from the criminal convictions which the Commonwealth offered in support of the aggravating circumstance involving a significant history or prior crimes entailing the use or threat of violence." Rega II, 70 A.3d at 791 n.11. It denied Rega sentencing-phase relief because it had previously held on direct review that Rega "waived mitigation in relevant part," that Rega's PCRA evidence did not establish that that holding was manifestly erroneous, and that, therefore, Rega did not establish that he was prejudiced. Id. at 792 & n.13. That decision was an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Rega challenged the Commonwealth's case for a death sentence. He allowed his counsel to make a limited mitigation case, and even put his young daughters through the ordeal of testifying. That he did not want his counsel to present certain types of mitigating evidence did not mean that he would have interfered with his counsel's ability to investigate his prior criminal record so that they could be prepared to rebut the § 9711(d)(9) aggravator.

The United States Supreme Court's decision in Landrigan does not compel a different result. The petitioner in that case did not allow his counsel to present mitigating evidence[38] and interrupted his counsel when he was responding to the trial court's request to make a proffer of what mitigating evidence counsel would present if the petitioner had permitted him to make a case for his life. Landrigan, 550 U.S. at 469-70. At the conclusion of his sentencing hearing, the petitioner told the sentencing court: "I think if you want to give me the death penalty, just bring it

---

[38] "Landrigan's counsel attempted to present the testimony of Landrigan's ex-wife and birth mother as mitigating evidence. But at Landrigan's request, both women refused to testify." Landrigan, 550 U.S. at 469.

right on. I'm ready for it." Id. at 470 (internal quotation and citation omitted.) The state court denied the petitioner's subsequent ineffective assistance of counsel claim because the petitioner had instructed his counsel not to offer mitigating evidence. The United States Supreme Court held that the state court's decision was not an "unreasonable determination of the facts" under § 2254(d)(2). Id. at 471, 475-77. In light of that state-court finding, the Court held, the petitioner could not establish Strickland's prejudice prong. Id. at 475 ("If [the petitioner] issued such an instruction, counsel's failure to investigate further could not have been prejudicial under Strickland."); id. at 476 (the petitioner's "behavior confirms what is plain from the transcript of the colloquy: that [he] would have undermined the presentation of any mitigating evidence that his attorney might have uncovered."); id. at 477 ("[B]ecause of his established recalcitrance, [the petitioner] could not demonstrate prejudice under Strickland even if [the district court had] granted an evidentiary hearing.").

Here, Rega did permit his counsel to make a case for a life sentence and did allow them to present some mitigating evidence. In contrast to Landrigan, this court cannot "conclude that regardless of what information counsel might have uncovered in [their] investigation, [Rega] would have interrupted and refused to allow his counsel to present" evidence to challenge the § 9711(d)(9) aggravating circumstance had they prepared to do so. 550 U.S. at 476.

Rega demonstrated to this court that he was prejudiced by his trial counsel's failure to investigate and present evidence to rebut the § 9711(d)(9) aggravating circumstance, and that the Pennsylvania Supreme Court's decision that he suffered no prejudice was an "unreasonable application of" that prong of the Strickland analysis. Had counsel investigated and been properly prepared to support the argument that Rega's prior criminal record was non-violent, it is reasonably probable that they could have diminished the weight the jury gave to the § 9711(d)(9) aggravator, if not entirely rebutted it. It is also reasonably probable that those efforts would have

119

bolstered a juror's assessment of Rega's mitigation case, since the Commonwealth relied upon Rega's prior convictions to undercut the strength of the mitigating testimony counsel did present.

Importantly, as set forth above, under Pennsylvania law, the jury had to find unanimously an aggravating circumstance, and its sentence of death had to be unanimous. See Blystone, 664 F.3d at 427 (prejudice can be shown if there is a reasonable probability that one juror would not have sentenced the defendant to death); Jermyn v. Horn, 266 F.3d 257, 309 (3d Cir. 2001) (same). Because Rega's trial counsel failed to prepare to rebut the § 9711(d)(9) aggravating circumstance, counsel was unable to present an effective case to persuade a juror to reject it outright, or to give it little to no weight in the deliberations. While the evidence at issue may not have swayed every juror, Rega need only show a reasonable probability that one juror would have found death an inappropriate punishment. He met that burden. To the extent that the Pennsylvania Supreme Court held otherwise, its decision was more than just wrong. It "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

Rega demonstrated that his appellate counsel performed deficiently for not presenting or properly arguing on direct appeal that his trial counsel were ineffective for failing to rebut the § 9711(d)(9) aggravating circumstance. If the Pennsylvania Supreme Court ruled upon this claim of appellate counsel's ineffectiveness, it denied it because it rejected the underlying claim pertaining to trial counsel's performance. Rega II, 70 A.3d at 780 n.2. This court already determined that the Pennsylvania Supreme Court's decision in that regard does not survive review under § 2254(d) and that Rega demonstrated that his trial counsel rendered constitutionally ineffective assistance.

Rega convincingly argues that appellate counsel failed to litigate properly the underlying claim of trial counsel's ineffectiveness on direct appeal, even though both English and Elliott

testified at the post-sentence hearings that they did no investigating in order to rebut the § 9711(d)(9) aggravating circumstance despite knowing for more than a year before Rega's trial that the Commonwealth would attempt to prove it at the capital sentencing hearing. Appellate counsel did not obtain all of Rega's prior criminal records, including the records pertaining to his 1985 Oklahoma burglary conviction. These failures are inexplicable, given the importance of the § 9711(d)(9) aggravator to the Commonwealth's case for death.

Rega was prejudiced by his appellate counsel's deficient performance. Had they properly litigated and briefed the issue of trial counsel's ineffectiveness for failing to rebut the § 9711(d)(9) aggravating circumstance, there is a reasonable probability that Rega would have received sentencing-phase relief on direct appeal.

Based upon all the foregoing, Rega met his burden of demonstrating that he is entitled to a new capital sentencing hearing.[39] If the Commonwealth still seeks the death penalty for Rega, it must conduct a new hearing to determine whether he should receive a life or death sentence.

An appropriate order will be entered.


/s/ Joy Flowers Conti
Joy Flowers Conti
Dated: February 15, 2018                Chief United States District Court Judge

---

[39] This court's determination that Claim 10 entitles Rega to sentencing-phase relief renders it unnecessary for the court to address his remaining sentencing-phase claims. Any relief that he could obtain on them would be cumulative.